JUDGE JONES

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

08 CIV 6613

|  |  |  |
|---|---|---|
| ——————————————————— x |  |  |
| PLUMBERS, PIPEFITTERS AND APPRENTICES LOCAL NO. 112 PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | : : : : : | Civil Action No.

CLASS ACTION

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| Plaintiff, | : : |  |
| vs. | : : |  |
| CIT GROUP INC., JEFFREY M. PEEK and JOSEPH M. LEONE, | : : : |  |
| Defendants. | : : |  |
| ——————————————————— x | : | DEMAND FOR JURY TRIAL |



## INTRODUCTION AND OVERVIEW

1.      This is a class action for violations of the anti-fraud provisions of the federal securities laws on behalf of all purchasers of CIT Group Inc. ("CIT" or the "Company") common stock between April 18, 2007 and March 5, 2008 (the "Class Period"), who were damaged thereby (the "Class").

2.      CIT is a leading commercial and consumer finance company, providing clients with financing and leasing products and advisory services in North America, Europe, Latin America and Asia Pacific.  The Company was founded in 1908 and is headquartered in New York, New York.

3.      During the Class Period, defendants made false and misleading statements about the Company's financial condition.  Specifically, CIT's public financial statements failed to account for tens of millions of dollars in loans to Silver State Helicopter ("Silver State"), which were highly unlikely to be repaid and should have been written off.

4.      On March 6, 2008, *Associated Press* published an article entitled "CIT shares plunge on potential write-off," which stated in part:

> Shares in CIT Group Inc. plunged Thursday after an analyst slashed its earnings target for the lender on concerns that the company will take a massive charge to write down its student loan portfolio.
>
> *       *       *
>
> Keefe, Bruyette & Woods analyst Sameer Gokhale now expects the company to earn 8 cents per share in the first quarter instead of his previous estimate of 76 cents per share.
>
> "We believe there is increased risk that the company will have to charge off $179 million of private student loans made to students of a flight school which recently filed for bankruptcy," he wrote in a note to investors.
>
> He said the students did not receive their licenses and are less likely to be able to repay the loans.

- 1 -

5.     As a result, CIT's stock price dropped $4.50 to close to $15.86 on March 6, 2008. This decrease in CIT's stock price was a result of the artificial inflation caused by defendants' misleading statements coming out of the stock price.

## JURISDICTION AND VENUE

6.     The claims asserted herein arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5. Jurisdiction is conferred by §27 of the 1934 Act. Venue is proper pursuant to §27 of the 1934 Act. CIT's headquarters are located in New York, New York, and false statements were made in this District and acts giving rise to the violations complained of occurred in this District.

## THE PARTIES

7.     Plaintiff Plumbers, Pipefitters and Apprentices Local No. 112 Pension Fund purchased CIT stock during the Class Period as set forth in the attached certification and was damaged thereby.

8.     Defendant CIT is a commercial and consumer finance company with its headquarters located in New York, New York. CIT's stock is traded under the symbol CIT on the New York Stock Exchange, which is an efficient market.

9.     Defendant Jeffrey M. Peek ("Peek") was, at all relevant times, Chairman and Chief Executive Office ("CEO") of the Company.

10.     Defendant Joseph M. Leone was, at all relevant times, Vice Chairman and Chief Financial Officer ("CFO") of the Company.

## FALSE AND MISLEADING STATEMENTS
## DURING THE CLASS PERIOD

11.     On April 18, 2007, the Company issued a press release entitled "CIT Reports Record

First Quarter Results; Strong Revenue and Origination Growth, Moderating Expense Trends and

Low Net Charge-Offs." The release stated in part:

> CIT Group Inc. today reported diluted earnings per share (EPS) of $1.37 for the
> quarter, up from $1.12 for the 2006 quarter. Net income available to common
> shareholders was $271.4 million and $229.7 million for the current and prior year
> quarters.
>
>     Excluding noteworthy items, diluted EPS of $1.30 ($257.8 million net
> income available to common shareholders) for the quarter improved 15% from $1.13
> ($230.6 million) in 2006. On this basis, return on average common equity was
> 14.8%, up from 14.2% last year.
>
>     The current quarter noteworthy items increased EPS by $0.07 including a tax
> expense reduction of $20.6 million due to the release of certain international tax
> reserves ($0.10 diluted EPS increase) and an interest expense increase of $14.8
> million due to certain costs related to early extinguishments of high cost debt ($0.04
> diluted EPS decrease). . . .
>
>     "CIT is off to a solid start in 2007 with our operating EPS increasing 15%
> from a year ago," said Jeffrey M. Peek, Chairman and Chief Executive Officer of
> CIT. "The key drivers of our success have been broad-based and are rooted in the
> growth strategies and initiatives that are building CIT's future. Our sales force
> investment continues to pay dividends. Top-line revenue grew 14% as a result of our
> 24% increase in new business volume.

12.     On April 18, 2007, on the Company's Q1 2007 earnings conference call, defendants

made the following statements:

> [Peek:] Second, in conjunction with our own internal review of Student Loan
> Xpress, a business we acquired in 2005, and under review by the New York Attorney
> General's Office, we took decisive action and placed three senior SLX executives on
> administrative leave. Randy Chesler, President of CIT Consumer Finance, has
> assumed interim oversight of the organization.
>
>     CIT's solid reputation for many years has been built on a foundation of
> integrity and trust. The keystone of that reputation remains our commitment to
> maintaining best-in-class corporate governance practices and our internal code of
> business contact. We will continue to cooperate fully and closely with the Attorney

General's Office as we go up to come to a timely resolution on this student lending matter.

*    *    *

Laura Kaster – Sander O'Neill – Analyst

. . . I have one question on student lending and then a follow-up on your CLO business. So can we infer from your comments that you are definitively not selling your student lending business despite the premium that Sallie Mae received for their LBL?

. . . [Peek:] Our process on evaluating these businesses really hasn't changed much. We continue to review them on an annual basis as to whether they can get to our corporate hurdle rates and we try to tack back to that on a continuous basis. I think, as you know and a number of other close observers of the Company, SLX has really done a terrific job in terms of growth. They've really exceeded all of our growth objectives. We bought it two years ago. The Company is more than twice the size of when we bought it , so we continue to review all our businesses and are very committed to fixing or divesting those that we don't think can get through the corporate hurdle rate within a reasonable period of time, and that will really apply to SLX just the same way it applies to all of the other business.

13.    On April 24, 2007, at the AFSA 7th Finance Industry Conference for International Fixed-Income Investors, defendants made the following statements:

Unidentified Company Participant

*    *    *

And then finally our student lending business, which is another one that's been in the news for a couple of reasons. One, on the legislative front, you've all heard about some of the legislation being contemplated in Washington around changes to the program, whether it be changing the level of guarantee, or changing the spread that can be offered to the obligors. So there's a number of uncertainties in this business. This is a portfolio of a business that we acquired a couple years ago. We have been quite pleased with the performance of this business; we have grown it to more than twice the size it was when we first acquired it. It continues to make good progress in generating the returns that we're expecting; so those metrics are quite positive.

*    *    *

But we also take our governance practices very seriously, and among the areas of investigation, there was a question around a few of our executives prior to us acquiring the business that related to an offering of shares on a private basis. And, again, we view integrity and trust very highly; we think it's critical to CIT and the

- 4 -

way we conduct business, and we've put those three individuals on a leave of absence pending our own internal investigation. So, again, I just want to reinforce the fact that integrity is critically important to CIT and we hold ourselves to very high standards in that regard.

14.    On May 8, 2007, the Company filed a Form 10-Q with the SEC, which stated in part:

Student Loan Investigation

Student Loan Xpress, Inc. ("SLX"), a subsidiary of CIT, is engaged in the student lending business. During the quarter ended March 31, 2007, in connection with investigations into the relationships between student lenders and the colleges and universities that recommend such lenders to their students, CIT and/or SLX have received requests for information from the Attorneys General of the State of New York and several other states and federal government bodies. CIT engaged outside legal counsel to conduct a review of the business practices that are the subject of the investigations and to support CIT in responding to the information requests. The internal review is ongoing, and CIT is fully cooperating with the investigations.

*       *       *

Student Lending (Student Loan Xpress)

The Consumer Finance student lending portfolio, which is marketed as Student Loan Xpress, totaled $9.9 billion at March 31, 2007, representing 13% of owned and 12% of managed assets. Loan origination volumes were $1.8 billion and $1.6 billion for the quarters ended March 31, 2007 and 2006. Student Loan Xpress has arrangements with certain financial institutions to sell selected loans and works jointly with these financial institutions to promote these relationships.

15.    On July 18, 2007, the Company issued a press release entitled "CIT Reports Second

Quarter Results; Exiting Home Lending Business," which stated in part:

- Loss of $0.70 per share, with $2.58 per share loss on home lending business exit

- $0.71 per share gain on sale of U.S. construction portfolio

*       *       *

CIT Group Inc. today reported a diluted loss per share of $0.70 for the 2007 quarter, versus $1.16 of earnings per share for the 2006 quarter. The net loss attributable to common shareholders was $134.5 million for the current quarter, versus $236.0 million income for the prior year quarter.

16.    On July 18, 2007, on the Company's Q2 2007 earnings conference call, defendants made the following statements:

[Peek:]  Finally, in consumer small business lending, the performance and growth of our student loan business has been overshadowed by the uncertainty of pending legislation on Capitol Hill. As the fog lessens there, we're closely monitoring the situation and evaluating how well our model would perform in the face of shifting industry dynamics. In the immediate future, we expect this business to have a solid second half of the year. As typically their third quarter is the strongest origination quarter and the fourth quarter benefits from increased home loan sales.

*      *      *

Chris Brendler – Stifel Nicolaus – Analyst

One final question. If you decide to exit the student lending business next, would we see anywhere near as big an impact on your earnings?

[Leone:]  You mean in terms of the operating earnings contribution? I would say no.

Chris Brendler – Stifel Nicolaus – Analyst

And the write-down?

[Leone:]  We didn't evaluate that. As I said before, we have about $300 million of goodwill and I think as Jeff said, the business is twice as big as it was when we bought it.

Chris Brendler – Stifel Nicolaus – Analyst

But there's almost no credit risk in that business.

[Leone:]  That's right. And all those loans, the historical book is at the old rate or the grandfathered rate, so to speak.

17.    On August 7, 2007, the Company filed a Form 10-Q with the SEC, which stated in part:

Student lending delinquencies were $487.7 million (5.03%) at June 30, 2007, up from $452.9 million (4.77%) at March 31, 2007 and $400.1 million (4.71%) at December 31, 2006. The higher delinquency in the student loan portfolio is not indicative of potential loss due to the underlying U.S. government guarantee of 97%-98% of the remaining principal amount.

*      *      *

- 6 -

Student Lending (Student Loan Xpress)

The Consumer Finance student lending portfolio, which is marketed as Student Loan Xpress, totaled $10.3 billion at June 30, 2007, representing 14% of owned and 13% of managed assets. Loan origination volumes were $1.3 billion for both quarters ended June 30, 2007 and 2006 and $3.2 billion and $2.9 billion for the six months then ended. Student Loan Xpress has arrangements with certain financial institutions to sell selected loans and works jointly with these financial institutions to promote these relationships.

18.     On September 11, 2007, at the Lehman Brothers 5th Annual Services Conference, defendants made the following statements:

[Peek:] Let me just hit on student lending here. . . . Operationally, the business is in the midst of its strongest operating quarter. We had record originations in July and the school channel in August. We were up 49% over loans originated in the school channel in 2006.

19.     On October 17, 2007, the Company issued a press release entitled "CIT Reports Third Quarter Results; Quarterly Financial Highlights," which stated in part:

CIT Group Inc. today reported diluted net loss per share of $0.24 for the third quarter of 2007, due to the home lending charge, versus $1.44 of earnings per share for the 2006 quarter. Net loss attributable to common shareholders was $46.3 million for the current quarter, versus net income of $290.8 million last year.

20.     On October 17, 2007, on the Company's Q3 2007 earnings conference call, defendants made the following statements:

[Peek:] And finally, an update on student lending. Our team did a great job delivering record new business volume in what is seasonally the most important quarter of the year. School channel originations were up 17% from a year ago, and that is important because with the new legislation, in-school originations are, far and away, the most profitable for us.

21.     On November 5, 2007, the Company filed a Form 10-Q with the SEC, which stated in part:

Student Lending (Student Loan Xpress)

The Consumer Finance student lending portfolio, which is marketed as Student Loan Xpress, totaled $11.5 billion at September 30, 2007, representing 14.9% of owned and 13.7% of managed assets. Loan origination volumes were $1.8

billion for the quarters ended September 30, 2007 and 2006 and $5.0 billion and $4.7 billion for the nine months then ended. Student Loan Xpress has arrangements with certain financial institutions to sell selected loans and works jointly with these financial institutions to promote these relationships.

22.     On November 15, 2007, at the Merrill Lynch Banking and Financial Services Investor Conference, defendants made the following statements:

Unidentified Audience Member

Joe, could you talk about the student lending business? There is [sic] been a lot of change in that business in the last 12 months from just what's going on on the M&A front and on the governmental front?

*      *      *

[Leone:] That's great. I would add, we like the business. Until 2007, it was liquid, it had a low risk element to it, it was leverageable. We had a company that we were creating operating efficiencies with, but then clearly those laws changed when that happened. And as Ken said, I think the couple of things that we have to do is we have to remodel the business because some of the parts of the business do not work under existing legislation. So part of the efforts we'll have over the next few months is remodeling the business, as Ken said – more focus on the school channel, less focus on direct marketing, dropping envelopes into everybody's mailbox and see who responds. It's too expensive relative to the rate.

*      *      *

Having said that, there is interest in this business because it has – it really does have a good growth demographic as many of you think about who would take a student loan and why. And that's one of the reasons we got into it. It still has that good growth demographic. The question is, how much ROE can you get on even the limited amount of E that you have to put into it.

23.     On December 11, 2007, at the Goldman Sachs Financial Services Conference, defendants made the following statements:

[Peek:] Consumer – just to round it out, we are redefining our student lending strategy in light of the new legislation. We have effectively exited the consolidation loan and the private loan channels and we're concentrating on the government guaranteed school channel. In that channel, we really have experienced good success and good growth and we'll continue to evaluate our strategy and the competitive landscape as that becomes a little clearer.

24.    On January 17, 2008, the Company issued a press release entitled "CIT Reports Fourth Quarter Results; Quarterly Financial Highlights," which stated in part:

> CIT Group Inc. today reported a net loss of $130.7 million, or $0.69 per share, for the fourth quarter of 2007, reflecting the impact of several noteworthy items discussed below, versus net income of $259.3 million, or $1.28 of diluted earnings per share, for the 2006 quarter. For the full year, the net loss attributable to common shareholders was $111.0 million for 2007, versus net income of $1,015.8 million last year.
>
> "We were not pleased with our reported loss this quarter, which primarily related to charges on our home lending and student lending businesses – two sectors that have recently experienced significant change."
>
> *      *      *
>
> Fourth quarter results include the following previously disclosed items:
>
> *      *      *
>
> •    A $313 million goodwill and intangible asset impairment charge related to the Company's student lending business, reflecting decreased market valuations for student lending businesses, and lower profit expectations as a result of higher funding costs (decrease to EPS of $1.59) . . . .

25.    On January 17, 2008, on the Company's Q4 2007 earnings conference call, defendants made the following statements:

> [Leone:]  Given the change in the student lending landscape, with declining pier valuations, plus higher funding costs for this asset class – as a matter of fact, ABS spreads are higher by about 50 basis points today than they were when we started the second quarter into the third quarter. We ended the second quarter into the third quarter. As a result of these two factors, our estimates of fair value no longer supported the goodwill and intangibles for the student lending business. We took a non-cash write, it had no impact on our tangible book or our capital metrics, but it did reduce income by almost the full amount as there was very little tax benefit booked on this charge.
>
> *      *      *
>
> We'll also continue to modify the student lending business model to reflect the new, market, and legislative realities. By that, we'll continue to de-emphasize consolidation loans and private loans in favor of guarantee loans originated in the school channel. As you know, securitization markets are an important source of

funding for these assets, so we'll have to monitor the condition of that market closely.

26.    On February 8, 2008, at the Credit Suisse Group Financial Services Forum,

defendants made the following statements:

> [Peek:] We did, however, as I think many of you know, report a loss for the year due to the charges we took in our consumer businesses. About $1.5 billion against our home lending portfolio and over $300 million in writing-off the goodwill and intangibles from our student lending acquisition in 2005.

*      *      *

> Despite, certainly, in the second half of 2007, despite a lot of the market dislocation, we clearly stayed open for business with our customers. As the year progresses, we went through 2007, we started to significantly deemphasize our consumer businesses. In August, we closed our origination network for home lending and as we got into the new legislation in student lending in the fourth quarter, we changed our business platform just to conform to the change of focus in the new legislation.

*      *      *

> In terms of student lending, let me just give you a brief update on that. We wrote off all the goodwill and the intangibles, a little over $300 million in the fourth quarter. We have effectively stopped making new consolidation in private loans. We're still making the FFELP loans in the school channel. They're not as profitable as they were six months ago. Here, we are going to continue to monitor the competitive and the legislative landscape and look at our strategic alternatives over time.

*      *      *

> Our largest industry concentration is student lending, where 95% of the assets are FFELP loans guaranteed by the government as to 97% principal.

27.    On February 29, 2008, the Company filed a Form 10-K with the SEC, which stated in

part:

> Consumer delinquency increased in 2007 driven by Student Lending. Delinquencies on student loans for which there is a 97% government guarantee totaled $569.1 million (5.23%) and $399.0 million (4.88%) at December 31, 2007 and 2006. Higher delinquency in this component of our student loan portfolio is not indicative of potential loss due to the underlying U.S. government guarantee on the majority of the loan balance. Delinquencies on non-government guaranteed private loans totaled $12.7 million (2.03%) and $1.1 million (0.35%) at December 31, 2007

- 10 -

and 2006. Approximately $445 million (75%) of the private loan portfolio is not yet in repayment status, which begins upon graduation, or when students no longer attend the school. As more loans enter repayment status, it is possible that we will experience increasing delinquencies in the portfolio.

\*       \*       \*

Student Lending (Student Loan Xpress)

The Consumer Finance student lending portfolio, which is marketed as Student Loan Xpress, totaled $11.6 billion at December 31, 2007, representing 15.1% of owned and 13.9% of managed assets. Loan origination volumes totaled $5.9 billion in 2007, $6.3 billion in 2006, and $2.4 billion for the period of CIT ownership beginning in February 2005. Student Loan Xpress has arrangements with certain financial institutions to sell selected loans and works jointly with these financial institutions to promote these relationships. These sales are held on-balance sheet and are further described in "On-balance Sheet Securitization Transactions."

\*       \*       \*

The Company ceased originating private (unguaranteed) student loans in late 2007 based on an evaluation of the return and risk characteristics of this student lending product, but has continued to fund pre-existing loan commitments. In February 2008, a private pilot training school filed bankruptcy. Our student lending business had originated private (unguaranteed) loans to students of the school, which totaled approximately $196 million in total principal and accrued interest as of December 31, 2007. We ceased originating new loans to students of this school in mid-2007. Approximately $17 million of the total loans represents loans to students who have completed their education (loans in "repayment"); the remainder is to students who have not yet completed their training. Loans in repayment to students of this school that were past due loans 60 days or more were approximately $2.0 million at December 31, 2007. Collectibility of the outstanding principal and interest balance of loans that have both reached, and have not yet reached repayment status, will depend on a number of factors, including the student's current ability to repay the loan, whether a student has completed the licensing requirements, whether a student can complete any remaining education requirements at another institution (including making further tuition payments and accessing previous education records) and satisfy any remaining licensing requirements.

Management is currently evaluating the collectibility and projected cash flows related to these loans. Given that the loans are unsecured and that uncertainties exist regarding collection, management currently expects that additional reserves may be required in 2008 in connection with these loans.

## DEFENDANTS' STATEMENTS WERE FALSE

28.    Defendants' statements were materially false and misleading because they failed to reflect tens of millions of dollars of bad loans the Company had made to students of Silver State, a helicopter flight training school headquartered in Las Vegas with locations throughout the U.S. These loans were highly unlikely to be repaid because Silver State was nothing more than a pyramid scheme.  Silver State recruited unwitting students with seminars promising to train them in 18 months for high paying careers as helicopter pilots.  Silver State then arranged for these students to obtain loans for the school's tuition – $70,000 for the 18-month course – from lenders, including CIT.

29.    Also unlike other flight training schools, Silver State promised graduates a job with the school after graduation – as flight instructors.  Thus, the tuition of the students paid the salaries of the graduates who trained ever more future instructors.  A new student's tuition did not pay for their own instruction, but rather the school's immediate expenses.  That student's instruction was then paid for by the tuition from future students, provided they enrolled, in a classic pyramid scheme. Further compounding its problems, Silver State did not have enough helicopters to train its ever-growing student body in 18 months.  Once their 18 months was up, students were either expelled or required to borrow and pay more tuition.

30.    On January 31, 2008, Citibank refused to provide any further loans to Silver State students since they would likely never be repaid.  The next day, on February 1, 2008, Silver State declared bankruptcy and shut its doors.  Bankruptcy filings have revealed assets of $50,000 and liabilities in the tens of millions of dollars.

31.    During the Class Period, CIT had outstanding loans to Silver State students in the following amounts:

- 12 -

| Q1 07 | Q2 07 | Q3 07 | Q4 07 |
|-------|-------|-------|-------|
| $141 million | $165 million | $186 million | $196 million |

32.     During the Class Period, CIT knew that these loans were very unlikely to be repaid

and that they should have been written off.  By failing to do so, defendants rendered their financial

statements materially false and misleading.  Since the Class Period, CIT has written off all of those

loans to Silver State students.

## THE TRUTH BEGINS TO COME TO LIGHT

33.     On March 6, 2008, Keefe, Bruyette & Woods issued the following analyst report on

the Company:

> (CIT, $20.36, Outperform, Target: $39.00)
>
> CIT: *Adjusting Q108 Estimate for Likely Student Loan Write-down*
>
> **Event** – As a follow-up to our initial thoughts published on March 3, we are lowering our Q108 EPS estimate to $0.08 from $0.76 to reflect our view that the company will have to write-down a significant portion of its private student loan portfolio.

34.     On March 6, 2008, *Associated Press* published an article entitled "CIT shares plunge

on potential write-off," which stated in part:

> Shares in CIT Group Inc. plunged Thursday after an analyst slashed its earnings target for the lender on concerns that the company will take a massive charge to write down its student loan portfolio.
>
> CIT shares lost $4.50, or 22.1 percent, to $15.86 Thursday. Earlier in the session the stock hit a 52-week low of $15, well below the previous mark of $19.05.
>
> Keefe, Bruyette & Woods analyst Sameer Gokhale now expects the company to earn 8 cents per share in the first quarter instead of his previous estimate of 76 cents per share.
>
> "We believe there is increased risk that the company will have to charge off $179 million of private student loans made to students of a flight school which recently filed for bankruptcy," he wrote in a note to investors.
>
> He said the students did not receive their licenses and are less likely to be able to repay the loans. Because the loans are private, they cannot be written off in personal bankruptcy, he said.

- 13 -

35.    As a result of these disclosures, CIT's stock price dropped from $20.36 to $15.86 the next day.  This decrease in CIT's stock price was a result of the artificial inflation caused by defendants' misleading statements coming out of the stock price.

## SCIENTER

36.    During the Class Period, the defendants had both the motive and opportunity to conduct fraud.  They also had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time.  In so doing, the defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of CIT common stock during the Class Period.

## CIT'S FALSE FINANCIAL
## REPORTING DURING THE CLASS PERIOD

37.    In order to inflate the price of CIT's stock, defendants caused the Company to falsely report its results for the first three quarters of 2007 by failing to adequately accrue its loan loss provisions with respect to its Silver State loan portfolio which overstated the Company's net income.

38.    The results for the first three quarters of 2007 were included in Forms 10-Q filed with the SEC.  The results were also included in press releases disseminated to the public.

39.    These representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information a "fair representation" of CIT's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

40.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the

SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

41.    With respect to accounting for contingencies, GAAP, as set forth in FASB Statement of Financial Accounting Standard No. 5, *Accounting for Contingencies*, ¶8, states:

> An estimated loss from a loss contingency . . . shall be accrued by a charge to income if *both* of the following conditions are met:
>
> a.    Information available prior to issuance of the financial statements indicates that it is probable that an asset has been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
>
> b.    The amount of loss can be reasonably estimated.

(Emphasis in original, footnote omitted.)

42.    In violation of GAAP, CIT failed to provide an adequate reserve for its loan loss provision related to its Silver State loan portfolio. Despite evidence that loans provided to students attending Silver State schools would very likely never be paid back, the Company failed to provide an adequate reserve for its borrowers attending Silver State schools.

43.    Until recently, CIT offered financing to the student loan market through its student lending unit Student Loan Xpress. Student Loan Xpress originated both government-guaranteed student loans made under the Federal Family Education Loan Program ("FFELP") and non-federal guaranteed Private Education Loans. Due to turmoil in the credit markets and a new federal law enacted in the third quarter of 2007 that slashed subsidies to the private companies that make government-backed student loans, CIT decided to exit the student lending industry. CIT

- 15 -

discontinued offering private student loans during the fourth quarter of 2007 and further discontinued originating all student loans, including U.S. government guaranteed loans, in April 2008.

44.    CIT offers its loans to students attending both traditional schools and non-traditional schools. Traditional schools are typically institutions of higher education that are not-for-profit and offer bachelors and graduate degrees. Non-traditional schools are typically educational institutions that are for-profit and offer associate degrees and/or vocational, career or technical programs. For-profit schools are institutions that are run by private profit-seeking companies or organizations.

45.    The graduation rate at the non-traditional schools is much lower than the graduation rate at the typical schools. Graduation is critical to student loan lenders as graduates tend to earn more and experience lower rates of unemployment than non-graduates, both of which are key factors for borrowers being able to pay back their student loans. Additionally, the students attending non-traditional schools tend to have a lower tier credit quality and many of them fall into the category of subprime borrowers.

46.    The majority of CIT's private loans were made to non-traditional schools – and a large portion of these were made to students at Silver State. As of March 31, 2008, 65% of CIT's private student loans fell into this category. Furthermore, as of year-end December 31, 2007, CIT held $599.3 million of finance receivables related to private student loans; students attending Silver State held approximately $196 million of the outstanding student loans – over 32% of CIT's total private student loan balance was concentrated in this one non-traditional school. In light of the significant concentration of loans at this one institution, as well as the fact that Silver State was a non-traditional school, CIT should have been prompted to perform additional due diligence on Silver State.

47.   Despite evidence that CIT's loan loss provisions for its borrowers attending Silver State were inadequate both prior to and at the start of the Class Period, CIT failed to adequately reserve for losses in its non-traditional portfolio.

48.   Ultimately, CIT was forced to take a charge to increase its loan loss provision by $111.50 million in the first quarter of 2008 in order to cover actual and expected loan losses specifically related to its Silver State portfolio, which stood at $194.6 million at March 31, 2008. The Company may be required to take additional charges in the future related to Silver State.

49.   Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)   The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)   The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)   The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)   The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers

- 17 -

securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)    The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)    The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, 95, 97).

50.    Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities

analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## LOSS CAUSATION/ECONOMIC LOSS

51.    During the Class Period, as detailed herein, defendants made false and misleading statements about the Company's financial condition and engaged in a scheme to deceive the market. This artificially inflated CIT's stock price and operated as a fraud or deceit on the Class. Later, when defendants' prior misrepresentations and fraudulent conduct became apparent to the market, CIT's stock price fell precipitously, as the prior artificial inflation came out of the stock price over time. As a result of their purchases of CIT common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

52.    CIT's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

53.    The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of CIT who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICABILITY OF PRESUMPTION OF
## RELIANCE:  FRAUD ON THE MARKET

54.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's stock traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)    Plaintiff and other members of the Class purchased CIT common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

55.    At all relevant times, the market for CIT securities was efficient for the following reasons, among others:

(a)    As a regulated issuer, CIT filed periodic public reports with the SEC; and

(b)    CIT regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## COUNT I

### For Violation of §10(b) of the 1934 Act
### and Rule 10b-5 Against All Defendants

56.    Plaintiff incorporates ¶¶1-55 by reference.

57.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

58.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of CIT common stock during the Class Period.

59.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for CIT common stock.  Plaintiff and the Class would not have purchased CIT common stock at the price they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

60.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of CIT common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act Against All Defendants

61.     Plaintiff incorporates ¶¶1-60 by reference.

62.     The Individual Defendants acted as controlling persons of CIT within the meaning of §20 of the 1934 Act.  By virtue of their positions and their power to control public statements about

- 21 -

CIT, the Individual Defendants had the power and ability to control the actions of CIT and its employees. CIT controlled the Individual Defendants and its other officers and employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

### CLASS ACTION ALLEGATIONS

63.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased CIT common stock during the Class Period. Excluded from the Class are defendants, directors and officers of CIT and their families and affiliates.

64.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. CIT had more than 282 million shares of stock outstanding, owned by thousands of persons.

65.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the 1934 Act was violated by defendants;

(b)     Whether defendants omitted and/or misrepresented material facts;

(c)     Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the price of CIT common stock was artificially inflated; and

- 22 -

(f)    The extent of damage sustained by Class members and the appropriate measure of damages.

66.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

67.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

68.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.    Awarding plaintiff and the members of the Class damages and interest;

C.    Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  July 25, 2008

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN

SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
MATTHEW P. MONTGOMERY
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

PLUMBERS, PIPEFITTERS AND APPRENTICES LOCAL NO. 112 PENSION FUND ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _____ day of _____, 2008.

PLUMBERS, PIPEFITTERS AND
APPRENTICES LOCAL NO. 112
PENSION FUND

By: _____

Its: _____

- 2 -

CIT GROUP

## SCHEDULE A

### SECURITIES TRANSACTIONS

Acquisitions

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 08/15/2007 | 900 | $34.33 |
| 11/14/2007 | 721 | $31.92 |
| 11/15/2007 | 379 | $30.66 |
| 11/28/2007 | 800 | $26.59 |
| 01/09/2008 | 600 | $20.13 |

Sales

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 04/25/2007 | 200 | $58.84 |
| 05/09/2007 | 200 | $60.57 |
| 12/26/2007 | 200 | $24.26 |
| 01/23/2008 | 700 | $21.29 |

*Opening position of 2,900 shares.