UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re CIT GROUP INC. SECURITIES LITIGATION | : | Master File No. 1:08-cv-06613-BSJ-THK |
| | : | CLASS ACTION |
| This Document Relates To: | : | CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL |
| ALL ACTIONS. | : | SECURITIES LAWS |
| | x | DEMAND FOR JURY TRIAL |

## INTRODUCTION AND OVERVIEW

1.      Lead Plaintiff Pensioenfonds Horeca & Catering ("PH&C") and named plaintiff Don Pizzuti ("Pizzuti") (collectively, "plaintiffs"), on behalf of themselves and all other persons similarly situated, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys.

2.      This is a class action for violations of the federal securities laws on behalf of all purchasers or acquirers of CIT Group Inc. ("CIT" or the "Company") securities from December 12, 2006 through March 5, 2008 (the "Class Period"), including all persons who purchased or acquired CIT-Z preferred stock pursuant to the October 17, 2007 CIT-Z offering, and who were damaged thereby (the "Class").

3.      This action concerns defendants' false statements and omissions regarding CIT's subprime home lending and private student lending businesses and their impact on the Company's financial results.  Throughout the Class Period, defendants failed to disclose the known risks and impairments associated with both CIT's subprime home loans and non-guaranteed, private loans to students of the sham Silver State Helicopters LLC ("Silver State") vocational school and violated Generally Accepted Accounting Principles ("GAAP") in accounting for those loans.  For four fiscal quarters, beginning in December 2006, defendants' false statements and omissions artificially inflated CIT's stock price, allowing defendants and the Company to complete a $690 million preferred stock offering, stave off dividend restrictions, protect the Company's credit and debt ratings and collect over $35.7 million in performance bonuses and insider trading proceeds.  As the truth about defendants' false statements and omissions were revealed, CIT shareholders suffered hundreds of millions of dollars in damages and the Company's common stock price plummeted from

a Class Period high of $61 per share to under $16 per share on March 6, 2008 – a 74% decline in little over seven months, from which CIT's stock price never recovered.

## CLAIMS ASSERTED IN THE COMPLAINT

4.      Lead Plaintiff PH&C asserts the first set of claims arising from allegations of securities fraud in violation of §10(b) of the Securities Exchange Act of 1934 ("1934 Act") against those defendants, CIT and certain of the Company's senior executives, who made materially false and misleading statements that caused the price of CIT securities to be artificially inflated over the course of the December 12, 2006 through March 5, 2008 Class Period.  PH&C also asserts control-person claims under §20(a) of the 1934 Act.

5.      The second set of claims arise under §§11 and 12 of the Securities Act of 1933 ("1933 Act") against those defendants who are alleged to be statutorily liable under a theory of strict liability and/or negligence for materially untrue statements and misleading omissions made in connection with the registration statement and prospectus for the October 17, 2007 offering of CIT-Z preferred shares.  Through this offering, CIT raised $690 million in desperately needed capital. Plaintiffs also assert control-person claims under §15 of the 1933 Act.

## JURISDICTION AND VENUE

6.      The claims asserted herein arise under §§11, 12(a)(2) and 15 of the 1933 Act (15 U.S.C. §§77k, 77l and 77o) and under §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §§78j(b), 78t(a) and 78t-1) and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder by the Securities and Exchange Commission ("SEC").  Jurisdiction is conferred by §22 of the 1933 Act (15 U.S.C. §77v) and §27 of the 1934 Act (15 U.S.C. §78aa).  Venue is proper pursuant to §22 of the 1933 Act and §27 of the 1934 Act.  CIT's headquarters are located at 505 Fifth Avenue, New York, New York 10017 and many of the acts and transactions constituting the violations of the securities laws alleged herein occurred in this District.

- 2 -

7.    In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchanges and markets.

## PLAINTIFFS

8.    On May 26, 2009, the Court appointed Pensioenfonds Horeca & Catering Lead Plaintiff to represent the proposed class of CIT shareholders.  PH&C is an occupational pension fund based in Zoetermeer, The Netherlands. Established for the benefit of current and former employees in the hospitality and catering industry, PH&C has 700,000 members from more than 34,000 employers. During the Class Period, PH&C purchased and held shares of CIT common stock as detailed in the chart attached hereto as Exhibit A. As a result of the defendants' conduct detailed herein, PH&C suffered damages in connection with its purchases of CIT securities.

9.    Plaintiff Don Pizzuti is a resident of Lynnfield, Massachusetts.  During the Class Period, Pizzuti purchased 44,000 shares of CIT-Z preferred stock pursuant to the October 17, 2007 offering documents as identified in the certification attached hereto as Exhibit B. As a result of defendants' false statements and omissions, Pizzuti suffered damages in connection with his purchases of CIT-Z preferred stock.

## 1934 ACT DEFENDANTS

10.    Defendant CIT is a commercial and consumer finance company with its headquarters located at 505 Fifth Avenue, New York, New York 10017.  At all relevant times, CIT's common stock traded under the symbol "CIT" and the preferred stock under the symbol "CIT-Z" or "CIT PrZ" on the New York Stock Exchange ("NYSE"), which is an efficient market.  As of February 15, 2008, there were 191,231,307 shares of CIT's common stock outstanding.

11.     Defendant Jeffrey M. Peek ("Peek") was, at all relevant times, Chairman and Chief Executive Officer ("CEO") of CIT.  During the Class Period, Peek participated in the issuance of false and misleading statements and failed to disclose the true facts about CIT's subprime home lending and student lending portfolios.  In addition to issuing statements throughout the Class Period, Peek repeatedly had the opportunity to correct the misstatements and omissions by and on behalf of CIT, and failed to do so.

(a)     As CEO and Chairman, Peek was responsible for directing CIT's financial and business affairs.  During conference calls and meetings with analysts and investors, Peek repeatedly held himself out as knowledgeable about CIT's business and financial results, including, specifically, the Company's home and student lending portfolios, credit risks and loan portfolio characteristics and reserves for losses.  Moreover, in conjunction with each of CIT's Class Period financial reports publicly filed with the SEC, Peek assured investors that he, together with Joseph M. Leone ("Leone"), was "responsible for . . . maintaining disclosure controls and . . . designed such disclosure controls and procedures . . . to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities."  At no time during the Class Period did Peek or any other defendant assert that they were not aware of material aspects of CIT's subprime home lending or student lending businesses or the Company's related loss reserves.

(b)     According to CIT's SEC filings, Peek, together with the Company's senior officers, would "regularly evaluate the consumer loan portfolio," which included the subprime home loans and private student loans, "using past due, vintage curve and other statistical tools to analyze trends and credit performance by transaction type."  During public conference calls, Peek personally assured the investors that he met with CIT's senior executives on a monthly basis to "look at the

- 4 -

[subprime home lending portfolio] reserve" and that "every quarter we talk about what the provision should be." CIT's fiscal year 2006 Form 10-K also reported that "[t]he reserve for credit losses is reviewed for adequacy based on portfolio collateral values and credit quality indicators, including charge-off experience, levels of past due loans and non-performing assets, evaluation of portfolio diversification and concentration as well as economic conditions. . . . This information is reviewed formally on a quarterly basis with senior management, including the CEO [Peek], CFO [Leone], Chief Lending Officer and Controller [William J. Taylor ("Taylor")], among others, in conjunction with setting the reserve for credit losses."[1]

> (c)    Reinforcing the claim that Peek, with CIT's senior executives, monitored and was aware of material information about the subprime home lending and student lending portfolios, the Company's SEC filings stated that Peek was the senior member of CIT's Executive Credit Committee, which oversaw and managed credit risk throughout CIT, and regularly met with the Company's Asset Quality Review Committee "to review overall credit risk, including geographic, industry and customer concentrations, and the reserve for credit losses." Peek was also the senior member of CIT's Capital Committee which was responsible for the "establishment and monitoring of risk metrics."

12.    Defendant Joseph M. Leone was, at all relevant times, Vice Chairman and Chief Financial Officer ("CFO") of the Company. Leone is a Certified Public Accountant and, prior to joining CIT, had been a Senior Audit Manager at KPMG Peat Marwick. During the Class Period, Leone participated in the issuance of false and misleading statements, including signing each of

---

[1]    At all relevant times, CIT's fiscal year ran concurrent with the calendar year. Hereinafter, fiscal year will be abbreviated FY (*e.g.*, FY 2006 for fiscal year 2006) and fiscal quarter will be abbreviated Q (*e.g.*, 1Q 2007 for the first quarter of fiscal year 2007).

CIT's financial statements, and failed to disclose the true facts about CIT's subprime home lending and student lending portfolios. In addition to issuing statements throughout the Class Period, Leone repeatedly had the opportunity to correct the misstatements and omissions by and on behalf of CIT, and failed to do so.

(a)     As CFO and Vice Chairman, Leone was responsible for monitoring and reporting CIT's financial results. During conference calls and meetings with analysts and investors, Leone repeatedly held himself as knowledgeable about CIT's financial results, and business practices, including, specifically, the Company's home and student lending portfolios, credit risks and loan portfolio characteristics and reserves for losses. Moreover, in conjunction with each of CIT's Class Period financial reports publicly filed with the SEC, Leone assured investors that he, together with Peek, was "responsible for . . . maintaining disclosure controls and . . . designed such disclosure controls and procedures . . . to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities." At no time during the Class Period did Leone ever assert that he was not aware of any material aspects of CIT's subprime home lending or student lending businesses or the Company's related loss reserves.

(b)     Throughout the Class Period, Leone was the senior executive on CIT's Internal Controls Committee, which was responsible for monitoring and improving the Company's internal controls and compliance with SEC reporting and disclosure regulations. Leone was also a senior member of CIT's Asset Quality Review Committee, which, according the CIT's FY 2006 Form 10-K, reviewed "portfolio performance, including the status of individual financing and leasing assets." Further, Leone was responsible for overseeing market risk management, including the review and monitoring of CIT's credit exposure which defendants publicly asserted was intended to "identify, as early as possible, customers that may be experiencing declining creditworthiness or

financial difficulty, and periodically evaluate the performance of our finance receivables across the entire organization . . . [including] concentrations by borrower."

(c)     According to CIT's SEC filings, Leone, together with the Company's senior officers, would "regularly evaluate the consumer loan portfolio," which included the subprime home loans and private student loans, "using past due, vintage curve and other statistical tools to analyze trends and credit performance by transaction type." During public conference calls, Peek personally assured the investors that he met with CIT's senior executives, which would include Leone, on a monthly basis to "look at the [subprime home loan portfolio] reserve" and that "every quarter we talk about what the provision should be." CIT's FY 2006 Form 10-K also reported that "[t]he reserve for credit losses is reviewed for adequacy based on portfolio collateral values and credit quality indicators, including charge-off experience, levels of past due loans and non-performing assets, evaluation of portfolio diversification and concentration as well as economic conditions…. This information is reviewed formally on a quarterly basis with senior management, including the CEO [Peek], CFO [Leone], Chief Lending Officer and Controller [Taylor], among others, in conjunction with setting the reserve for credit losses."

13.     Defendant Thomas B. Hallman ("Hallman") was, at all relevant times until his retirement from CIT in December 2007, Vice Chairman and Head of CIT's Specialty Finance Unit. The Specialty Finance Unit under Hallman, and his successor Randy Chesler ("Chesler"), included CIT's home mortgage and student lending businesses. During the Class Period, Chesler worked with and reported directly to Hallman and Peek.

(a)     During the Class Period, Hallman participated in the issuance of false and misleading statements and failed to disclose the true facts about CIT's subprime home lending or student lending portfolios. As the head of CIT's Specialty Finance Unit, and Vice Chairman,

Hallman was responsible for the day-to-day operations of the home and student lending businesses and personally monitored those businesses through regular meetings with subordinates. During conferences with analysts and investors, Hallman held himself out as knowledgeable about CIT's businesses, including the Company's financial results and the subprime home and student lending portfolios. Moreover, Hallman was involved, on a monthly basis, in meetings with Peek, Leone and Taylor to assess and review CIT's subprime home lending portfolio and associated reserves.

   (b) In addition to his monthly review of the home lending portfolio, each month during the Class Period, and until his retirement in December 2007, Hallman participated in a internal conference call with CIT executives, including Chesler, Umar Farooq and Ken Reynolds, and CIT employees at the Company's Student Loan Xpress Inc. ("SLX") business, including Michael Shaut, Robert DeRose, Fabrezio Balestri and Gary Rohmann. The purpose of the call was to review the student loan portfolio, including private student loans, and monthly financial results. Together with these calls, which typically occurred during the second week of each month, Hallman was provided with a "Management Process Meeting" report, which included sections identifying CIT's portfolio of private student loans, monthly and year-to-date delinquency and charge-off rates for the private loans, a breakdown of the total loans outstanding to students of select schools, including Silver State, and "punchlist updates," which included information about CIT's failed efforts to sell the Silver State loan portfolio. These reports were prepared by the SLX employees and delivered via email to Hallman and other CIT executives on a monthly basis and were available to Peek, Leone and Taylor throughout the Class Period. The information contained in the Management Process Meeting report was pulled from CIT's internal Salesforce.com, Inc. customer relationship management system, which was also accessible by all of CIT's senior executives, including Peek, Leone, Hallman and Taylor.

14.     Defendant William J. Taylor was, at all relevant times, the Executive Vice President, Controller and Principal Accounting Officer of CIT.  Like defendant Leone, Taylor is a Certified Public Accountant and, prior to joining CIT, had been a Senior Audit Manager with KPMG Peat Marwick.  During the Class Period, Taylor participated in the issuance of false and misleading statements, including signing each of CIT's financial statements, and failed to disclose the true facts about CIT's subprime home lending or student lending portfolios.  In addition to issuing statements throughout the Class Period, Taylor repeatedly had the opportunity to correct the misstatements and omissions by and on behalf of CIT, and failed to do so.

(a)     As Controller and Principal Accounting Officer, Taylor was responsible for monitoring and accounting for CIT's subprime home and student lending businesses, and was intimately involved in the preparation and approval of the Company's financial results, including the valuation and reserves associated with the subprime home and student lending portfolios.

(b)     Throughout the Class Period, Taylor chaired CIT's Internal Controls Committee, which was responsible for monitoring and improving the Company's internal controls and compliance with SEC reporting and disclosure regulations.  Taylor was also a senior member of CIT's Asset Quality Review Committee, which, according to CIT's FY 2006 Form 10-K, reviewed "portfolio performance, including the status of individual financing and leasing assets" and "periodically meets with [Peek] to review overall credit risk, including geographic, industry and customer concentrations, and the reserve for credit losses."

(c)     According to CIT's SEC filings, Taylor, together with the Company's senior officers, would "regularly evaluate the consumer loan portfolio," which included the subprime home loans and private student loans, "using past due, vintage curve and other statistical tools to analyze trends and credit performance by transaction type."  During public conference calls, Peek personally

assured the investors that he met with CIT's senior executives, which would include Taylor, on a monthly basis to "look at the [subprime home loan portfolio] reserve" and that "every quarter we talk about what the provision should be."  CIT's FY 2006 Form 10-K also reported that "[t]he reserve for credit losses is reviewed for adequacy based on portfolio collateral values and credit quality indicators, including charge-off experience, levels of past due loans and non-performing assets, evaluation of portfolio diversification and concentration as well as economic conditions. . . . This information is reviewed formally on a quarterly basis with senior management, including the CEO [Peek], CFO [Leone], Chief Lending Officer and Controller [Taylor], among others, in conjunction with setting the reserve for credit losses."

15.     Defendants CIT, Peek, Leone, Hallman and Taylor are collectively referred to herein as the "1934 Act Defendants."

## 1933 ACT DEFENDANTS

16.     Pursuant to the prospectus dated October 17, 2007, CIT issued 24 million shares of preferred stock (plus an over-allotment of 3.6 million shares) to trade under the symbol "CIT-Z" or "CIT PrZ."  CIT is statutorily liable under §§11 and 12 of the 1933 Act for the materially untrue statements incorporated and contained in the CIT-Z offering documents, including CIT's materially false and misleading financial statements incorporated therein.

17.     Defendant Peek was, at all relevant times, Chairman and CEO of CIT.  Peek signed the Company's October 17, 2007 registration statement, which was then incorporated into the CIT-Z prospectus.  Peek was also a member of the Board of Directors at the time of the CIT-Z offering. Peek is statutorily liable under §§11, 12 and/or 15 of the 1933 Act for the materially untrue statements contained in the CIT-Z offering documents, including CIT's materially false and misleading financial statements incorporated therein.  Peek failed to perform adequate due diligence and/or did not possess reasonable grounds for the belief that the statements contained in and

incorporated in the CIT-Z offering documents were true and without omissions of any material facts and were not misleading.

18.    Defendant Leone was, at all relevant times, Vice Chairman and CFO of CIT.  Leone signed the Company's October 17, 2007 registration statement, which was then incorporated into the CIT-Z prospectus.  Leone was also a member of the Board of Directors at the time of the CIT-Z offering.  Leone is statutorily liable under §§11, 12 and/or 15 of the 1933 Act for the materially untrue statements contained in the CIT-Z offering documents, including CIT's materially false and misleading financial statements incorporated therein.  Leone failed to perform adequate due diligence and/or did not possess reasonable grounds for the belief that the statements contained in and incorporated in the CIT-Z offering documents were true and without omissions of any material facts and were not misleading.

19.    Defendant Taylor was, at all relevant times, Executive Vice President, Controller and Principal Accounting Officer of CIT.  Taylor signed the Company's October 17, 2007 registration statement, which was then incorporated into the CIT-Z prospectus.  Taylor is statutorily liable under §§11, 12 and/or 15 of the 1933 Act for the materially untrue statements contained in the CIT-Z offering documents, including CIT's materially false and misleading financial statements incorporated therein.  Taylor failed to perform adequate due diligence and/or did not possess reasonable grounds for the belief that the statements contained in and incorporated in the CIT-Z offering documents were true and without omissions of any material facts and were not misleading.

20.    Defendant Gary C. Butler ("Butler") was, at all relevant times, including at the time of the CIT-Z offering, a Director of CIT.  Butler signed the Company's October 17, 2007 registration statement, which was then incorporated into the CIT-Z prospectus.  Butler is statutorily liable under §§11, 12 and/or 15 of the 1933 Act for the materially untrue statements contained in the CIT-Z

offering documents, including CIT's materially false and misleading financial statements incorporated therein. Butler failed to perform adequate due diligence and/or did not possess reasonable grounds for the belief that the statements contained in and incorporated in the CIT-Z offering documents were true and without omissions of any material facts and were not misleading.

21.     Defendant William M. Freeman ("Freeman") was, at all relevant times, including at the time of the CIT-Z offering, a Director of CIT. Freeman signed the Company's October 17, 2007 registration statement, which was then incorporated into the CIT-Z prospectus. Freeman is statutorily liable under §§11, 12 and/or 15 of the 1933 Act for the materially untrue statements contained in the CIT-Z offering documents, including CIT's materially false and misleading financial statements incorporated therein. Freeman failed to perform adequate due diligence and/or did not possess reasonable grounds for the belief that the statements contained in and incorporated in the CIT-Z offering documents were true and without omissions of any material facts and were not misleading.

22.     Defendant Susan Lyne ("Lyne") was, at all relevant times, including at the time of the CIT-Z offering, a Director of CIT. Lyne signed the Company's October 17, 2007 registration statement, which was then incorporated into the CIT-Z prospectus. Lyne is statutorily liable under §§11, 12 and/or 15 of the 1933 Act for the materially untrue statements contained in the CIT-Z offering documents, including CIT's materially false and misleading financial statements incorporated therein. Lyne failed to perform adequate due diligence and/or did not possess reasonable grounds for the belief that the statements contained in and incorporated in the CIT-Z offering documents were true and without omissions of any material facts and were not misleading.

23.     Defendant Marianne Miller Parrs ("Parrs") was, at all relevant times, including at the time of the CIT-Z offering, a Director of CIT. Parrs signed the Company's October 17, 2007

registration statement, which was then incorporated into the CIT-Z prospectus. Parrs is statutorily liable under §§11, 12 and/or 15 of the 1933 Act for the materially untrue statements contained in the CIT-Z offering documents, including CIT's materially false and misleading financial statements incorporated therein. Parrs failed to perform adequate due diligence and/or did not possess reasonable grounds for the belief that the statements contained in and incorporated in the CIT-Z offering documents were true and without omissions of any material facts and were not misleading.

24.    Defendant Timothy M. Ring ("Ring") was, at all relevant times, including at the time of the CIT-Z offering, a Director of CIT. Ring signed the Company's October 17, 2007 registration statement, which was then incorporated into the CIT-Z prospectus. Ring is statutorily liable under §§11, 12 and/or 15 of the 1933 Act for the materially untrue statements contained in the CIT-Z offering documents, including CIT's materially false and misleading financial statements incorporated therein. Ring failed to perform adequate due diligence and/or did not possess reasonable grounds for the belief that the statements contained in and incorporated in the CIT-Z offering documents were true and without omissions of any material facts and were not misleading.

25.    Defendant John Ryan ("Ryan") was, at all relevant times, including at the time of the CIT-Z offering, a Director of CIT. Ryan signed the Company's October 17, 2007 registration statement, which was then incorporated into the CIT-Z prospectus. Ryan is statutorily liable under §§11, 12 and/or 15 of the 1933 Act for the materially untrue statements contained in the CIT-Z offering documents, including CIT's materially false and misleading financial statements incorporated therein. Ryan failed to perform adequate due diligence and/or did not possess reasonable grounds for the belief that the statements contained in and incorporated in the CIT-Z offering documents were true and without omissions of any material facts and were not misleading.

26.     Defendant Seymour Sternberg ("Sternberg") was, at all relevant times, including at the time of the CIT-Z offering, a Director of CIT. Sternberg signed the Company's October 17, 2007 registration statement, which was then incorporated into the CIT-Z prospectus. Sternberg is statutorily liable under §§11, 12 and/or 15 of the 1933 Act for the materially untrue statements contained in the CIT-Z offering documents, including CIT's materially false and misleading financial statements incorporated therein. Sternberg failed to perform adequate due diligence and/or did not possess reasonable grounds for the belief that the statements contained in and incorporated in the CIT-Z offering documents were true and without omissions of any material facts and were not misleading.

27.     Defendant Peter J. Tobin ("Tobin") was, at all relevant times, including at the time of the CIT-Z offering, a Director of CIT. Tobin signed the Company's October 17, 2007 registration statement, which was then incorporated into the CIT-Z prospectus. Tobin is statutorily liable under §§11, 12 and/or 15 of the 1933 Act for the materially untrue statements contained in the CIT-Z offering documents, including CIT's materially false and misleading financial statements incorporated therein. Tobin failed to perform adequate due diligence and/or did not possess reasonable grounds for the belief that the statements contained in and incorporated in the CIT-Z offering documents were true and without omissions of any material facts and were not misleading.

28.     Defendant Lois M. Van Deusen ("Van Deusen") was, at all relevant times, including at the time of the CIT-Z offering, a Director of CIT. Van Deusen signed the Company's October 17, 2007 registration statement, which was then incorporated into the CIT-Z prospectus. Van Deusen is statutorily liable under §§11, 12 and/or 15 of the 1933 Act for the materially untrue statements contained in the CIT-Z offering documents, including CIT's materially false and misleading financial statements incorporated therein. Van Deusen failed to perform adequate due diligence

and/or did not possess reasonable grounds for the belief that the statements contained in and incorporated in the CIT-Z offering documents were true and without omissions of any material facts and were not misleading.

29.    Defendants CIT, Peek, Leone, Taylor, Butler, Freeman, Lyne, Parrs, Ring, Ryan, Sternberg, Tobin and Van Deusen are collectively referred to herein as the "1933 Act Defendants."

30.    In the context of their claims for violations of §§11, 12 and 15 of the 1933 Act, plaintiffs specifically do not allege that any of the 1933 Act Defendants are liable for fraudulent or intentional conduct.

## CLASS ACTION ALLEGATIONS

31.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased CIT securities during the Class Period and were damaged thereby.  Excluded from the Class are: (i) defendants; (ii) any person who was an officer or director of CIT during the Class Period; (iii) members of the immediate family of any of the individual defendants; (iv) any firm, trust, corporation, officer, director or other entity in which any defendant has a controlling interest; and (v) the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any excluded party.

32.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of February 15, 2008, CIT had over 191.2 million shares of common stock outstanding, and there were more than 93,000 beneficial owners of CIT common stock.  In addition, 27.6 million shares of CIT-Z preferred stock were issued in the CIT-Z offering.  While the precise number of Class members is unknown to plaintiffs at this time, it is in the thousands.  The names and contact information of the Class members can be ascertained from the books and records maintained by or on behalf of CIT, its transfer agent and/or the CIT-Z offering underwriters.

33. The claims of plaintiffs are typical of the claims of other Class members. Plaintiffs and all Class members acquired their CIT securities on the open market and/or pursuant to the CIT-Z offering and sustained damages as a result of defendants' violations of the federal securities laws.

34. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) Whether defendants' public statements contained misstatements or omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(c) Whether the prospectus and registration statement issued by defendants to the investing public in connection with the CIT-Z offering omitted and/or misrepresented material facts about CIT and its business and financial results; and

(d) The extent of damages sustained by Class members and the appropriate measure of damages.

35. Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation. Plaintiffs' claims are typical of the claims of other members of the Class because plaintiffs' and Class members' damages arise from and were caused by the same false statements and omissions made by or chargeable to defendants. Plaintiffs have no interests which conflict with those of the Class.

36.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

### FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

37.    Founded as the Commercial Credit and Investment Company in 1908, CIT was a staid commercial lender through much of the 20th century, providing financing and leasing to small to mid-size businesses.  Relying on positive credit ratings and ready access to capital, CIT's steadfast focus on this middle market produced solid, if unspectacular, financial results and growth.  In the mid-1990s, the Company's then CEO, Albert Gamper Jr. ("Gamper"), tried to boost growth by moving into the consumer lending business, including home loans, but CIT was battered when those loans quickly soured.  A brief foray into technology leasing shortly thereafter coincided with the dot-com balloon busting and nearly bankrupted the Company, leaving CIT vulnerable to a takeover.

38.    In March 2001, CIT was acquired by and became a subsidiary of the ill-fated Tyco International, Ltd. ("Tyco") for $9.1 billion.  Little more than one year later and just months before the disclosure that Tyco's CEO Dennis Koslowski and other insiders had been involved in a massive accounting fraud, Tyco announced that it would spin off CIT.  In July 2002, CIT became a publicly traded corporation in an initial public offering that raised $4.8 billion.  The association with Tyco, however, had taken its toll.  CIT's credit and debt ratings had been decimated, blocking access to the commercial paper market and eliminating the margin the Company could make on its lending activities.

39.    By 2003, Gamper was prepared to step down as CEO and, after a lengthy search process, the Company hired Peek to serve as its new president.  One year later, Peek became CIT's new CEO.  A veteran Wall Street insider, Peek joined CIT after twice being passed over for the CEO position at investment banks, first at Merrill Lynch & Co. and then at Credit Suisse First Boston.

Anxious to prove his worth and create a legacy, Peek set out to transform CIT (again) from a stodgy and risk-adverse commercial finance outfit into a elite Wall Street financial firm.

40.     Peek immediately instituted a number of changes.  He moved CIT from its suburban New Jersey headquarters to Manhattan and created a new compensation program similar to the ones used in investment banks, which tied executive and officer compensation to the Company's reported financial results.  Specifically, the plan mandated that 70% of CIT's compensation  be in stock and options and accessible only if the Company met specified financial performance targets, including earnings per share ("EPS") targets.  And Peek aggressively moved CIT into consumer lending.

41.     Subprime home lending and student lending were at the core of Peek's transformation efforts.  Beginning in late 2004, Peek led CIT in acquiring billions of dollars in subprime loans and ramped up the Company's origination of home loans.  In 2005, the Company originated and acquired more than $4.3 billion in subprime home loans.  By 3Q 2006, as defendants reduced the credit standards and proof of credit necessary to qualify for subprime loans and boosted originations, the Company's subprime home loan assets had ballooned to $9.8 billion, nearly double what they had been at the start of 2005.

42.     Peek's growth-by-acquisition strategy carried over into student lending when, in February 2005, CIT acquired Educational Lending Group, which it renamed SLX, a publicly-traded student loan finance company for approximately $381 million.  At the time of the acquisition, SLX focused on originating and consolidating federally guaranteed student loans – low risk loans that are 97%-98% guaranteed by the United States federal government.

43.     The move into consumer lending was initially successful.  Through the acquisitions and rapid escalation of loan originations – driven by reduced lending standards and the aggressive expansion of CIT's home and student lending operations – defendants dramatically grew CIT's

assets under management and improved the Company's reported financial results. By the end of 2006, the home lending and student lending businesses represented 27.5% of CIT's total assets and were the Company's two largest businesses. They were also among the only lending businesses at CIT reporting any growth.

44.    Defendants touted CIT's rapid expansion and, based upon the improved financial results, the Company's credit ratings were upgraded from "stable" to "positive," allowing defendants to fund the business at lower cost and, increase earnings. By the summer of 2006, it appeared that Peek had resurrected CIT and proven himself as a CEO. Analysts and investors were impressed, but, as a result of the rapid expansion, questions remained about Peek and his executive officers' ability to monitor the credit quality of CIT's expanding subprime home and student loan portfolios. In response to those questions, Peek insisted on a conference call with investors that "the company's growth is not outpacing its investments in risk management systems that prevent and limit losses from bad loans."

45.    While systems were in place to monitor the subprime home and student lending businesses, defendants failed to timely disclose or account for the fact that the quality and value of those loan portfolios was dropping as fast as the volume had been built up. Having barely overcome CIT's last scrape with disaster, defendants were unwilling to acknowledge that the next, self-made disaster was already upon them.

**DEFENDANTS' FALSE STATEMENTS AND OMISSIONS REGARDING CIT'S SUBPRIME HOME LOAN PORTFOLIO**

46.    The Class Period commences on December 12, 2006. On that day, defendant Peek attended the Goldman Sachs Financial Services CEO Conference and made presentations regarding CIT's financial performance to investors and analysts. With respect to CIT's subprime home lending portfolio, Peek acknowledged that CIT expected losses to increase, but blamed that on the

"seasoning of the portfolio."  Commenting on charge-offs for the home lending portfolio, Peek asserted that "it is going to be higher than it's been this year but ***it's not going to be that much higher.  It will be very manageable for us.  It is not going to be catastrophic***."  Peek concluded, commenting that "we'll have our issues in that sector [home lending] like everybody, but ***we think we are much more conservative***."

47.     On January 17, 2007, the 1934 Act Defendants issued a press release entitled, "CIT Reports Record Fourth Quarter Results: Increases 2007 EPS Guidance Results Reflect Strong Earnings, Revenue and Origination Growth."  The press release reported CIT's financial results for 4Q and FY 2006, including EPS of $1.28 and $5.00, respectively.  Defendants' press release, included, as one of CIT's financial highlights, the claim that "***[b]road-based credit quality remained solid*** despite an up-tick in consumer metrics" and asserted that asset growth "was broad-based, as all of the Commercial Finance businesses were up, along with the Consumer and Small Business segment."

48.     That same day, January 17, 2007, defendants hosted a conference call with analysts and investors to discuss CIT's business operations and prospects and the Company's 4Q 2006 and FY 2006 financial results.  The call repeated and addressed information previously made public in defendants' January 17, 2007 press release.  Defendants Peek and Leone participated in the call and had an opportunity to address analysts' and investors' questions and concerns about the Company's home lending portfolio and credit metrics.  During the call, Peek reassured investors that "***[h]eading into 2007, credit quality is solid***" at CIT and that higher delinquencies in the Company's home lending portfolio had been accounted for.  Peek further remarked:  "Credit remains at the heart of what we do every day [and] as we discussed at investor day we are elevating our risk management [and] promise to create an even more stable and predictable credit performance."

- 20 -

49.     During the January 17, 2007 call, Peek responded to questions regarding CIT's subprime home lending portfolio from Chris Brendler ("Brendler"), an analyst from Stifel Nicolaus, acknowledging recent losses in the portfolio, but assuring investors that CIT's subprime home lending was better than most other companies and that CIT's lending and risk management practices and strategies would remain unchanged.  The exchange between Peek and Brendler, in pertinent part, proceeded as follows:

> **Chris Brendler** . . . [C]ould you comment on how [CIT's subprime home loan portfolio is] performing relative to your expectations, and have you disclosed how much stated income loans you have done?

> **Jeff Peek** . . . You know, it is performing about on our expectations. I would the delinquencies [*sic*] is slightly higher than we would like and losses is slightly higher than we would like, but 95 or 96 basis points in the quarter is not unusual.

>      We do think it could go up to the 120 basis point area and that's the guidance I gave you. In terms of the stated income percentage, I don't have that off the top of my head. . . .

> **Chris Brendler** . . . I know you have [better] home equity portfolio than most, that's why I was wondering about that I know you have a lot of fixed rate and a little bit on IOs.

> **Jeff Peek** . . . On the IOs it is 10% or less and there's no negative AM, I can tell you that. No Negative AM products in the portfolio.

Defendant Leone also addressed Brendler's questions:

> **Joe Leone** . . . Yes, the delinquency [*sic*] did go higher and I think it went slightly higher than what you had mentioned, and I did give some thoughts on how we look at our '07 costs and '07 plans in terms of losses, so it will go higher.  *What we thought about, in terms of managing the risk in that portfolio we have been speaking about for the last quarter or so and it's unchanged*. . . .

>      I do not specifically know the answer to your mortgage insurance question, but *what we have done is monitored and managed the portfolio matrix very tightly to a portfolio that we feel more comfortable with relative to what we see in the overall environment*.  For example, a FICO score has been consistently in the mid-630 to 640 and it's unchanged. Our average loan size has been managed down to about $120,000, so we have moderately prized homes. *We have stayed away from some of the coastal areas. Some of the same risk metrics and risk management techniques we talked about will continue into '07 with the change of we don't*

- 21 -

***expect growth in the balance sheet or outstanding portfolio in home lending, that would include any securitization if we did any, but we have no plans to do so***. We'll continue in '07 to have loan sales as our way of managing the balance sheet, because we do expect the branch network to produce a nice level of production.

50.     On March 1, 2007, defendants filed CIT's annual report with the SEC on Form 10-K for FY 2006.  The Company's Form 10-K was signed by defendants Peek, Leone and Taylor and reported CIT's financial results for 4Q 2006, including EPS of $1.28 per share and $9.888 billion in home mortgage assets.  CIT's reported 4Q 2006 EPS beat analysts' EPS estimate of $1.25 per share. CIT's Form 10-K also reported that the Company's home mortgage assets had grown $1.552 billion since December 31, 2005 – a 19% increase year over year – and comprised 14.6% of CIT's total assets, the Company's largest business line.  According to the Form 10-K, the growth in CIT's managed assets in 2006 was led by asset growth in the consumer portfolios – home lending and student lending.  CIT's Form 10-K further reported that "***credit metrics remained strong in 2006***," that the Company had "***[s]table credit metrics, including reduced charge-offs***" and that Consumer and Small Business Lending charge-offs actually declined from 0.66% of receivables for 2005 to 0.57% for 2006.

51.     In the Form 10-K, defendants acknowledged that there was "softening in the home lending sector," but asserted "this expectation was factored into [CIT's] previously-issued 2007 [earnings] guidance," as well as accounted for in the Company's 2006 financial statements. Defendants reassured investors that they "regularly evaluate the consumer loan portfolio," as well as "review and monitor credit exposures, both owned and managed, on an ongoing basis to identify, as early as possible, customers that may be experiencing declining creditworthiness or financial difficulty."  With regard to the reserve for credit losses, CIT's Form 10-K reported that the reserve was regularly "reviewed for adequacy" and that "[t]his information is reviewed formally on a

quarterly basis with senior management, including the CEO, CFO, Chief Lending Officer and Controller, among others, in conjunction with setting the reserve for credit losses."

52.    In the 2006 Form 10-K, defendants Peek and Leone assured investors that they personally evaluated CIT's disclosure controls and procedures and have concluded that such procedures were effective as of December 31, 2006.  Defendants Peek and Leone also signed certifications filed with the Form 10-K stating that they had personally reviewed the Company's Form 10-K and that the public filing "does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "[t]he information contained in the [2006 Form 10-K] fairly presents, in all material respects, that financial condition and results of operations of CIT."

53.    The 1934 Act Defendants' statements in December 2006 and January and February 2007 were false and misleading when made.  Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a)    As detailed in ¶¶125-149, rather than appropriately accounting for the known and increasing impairments to CIT's subprime home lending portfolio, and the resulting inflation of the Company's home lending assets, defendants failed to comply with GAAP and appropriately reserve for the Company's loan loss exposure;

(b)    As a result of defendants' GAAP violations, CIT's reported net income and EPS for both 4Q and FY 2006 were materially overstated.  As detailed in ¶¶125-149, had defendants complied with GAAP and appropriately accounted for the subprime home lending portfolio loan loss exposure, CIT would have *lost* $91.7 million in 4Q 2006, as opposed to reporting income of $259.3 million and 4Q 2006 EPS would have been a loss of $0.32 per share, not the reported positive $1.28.

- 23 -

For FY 2006, had defendants complied with GAAP and appropriately accounted for the subprime home lending portfolio loan loss exposure, net income for the year would have dropped to $545.7 million, not the reported $1.015 billion and FY 2006 EPS would have been $1.74, not the reported $5.00;

(c)     But for defendants' accounting manipulations, CIT would have missed analysts' 4Q 2006 EPS projection of $1.25 by $1.57 per share;

(d)     CIT's subprime home lending credit quality was not "solid," "stable" or "conservative," and credit metrics had not "remained strong in 2006," but had, in fact, been weakened as defendants reduced credit standards to boost loan originations. As a result, default rates and delinquencies were rising sharply. According to form CIT home lending Account Executives at CIT offices throughout the country, by the end of 2006 CIT had substantially reduced the amount of documentation necessary, as well as the minimum FICO score, for subprime loan approval. In an effort to drive up originations, and assets under management, CIT was making increasingly risky home loans, including no documentation, stated income loans – also known as "liar loans." At the same time, according to the former Account Executives who were marketing and selling the loans during 2006 and into 2007, CIT was increasingly using 2/28 and 3/27 adjustable rate mortgages ("ARMs") to drive loan originations. A former Branch Manager for one of CIT's home lending offices, who was with the Company from the fall of 2006 through the summer of 2007, corroborated that CIT's lending standards had become "very loose" in late 2006, and were only tightened up in 2007 as the subprime home lending business continued to collapse;

(e)     As a result of defendants' weakening of CIT's credit standards in 2006 and internal incentives for the growth of subprime home loan originations, regardless of loan quality, the volume of stated income or liar loans, 2/28 and 3/37 ARMs, high loan-to-value loans and loans to

borrowers with FICO scores under 600 was rapidly increasing, particularly in high risk states such as California and Florida;

(f)    The secondary market for subprime home loans was freezing up and buyers for high risk loans disappeared.  As a result, defendants could not securitize and dump the increasingly risky subprime loans that were being added to CIT's home lending portfolio; and

(g)    The certifications Peek and Leone made together with CIT's FY 2006 Form 10-K (¶52) stating that the Company's financial results were reported in accordance with GAAP were, as described above and in ¶¶125-149, false and misleading when made.

54.    Defendants' statements during December 2006 and January and February 2007 regarding CIT's 4Q and FY 2006 financial results and the Company's subprime home lending portfolio had a direct effect on CIT's stock price.  On January 17, 2007, for example, CIT's stock price closed up $0.90 per share, at $56.54, as a result of defendants' false statements and omissions and continued to trade at artificially inflated levels thereafter.

55.    On April 2, 2007, in an interview published in *Investment Dealers Digest* entitled "Q&A: On the Move: To help sort out all of CIT's new initiatives, IDD caught up with Jeff Peek who explained the commercial and consumer finance company's grand plan," Peek again assured investors that CIT's subprime home loan portfolio was better than average.  Specifically, Peek stated:

> The subprime issue might be another blinking yellow light, but I don't think it's going to be a spreading contagion.  We've been in the business for almost 15 years and have a seasoned management team that has been through a number of cycles.  ***Our delinquencies are running about a third of the industry rate.  We anticipated some of this, and built it into our 2007 plan. We are a well diversified company and our subprime profile is strong.***  Our mortgage portfolio represents about 15% of our total assets and about 10% of our income.
>
> Additionally, ***we have strong portfolio demographics and a conservative product set.  We are holding our portfolio at our current asset levels and managing through it.***

- 25 -

56.     On April 18, 2007, defendants issued a press release entitled, "CIT Reports Record First Quarter Results;  Strong Revenue and Origination Growth, Moderating Expense Trends and Low Net Charge-Offs"  The press release reported CIT's financial results for 1Q 2007, including EPS of $1.37 for the quarter.  According to Peek, the results demonstrated that "'CIT is off to a solid start in 2007 with our operating EPS increasing 15% from a year ago.'"

57.     That same day, April 18, 2007, defendants hosted a conference call with investors and analysts to discuss CIT's business operations and prospects and the Company's 1Q 2007 financial results.  The call repeated and addressed information previously made public in defendants' April 18, 2007 press release.  Defendants Peek and Leone participated in the call and had an opportunity to address analysts' and investors' questions and concerns about CIT's subprime home lending portfolio.  In his opening remarks, Peek stated:

> [T]he subprime home lending industry has obviously been under pressure. CIT is a well diversified Company and our mortgage portfolio, **which maintains a conservative product set**, represents less than 10% of our income.  Our delinquencies and losses in home lending have trended higher, as we anticipated and planned for, but they are still running at about a third of the industry rate.

Following Peek's remarks, Leone stated, in pertinent part, as follows:

> I'll focus on the home lending business. **As Jeff said, we think our portfolio looks good compared to the industry**.  That said, we saw weakening.  Portfolio losses in the quarter were about 120 basis points, about where we expected them to be, and gains on receivables were down. . . .
>
> What actions are we taking in home lending?  On the operating front, many. Our team is focused on the back end. **We tightened home lending underwriting, we raised minimum FICA requirements, we lowered certain LTVs and we eliminated certain products**, including certain elements of non-owner occupied. We raised pricing, and as we always do when delinquencies arise, we added more collection and loss mitigation resources.  We increased our frequency of contact and calling efforts and we targeted more finally borrowers more likely to default.  We continue to refine our models and are very comfortable with what our models and forecasting strategies are, and we are reducing upfront origination costs.  We did close some offices.

> ***On the financial side, I think [Peek] mentioned, reserves continue strong and in the home lending area, we did increase our related loss reserves and continue to be very vigilant about updating our portfolio role rates and estimates.***

*     *     *

> ***Consumer lending fundamentals continue strong.***

58.     During the April 18, 2007 conference call, defendants responded to a number of questions retarding CIT's subprime home lending portfolio, including the following exchange with an analyst from Bear Stearns:

> **David Hochstim** . . . My question is really about home lending and if you could give us an update on your forecast for the [loan] loss rate which seems in my sense got to your prior forecast a little earlier than I thought, and then also about the decision to grow the portfolio in the first quarter. What kind of assets were you buying and are you likely to continue to grow that book?

*     *     *

> **Joe Leone** . . . A little detail on home lending, David, if I remember all you asked.

*     *     *

> In terms of the loss number, the losses at 120 basis points, as you know, are, I think it was a premise of your question is about our guidance for the year. I think I said last quarter that I expected losses in home lending to be in the 120 basis points area, and Q1 came in at 120. So as we looked at the quarterly close, our loss reserve and our roll rates and what we would say in response to the question that you asked, we took a hard look at our forecast for dollars for home lending losses in '07 and we continue to think that losses that would equate to about 120 basis point area is still the number we're looking at and forecasting. ***So we could have a slightly higher denominator than we thought but having said that, the amount of dollar losses hasn't changed in any significant way from our earlier in the quarter forecast.*** Did I get everything that you asked?

Later during the April 18, 2007 call, Brendler, an analyst from Stifel Nicolaus, followed up with Leone about CIT's subprime home lending portfolio:

> **Chris Brendler** . . . On home equity, I just have to ask one question at least on home equity . . . . [Y]ou bought 1 billion, I think or so, of portfolios this quarter. Are you able to buy those at a discount or are you being that sort of selective where you're selling at a gain and buying portfolios at a discount so you can sort of take advantage of the disruption? And then I'm still not clear on how you get comfortable with 120 basis points when delinquencies are still increasing and not modestly. I think they

- 27 -

are rising [] pretty quickly and it seems like it's only going to get worse from here but help me think about that.

**Joe Leone** . . . Yeah.  On the portfolios, I think that's a strategy we – I mentioned earlier we would evaluate on home lending.  We have not done that.  We haven't bought deeper down on the quality or the price and then flipped for gains.  We have not done that.  That's something that, as I said, we have a debate and a discussion and an evaluation going on.

*        *        *

What we did on the losses is took all of the delinquency, well clearly the delinquency as we saw it at the end of March and continued in April, and took all our roll rates and stressed our roll rates, so took the delinquencies, how much roll to non-performing, how much roll to repo and applied what we think our appropriate, based upon history and our expectation severity rates are.  So we put – it sounds like something you should do every quarter and we do but there was a lot more iterations, a lot more rigor and a lot more views of it, *so we continue to remain comfortable with 120 basis point area in terms of our forecast*.  Having said that, we did come out of that box at 120 basis points and we continue to have work to do and that's why I mentioned some of the initiatives that the unit has ongoing to improve the quality and efficiency of our servicing and take some costs out of the front end . . . .

Defendants responded to additional questions from investors and analysts focused on CIT's

subprime home lending portfolio:

**Meredith Whitney** . . . If I look at your loan growth and I take out the Barclay's deal, I've got a high percentage of loan growth from student and home equity and I was under the impression that you were sort of capping the growth of your . . . mortgage portfolio.  Is that not the case and then if I missed something, maybe I just need clarification. . . .

**Joe Leone** . . . I would just say on home lending, just so everybody is clear, we did have higher assets than we expected to in the quarter and two of the reasons were we had lower prepayments and we sold less in terms of portfolio sales and that was of our choice.  We had – we thought we had better economics than by holding for awhile, then selling in March.

59.    On May 8, 2007,  defendants filed CIT's quarterly report with the SEC on Form 10-Q

for 1Q 2007.  The Company's Form 10-Q was signed by defendants Leone and Taylor and reported

CIT's financial results for 1Q 2007, including EPS of $1.30 per share and $10.952 billion in home

mortgage assets.  CIT's reported EPS beat analysts' EPS estimate of $1.27 per share.  CIT's Form

- 28 -

10-Q also reported that the Company's home lending assets had grown $1.064 billion since December 31, 2006 – an 11% increase in three months – and comprised 14.9% of CIT's total assets, the Company's largest business line.  In the Form 10-Q, defendants asserted that "*[o]verall credit metrics remained strong in 2007*" and that "*our total reserve for credit losses is adequate*."

60.     In the 1Q 2007 Form 10-Q, defendants assured investors that "our risk management systems and procedures are designed to identify and analyze key business risks, to set appropriate policies and limits, and to continually monitor these risks and limits by means of reliable administrative and information systems . . . .  Within the Office of the Chairman, the Vice Chairman and Chief Lending Officer oversees credit risk management across the business while the Vice Chairman and Chief Financial Officer oversees market risk management."

61.     Defendants Peek and Leone assured investors that they personally "evaluated [CIT's] disclosure controls and procedures and have concluded that such procedures are effective as of March 31, 2007."  Peek and Leone also signed certifications filed with the Form 10-Q stating that they had personally reviewed the Company's Form 10-Q and that the public filing "does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "[t]he information contained in the [1Q 2007 Form 10-Q] fairly presents, in all material respects, that financial condition and results of operations of CIT."

62.     On May 8, 2007, defendants Peek, Leone, Hallman and Taylor participated in the Company's annual Stockholders Meeting and addressed investor questions and concerns about CIT's subprime home loan portfolio, including the following exchange:

> MR. FISHER:  . . . You mention among the risk factors, credit risk and I note that the provision for credit losses has increased slightly every year for the last two or

three years. I notice at the bottom, because of the increase in your managed assets, that the reserve itself has dropped from about 1.5% back in 2003 to 1.3% now. Given certain uncertainties in the economy, I'm not sure what the provision was for the first quarter but given certain developments such as the sub-prime area and so forth, I'm just wondering if you feel that these areas have to maybe be re-examined.

JEFF PEEK:  It's a good question and one that I know is close to your heart being a former Moody's debt rater. But clearly I think you need to – *we, on a regular basis look at the reserve*. We have a quarterly meeting where we try and take a look at the economy, what's happening in our business and *every quarter we talk about what the provision should be*.  *We meet monthly on that*.  In terms of the comparison between 2003 and 2007, I think two things.  One would be the economy is better now so you would think that your provision might be lower.  And two would be the mix of assets. You know because our student loans, which are close to $10 billion now on the balance sheet, because those are 98%, guaranteed by the government, we kind of back those out. And I would say that over the last four or five quarters, we've been looking at about 130 basis points, 1.3 of assets X student loans has been about where we've been.  So I think it's been fairly consistent and in absolute terms I think it's up over $700 million now at the end of the first quarter which is up close to 10% where we were this time last year. So it's something that we take as a core competency and have clearly invested in to try to get better systems and continue to add personnel.

63.    On May 14, 2007, defendants Leone and Hallman attended the UBS Financial Services Conference and made presentations regarding CIT's financial and business performance to investors and analysts.  With respect to CIT's subprime home lending portfolio, defendants stated that "*[o]ur portfolio is performing better than the industry*, which I'll show you pretty quickly.  We said it would, we also said we wouldn't be insulated from a downturn and we're not. . . .  *The demographics, are what we told you they would be, they'd be more on the conservative side of the market*.  The risk layering, we pay a lot of attention to, and you'll probably have some questions for me."  Defendants continued, "[i]n terms of delinquency we've said over the years that sooner or later there would be a cycle.  We would perform better than the industry we thought we could dimension it."

64.    On May 15, 2007, defendants Leone and Hallman attended the American Financial Services Association 17th Finance Industry Conference for Fixed Income Investors and again made

presentations regarding CIT's financial and business performance to investors and analysts.  With respect to CIT's subprime home lending portfolio, defendants stated that the "earnings growth has been pretty good.  ***It's been built on great credit performance***.  We're really happy with the credit performance of the Company in the first quarter – charge-offs less than 40 basis points. . . .  In terms of reserves – our reserving process is quite complicated; it's quite analytical.  I think it's thorough and comprehensive.  And we go through a detailed review of reserves every quarter. . . .  The reserves have stayed relatively steady as a percentage of receivables. . . .  [T]he percentage of loss reserve has stayed stable as we've built consumer reserves and reduced commercial reserves."  Commenting on the subprime home lending portfolio, defendants stated that "[i]n terms of the overall makeup of the business, ***the demographics are consistently good***. . . .  Overall, all of this should ***result in performance that's better than the industry at large, and it does***.  Now that doesn't mean, as we've said over the years, that we wouldn't be impacted by a downturn; we are.  Returns have gone from 15% down into the single-digit area.  But the portfolio is pretty resilient. . . .  So we think the outcome will be predictable, measurable, and within the context of what we've been talking about."

65.     On May 16, 2007, defendant Peek attended the Lehman Brothers 2007 Financial Service Conference in London, UK.  Peek made a presentation with accompanying slides to investors and analysts at this conference. One slide addressed CIT's subprime home lending portfolio, highlighting several factors, including CIT's purported "***[d]isciplined lending standards***" and "***[c]onservative product set***."

66.     The 1934 Act Defendants' statements in April and May 2007 were false and misleading when made.  Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a)     As detailed in ¶¶125-149, rather than appropriately accounting for the known and increasing impairments to CIT's subprime home lending portfolio, and the resulting inflation of the Company's home lending assets, defendants failed to comply with GAAP and appropriately reserve for the Company's loan loss exposure;

(b)     As a result of defendants' GAAP violations, CIT's reported net income and EPS for 1Q 2007 were materially overstated.  As detailed in ¶¶125-149, had defendants complied with GAAP and appropriately accounted for the subprime home lending portfolio loan loss exposure, CIT would have *lost* $302 million in 1Q 2007 (not including the reserve that defendants failed to take for the student loan portfolio), as opposed to reporting income of $271.4 million and 1Q 2007 EPS would have seen a loss of over $1.00 per share, not the reported positive $1.30;

(c)     But for defendants' accounting manipulations, CIT would have missed analysts' 1Q 2007 EPS projection of $1.27 by over $3.00 per share;

(d)     CIT's loan loss reserves for the home lending portfolio were not "strong," but were, in fact, materially understated, as detailed in ¶¶125-149, and resulted in an overstatement of the value of the Company's loan portfolio;

(e)     CIT's subprime home lending business did not have "strong portfolio demographics," "consistently good" demographics or a "conservative product set," and was not on "the conservative side of the market," but had, in fact, been weakened as defendants reduced credit standards to boost loan originations.  As a result, default rates and delinquencies continued to rise sharply;

(f)     As a result of defendants' weakening of CIT's credit standards in 2006 and internal incentives for the growth of subprime home loan originations, regardless of loan quality,  the volume of stated income or liar loans, 2/28 and 3/37 ARMs, high loan-to-value loans and loans to

borrowers with FICO scores under 600 had rapidly increased, particularly in high risk states such as California and Florida;

(g)    Defendants had only "tightened home lending writing" in 2007 as a result of the increasing, and unaccounted for, impairments and risks to the Company's subprime home lending portfolio that resulted from the lowered lending standards in 2006;

(h)    The secondary market for subprime home loans was freezing up and buyers for high risk loans continued to disappear.  As a result, defendants could not securitize and dump the increasingly risky subprime loans that were being added to CIT's home lending portfolio; and

(i)    The certifications Peek and Leone made together with CIT's 1Q 2007 Form 10-Q (¶61) stating that the Company's financial results were reported in accordance with GAAP were, as described above and in ¶¶125-149, false and misleading when made.

67.    Defendants' statements during April and May 2007 regarding CIT's 1Q 2007 financial results and the Company's subprime home lending portfolio and reserves, which were false and misleading when made, had a direct effect on CIT's stock price.  On April 18, 2007, CIT's stock price rose $1.82 per share, to close at $56.97.  By the start of June 2007, CIT's stock price was above $60 per share and continued to trade at artificially inflated levels until the truth about the Company's subprime home lending portfolio emerged.

**THE TRUTH ABOUT CIT'S SUBPRIME HOME LENDING PORTFOLIO EMERGES**

68.    On July 18, 2007, defendants finally disclosed that CIT's subprime home lending portfolio was neither strong nor conservative and, in fact, the Company would have to take a pre-tax charge of ***$765 million*** to write-down the value of the Company's subprime home lending portfolio by approximately 6.3%.  At the same time, defendants announced that they were abandoning the home lending market, only three months after assuring investors that the home lending portfolio "reserves continue strong" and "our portfolio looks good compared to the industry."

- 33 -

69.     As Forbes reported that day, "[i]n its bid to wipe its hands clean of home lending, and by extension the swath of subprime problems, the company was forced to revalue $10.6 billion in home-loan receivables.  The move cost the company $495.3 million after tax,es or $2.58 a share."  The loss "***blindsided the market***" according to Royal Bank of Scotland analysts, who reported: "***CIT has until now claimed to have a subprime book that was better than average***."

70.     During a conference call with investors and analysts on July 18, 2007, defendants faced questions regarding the subprime home lending portfolio disclosures.  As one analyst commented on the news that CIT's portfolio had been overvalued by at least $765 million, "I was under the impression your portfolio was better than most of the subprime business out there and a 10% haircut to book value is pretty steep."  The same analyst further commented, with regard to the home lending business, that "it's been a problem for years and I think I remember Jeff [Peek] telling me maybe nine months ago that you recognized it wasn't the greatest business – the greatest fit for the CIT."

71.     As a result of the July 18, 2007 disclosures, the price of CIT's common stock tumbled $6.26 per share to $49.17, the biggest one day price drop in over four years, on unusually high volume of over seven million shares.  On the same day, the Standard & Poor's 500 and the Dow Jones stock indices were essentially flat.  CIT was, in fact, the biggest loser for the day in the Standard & Poor's 500 stock index.

72.     On October 17, 2007, defendants were forced to disclose that CIT would have to take another charge of $465 million to further write-down the value of the Company's subprime home lending portfolio.  Together with the July 18, 2007 disclosure, defendants' write-downs totaled approximately 10% of the home lending portfolio.  Included in the October 17, 2007 disclosure were

write-downs related to a $1.4 billion pool of non-performing and delinquent loans and a $137 million write-down of a $342 million portfolio of home lending repossessed assets.

73.     Later, in CIT's 3Q 2007 Form 10-Q, defendants also disclosed, for the first time, that CIT's touted internal controls had previously been inadequate and had to be enhanced regarding the determination of fair value with respect to the valuation of CIT's home lending assets.

74.     As a result of the October 17, 2007 disclosure, CIT's common stock share price dropped an additional $2.14 per share to $34.98, on extraordinarily high volume of over 11.6 million shares.  On the same day, the Standard & Poor's 500 and the Dow Jones stock indices were essentially flat.  As a CIBC World Markets analyst commented on October 18, 2007, "CIT stock is down almost 40% YTD, worse than even Bear Stearns.  Management stated that it has the full support of the board to work out its current challenges.  Clearly, after a 6% one-day decline in response to 3Q results on Wednesday, investors held a far different opinion."

75.     In the last six months of 2007, CIT recorded a total of over $1.5 billion of charges, excess loss provisions and write-downs related to the subprime home lending portfolio and, in 1Q 2008, the Company took another charge of $218 million, further reducing the stated value of the subprime home lending portfolio.  By July 2008, CIT had completely disposed of all of its home lending business for only $1.5 billion and relief from $4.4 billion in debt.  The sale price reflected a valuation of the subprime home lending portfolio that was less than 50% of what defendants had claimed the assets were worth little more than one year before.  As a UBS AG analyst commented, "[u]gly prices, but this basically had to happen in order for CIT to survive."

## BACKGROUND TO DEFENDANTS' FALSE AND MISLEADING STATEMENTS ABOUT CIT'S STUDENT LENDING PORTFOLIO

76.     At the same time as they had been expanding CIT's subprime home lending business, defendants leapt into student lending.  Following the February 2005 purchase of SLX, defendants

immediately pushed for a rapid expansion of the student loan business. This expansion included both a build-up of the federally guaranteed loan portfolio and a foray into private student loans, which have no such guarantee. Prior to being acquired by CIT, SLX had offered little or no private student loans. What private loans there were, were usually offered to schools with high amounts of federally guaranteed loans as an inducement for them to keep doing business with SLX. Indeed, at the end of 2005 CIT had only made $17.6 million in private student loans. By the end of 2006 that number had ballooned to $301.4 million and up to $560.9 million by the end of 2007, an astounding 3,200% growth rate.

77.    While lacking government backing, the private loans charged far higher interest rates – often exceeding 15% – than the federally guaranteed loans and thus were potentially more lucrative. And, like the worst of the subprime loans, the riskiest of the private student loans could be bundled and sold, so long as there were buyers and an active secondary market. The lack of any government backing, however, meant that 100% of the private loans were "at risk" of default and nonpayment, compared to only 2%-3% of any federally guaranteed loans that was at risk. For investors, a critical factor in evaluating any lending portfolio is the potential loss exposure, the amount of loans at risk. Even with billions of dollars in federal loans, CIT's risk exposure was fairly small as a result of the government guarantee. In fact, throughout the Class Period, CIT's risk exposure to federally guaranteed loans was generally less than the private student loan risk. Moreover, as detailed herein, CIT's risk exposure to the Company's Silver State loans far exceeded the exposure to any other private student loan portfolio and represented approximately 22% of the total "at risk" loans in the Company's entire student lending portfolio.

78.    Defendants immediately were apprised of the risks of venturing into the private student loan market. Prior to the CIT acquisition, SLX had primarily used First Marblehead Bank

for financing related to student loans. After the acquisition, and as defendants pushed for the expansion into private student loans, CIT's executives became frustrated with what they viewed as First Marblehead's conservative lending requirements and unwillingness to fund the riskier private student loans. As a result, soon after the SLX acquisition, defendants took out a $500 million line of credit from Liberty Bank to fund the private loan program. At the time, and in an apparent effort to minimize risk, CIT internally required that the ratio of federally guaranteed loans to private loans at any institution should not be less than 85:15. Soon, however, defendants were breaking their own rule.

79.     By the end of 2006, CIT's student lending assets had grown to more than $8.7 billion, the Company's second largest business behind subprime home lending. Defendants had incentivized the founders of SLX to stay with CIT with offers of multi-million dollar bonuses predicated on hitting growth targets, irrespective of loan quality or losses. As investors would later learn, that growth was coming at any cost. The first sign of trouble came in March 2007, with the disclosure that the boom in CIT's federally guaranteed student loans had been driven by kickbacks to financial aid officers. According to New York Attorney General Andrew Cuomo (the "NYAG"), CIT had obtained loans and coveted spots on the "Preferred Lender Lists" provided by schools to students and their parents in exchange for giving financial aid officers lucrative consulting arrangements, company stock and other inducements. Almost immediately after the NYAG announcement, other attorneys general, the Department of Education and Congress launched a series of investigations and legislative initiatives aimed at stopping the kickbacks made by CIT and other student lenders. Within two months, CIT had settled with the NYAG, paying $3 million and entering into a Code of Conduct prohibiting the Company from offering inducements to student loan officers.

80.     On April 9, 2007, after the student loan kickbacks scandal was publicly reported, defendants announced that CIT had "placed senior [SLX] executives Robert deRose, Vice Chairman; Mike Shaut, CEO; and Fabrezio Balestri, President on administrative leave and [] that Randall Chesler, President of CIT Consumer Finance, would assume interim oversight of the organization." Chesler was based in CIT's New York headquarters and reported directly to defendants Hallman and Peek.  Peek himself confirmed in CIT's April 9, 2007 announcement that "'[a]s a company that holds itself to the highest standards of business ethics and integrity, we take the allegations raised by New York Attorney General Cuomo very seriously. ***The management changes announced today should facilitate CIT's independent review of [SLX's] student lending practices*** and its assessment of existing policies and procedures governing student lending.'"  With the entire top management of SLX suspended, and with the attention drawn by the student loan kickbacks scandal, by April 2007, defendants were, by their own admission, focused on SLX and CIT's student loan portfolio and lending practices.

81.     As the subprime home lending market was collapsing around them and the NYAG investigation was effectively putting an end to the growth of CIT's government-backed loans, defendants were busy trying to stem the tide of bad news.  Unfortunately for them, and ultimately for CIT's investors, by May 2007, as defendants took control of the day-to-day management of SLX and the student loan portfolio, the news got worse.  As defendants were aware, CIT had made over $130 million in private loans, more than 33% of all of the Company's private student loans and 21% of all at risk loans, to students of just one vocational school, Silver State.

82.     Silver State had been founded in 2000 by Jerry Airola ("Airola").  Airola had no experience with professional schools, flight training or the helicopter business, but proclaimed that he was going to revolutionize the way students would learn to fly.  Silver State was promoted to low

income, second career individuals on the basis that they would be certified to fly helicopters in 18 months and would then be hired to teach new Silver State students or work for Silver State's purported aviation services. Silver State's brochures touted $80,000-a-year salaries and promised that "[w]e hire almost every graduate of our program as an instructor in our schools." Given the low income target audience, at sales pitches around the country, Airola and his staff assured prospective students that they could get 100% financing for the $69,900 tuition and not have to start paying the loans for 18 months, when they would purportedly be certified and ready for a commercial aviation job.

83.    Unlike most schools, public or private, the tuition payments were non-refundable and Silver State demanded that the entire tuition be paid within 90 days of a student entering the school. Regardless of whether a student completed his or her training or was able to get certified, Silver State would keep the entire $69,900 tuition. Using these upfront tuition payments, Airola quickly grew Silver State to 34 locations in 12 states, signing up more than 2,500 students. What Airola and Silver State did not do was produce certified helicopter pilots.

84.    As Silver State expanded to new locations and signed up new students, it did not add equipment or qualified staff. As Randy Rowles ("Rowles"), the former Vice President of Silver State has admitted, "'Silver State didn't care about providing the service. Silver State cared about getting paid for the service.'" The business plan was built around getting new students to commit to the school, pocketing the tuition payments quickly and moving on. Rowles confirmed that Silver State only "'want[ed] about 20 percent of these people to finish,'" so that Airola and his cronies could pocket the tuition without having to provide any training or explain why there were no jobs for graduates. Classes were not taught or were severely over-crowded, flight simulators and aircraft were unavailable and few students could get the hours needed to graduate within 18 months. The

small collection of turbine helicopters Silver State had were rarely used for training, and were primarily flown from one school to the next as a backdrop for recruiting seminars and to give the impression that each school had its own fleet of aircraft. As a result, Silver State was never able to qualify as an Federal Aviation Administration ("FAA") Part 141 approved school.[2] By March 2007, Doug Henkel, SLX's Vice President of Business Development, was privately meeting with Silver State executives to discuss the school's lack of graduates. According to another former Vice President at SLX, who was with CIT from prior to the start of the Class Period through the end of 2007 and dealt with the Company's private student loans, it was also recognized within CIT that the lack of FAA Part 141 approval and the substandard conditions at Silver State rendered the few graduates of Silver State unemployable. The same Vice President recalled that the operators of other helicopter schools that CIT was providing loans for during this period, including Quantum Helicopters, had identified for the Company that Silver State was a scam operation.

85.    The Silver State ponzi scheme was able to grow and thrive as a result of private lenders and the duped students they financed. A key selling point at the school's recruitment seminars was the ability of Silver State to get virtually any student full financing for their tuition. Silver State did this by entering into partnerships with lenders, guaranteeing them a high volume of loans, on which they could charge high interest rates, and protecting the lenders from liability under the FTC Holder Rule. In February 2003, KeyBank became Silver State's first lending "partner." This provided the funding, and legitimacy, that propelled Silver State to grow exponentially and,

---

[2]    To receive FAA Part 141 approval, a school must meet minimum curriculum and equipment standards. Any school seeking FAA Part 141 approval is subjected to FAA audits to ensure that it is maintaining these standards. 14 C.F.R. §§141.1-141.101. None of Silver State's school sites were ever subjected to or passed an FAA Part 141 audit.

eventually, become the largest failed private vocational school in United States history. In a little more than two years, KeyBank loaned approximately $50 million to Silver State students.

86.     Despite the risks associated with the loans, KeyBank, like CIT later, was willing to lend to Silver State students because of the high interest rates, often exceeding 15%, that could be charged and the ability to bundle and sell the loans after they were made and before the Silver State students were supposed to have earned their flight certification. Silver State also agreed to prepare the loan agreements for its students and omit the Holder Rule Notice required pursuant to 16 C.F.R. §433. Following a rash of vocational school frauds, the FTC Holder Rule, in sum, was intended to make lenders subject to the same claims or defenses a debtor could use against the seller of goods or services. In other words, students of vocational schools could void their debt obligation to a lender by claiming that they had not received the bargained for services from the school. To protect themselves and their borrowers, lenders were expected to do sufficient due diligence to confirm that schools were able to fulfill their educational requirements. By arranging the loans and not including the Holder Rule Notice, however, Silver State was able to insulate lenders through a legal loophole, leaving only the school liable to students for the failure to provide the promised training. Critically, by eliminating the Holder Rule Notice in the loan documentation, Silver State's partner lenders were also able to bundle and sell the loans into the secondary market before students had completed their purported training.

87.     Even with Silver State's efforts to protect its lenders, KeyBank quickly realized that the school's students were not able to complete their helicopter training or get certified to fly commercially. Little more than one year after KeyBank became Silver State's preferred lender, the bank recognized that the school's high drop out rate and rising loan delinquencies were substantial risks to their loan portfolio. According to KeyBank documents, by March 2004 KeyBank had

significant concerns about Silver State and acknowledged internally that "it could be the next 'big one' to go under." By March 2005, KeyBank had identified Silver State as one of the "highest risk schools" and, soon thereafter, ceased making any loans to Silver State students.

88.     Just as KeyBank identified Silver State as one of the "highest risk schools" and ceased all lending to its students, CIT signed on to become the school's preferred lender and agreed to fund up to $65 million in private loans. Anxious to grow student loan assets, and looking for ways to derive higher margins from the student loan business, Silver State was one of CIT's first private student loan programs after the acquisition of SLX. With its rapid growth and marketing schemes, Silver State was guaranteed to generate tens of millions of dollars in loans at interest rates far higher than CIT could charge on the federally guaranteed student loans. With Silver State's willingness to violate the FTC Holder Rule for its partner lenders, CIT could securitize and sell the loans before the risks of students not graduating and being unable to repay the loans became apparent. And, as internal reports reveal, by the end of 2006, CIT had made more than $90 million in loans to Silver State students. In short order, CIT had made far more private loans to Silver State students than to students of any other school and approximately 33% of all of the Company's private student loans were to Silver State students.

89.     The quality, as opposed to volume, of the Silver State loans was, for CIT, relatively unimportant so long as the Company could securitize and sell the loan portfolio. Just as CIT had done with some of its subprime home lending assets, it attempted to dump the private student loans, and in particular the Silver State loan portfolio, before the known risks with the loans materialized. So long as defendants could sell the Silver State loans before it became publicly known that the school was a scam and the impairments and risks associated with the loans publicly materialized,

defendants could escape liability for the loans themselves and their false statements and omissions about them.

90.     By April 2007, when SLX's senior management team was removed as a result of the NYAG's kickbacks investigation and defendant Peek publicly proclaimed that he and CIT's executives were focusing on the student loan business, the Company had made more than $125 million in loans to Silver State students.  And, as defendants knew from the SLX Management Process Meetings and related reports, no more than 10% of all Silver State students CIT had lent money to had graduated and, of those few who did, approximately 30% were delinquent in making payments on their loans.  Without informing investors, defendants swiftly tried to distance themselves from the impending Silver State disaster.  By early May, defendants had placed Silver State on CIT's "Suspended Accounts" list and directed SLX employees to cease making all loans to Silver State students.  Thereafter, on May 14, 2007, the account manager for Silver State at CIT, Gary Rohmann, met with Silver State executives and informed them that CIT was ceasing all loans and was going to wind down the relationship with Silver State.

91.     At the same time defendants ceased all lending to Silver State students – effectively cutting off funding and dooming the ponzi scheme – they were desperately trying to sell the Silver State loan portfolio.  CIT pitched the entire portfolio of Silver State student loans to Deutsche Bank, Greystone & Co., Inc. and MyRichUncle.com.  CIT's management was, according to a former Vice President at SLX who was involved in the private loans at the time, very stressed about getting the Silver State loan portfolio sold in 2007 and the sale was motivated by the known problems with Silver State and the recognition that those problems meant that there was very little chance that CIT would be able to collect on the loans.  Had they succeeded, defendants could have wiped the entire mess off of CIT's books and never disclosed the truth to the Company's investors.  The efforts to sell

- 43 -

the Silver State loan portfolio, however, were unsuccessful.  By July 2007, CIT was internally

reporting that the effort to dump the Silver State loans had collapsed "due to market conditions."

## DEFENDANTS' FALSE STATEMENTS AND OMISSIONS REGARDING SILVER STATE AND CIT'S PRIVATE STUDENT LOAN PORTFOLIO

92.     As described in ¶¶59-60, on May 8, 2007,  defendants filed CIT's quarterly report

with the SEC on Form 10-Q for 1Q 2007.  The Form 10-Q reported CIT's financial results for 1Q

2007, including EPS of $1.30 per share and $9.877 billion in student loan assets.  CIT's Form 10-Q

also reported that the Company's student loan assets had grown $1.104 billion since December 31,

2006 – a 12.5% increase in three months – and comprised 13.5% of CIT's total assets, second only

to the reported home lending assets.  Moreover, nearly 20% of CIT's asset growth in 1Q 2007 came

from student lending.

93.     Defendants Peek and Leone assured investors that they personally "evaluated [CIT's]

disclosure controls and procedures and have concluded that such procedures are effective as of

March 31, 2007."  Peek and Leone also signed certifications filed with the Form 10-Q stating that

they had personally reviewed the Company's Form 10-Q and that the public filing "does not contain

any untrue statement of a material fact or omit to state a material fact necessary to make the

statements made, in light of the circumstances under which such statements were made, not

misleading with respect to the period covered by this report" and that "[t]he information contained in

the [1Q 2007 Form 10-Q] fairly presents, in all material respects, that financial condition and results

of operations of CIT."

94.     On May 14, 2007, defendants Leone and Hallman attended the UBS Financial

Services Conference and made presentations regarding CIT's financial and business performance to

investors and analysts.  With respect to CIT's student lending portfolio, defendants stated that "what

we've created is a pretty valuable business. ***It carries a 98% average greater protection on it and it***

*is performing well. . . . But the business is performing well and we had a great first quarter*. We have terrific expectations in terms of its continued success over the year. So operating conditions in the business in terms of it working, it's working ahead of schedule and . . . a lot more valuable than when we bought it." In response to a question about the future of the student lending business after the NYAG investigation, defendants stated that "[i]n the return, everything we said about the business is true; growth, the returns were there, our ability to grow it with our expertise including the school channel."

95.    The 1934 Act Defendants' statements in May 2007 were false and misleading when made. Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a)    As detailed in ¶¶125-130, 150-164, rather than appropriately accounting for the known and increasing uncertainties and impairments to CIT's portfolio of Silver State private student loans, defendants violated GAAP and failed to appropriately reserve for the Company's loan loss exposure;

(b)    As a result of defendants' GAAP violations related to the Silver State private student loans, CIT's reported net income and EPS for 1Q 2007 were materially overstated. As detailed in ¶¶125-130, 150-164, had defendants complied with GAAP and appropriately accounted for the Silver State loan loss exposure, excluding the impact of defendants' failure to properly account for the subprime home loan portfolio, CIT's 1Q 2007 net income would have been only $129 million, not the reported $271.4. Taken together with the GAAP violations associated with the subprime home loans, defendants' GAAP violations resulted in a $657.6 million overstatement of 1Q 2007 net income and allowed defendants to report positive EPS of $1.30 as opposed to a loss of $1.80 per share;

(c)     CIT's student loan business was not "performing well" and, but for defendants failure to properly account for the Silver State loans and the subprime home loans, CIT would have missed analysts' 1Q 2007 EPS projection of $1.27 by $3.07 per share;

(d)     By the end of 1Q 2007, CIT had made more than $113.3 million in private loans to Silver State students, far exceeding the concentration of such loans at any other institution. The Silver State loans represented over 31% of CIT's total private student loan portfolio and 19% of the Company's total at risk student loans;

(e)     One hundred percent of the loans made to Silver State students were private student loans, violating CIT's internal guideline that no more than 15% of the loans to the students of any institution be non-guaranteed, private loans;

(f)     Silver State suffered from an abysmal graduation rate, below 20%, as a result of inadequate staffing at the school locations and a lack of simulators and training helicopters. Even for those few students who graduated, the promised aviation and training jobs were nonexistent. By the end of 1Q 2007, less than 10% of the Company's loans to Silver State students were in repayment, meaning that over 90% of the Silver State students were still, unsuccessfully attempting to fulfill graduation requirements;

(g)     As a result of the poor training and low graduation rate, which led to drop-outs and prevented graduates from getting professional helicopter positions, the 60 days and over delinquency rate for CIT's few Silver State private student loans in repayment was 29.93% at the end of 1Q 2007. In comparison, at the same time, the average delinquency rate for CIT's entire private student loan portfolio was less than 4.5%;

(h)     As a result of CIT's material exposure to Silver State and the known risks with the school and its students, in early May 2007 defendants ordered CIT's employees to cease

making any new loans to Silver State students and placed Silver State on the Company's Suspended Accounts list. Defendants' directive to cease all lending to Silver State students meant that the school was cut off from its only revenue stream, would be unable to continue operations for more than six months and virtually all of the students for whom CIT had provided loans would be unable to obtain flight certification or repay their outstanding loans;

(i)    As a result of the known infirmities and impairments to the loans, defendants were unsuccessfully attempting to sell the entire Silver State private student lending portfolio – 31% of all of CIT's private student loans – to Deutsche Bank, Greystone & Co., Inc. or MyRichUncle.com, among others; and

(j)    The certifications Peek and Leone made together with CIT's 1Q 2007 Form 10-Q (¶93) stating that the Company's financial results were reported in accordance with GAAP were, as described above and in ¶¶125-130, 150-164, false and misleading when made.

96.    Defendants' statements in May 2007 regarding CIT's financial results and the Company's student lending business, which were false and misleading when made, had a direct effect on CIT's stock price. On May 7, 2007, CIT's stock price rose $0.53 per share and continued to trade at artificially inflated levels.

97.    By the early summer of 2007, there was speculation that CIT would pursue a sale of the student lending assets and return to the Company's core commercial market. As a CreditSights analyst reported on July 18, 2007, "[w]e would not rule out the company pursuing an outright sale for the right price as [] the recent discount on home loan weakness could provide a more attractive acquisition entry point."

98.    On July 18, 2007, defendants issued a press release entitled "CIT Reports Second Quarter Results; Exiting Home Lending Business." The press release reported CIT's financial

results for 2Q 2007, including $10.285 billion in student loan assets, and stated that the decrease in CIT's home lending business volume had been offset by "[n]ew business volume increases in student and small business lending." The press release also stated that CIT's increased reserves for loan losses were driven by home lending.

99.    That same day, July 18, 2007, defendants hosted a conference call with investors and analysts. While attention was focused on defendants' disclosures regarding CIT's subprime home lending portfolio, defendants Peek and Leone also responded to inquiries regarding the student loan business. During the call, the following exchange between Leone and an analyst took place:

> **Chris Brendler** . . . One final question. If you decide to exit the student lending business next, would we see anywhere near as big an impact on your earnings [as there was with the home lending business]?
>
> **Joe Leone** . . . You mean in terms of the operating earnings contribution? I would say no.
>
> **Chris Brendler** . . . And the write-down?
>
> **Joe Leone** . . . We didn't evaluate that. As I said before, we have about $300 million of goodwill and I think as Jeff said, the business is twice as big as when we bought it.
>
> **Chris Brendler** . . . ***But there's almost no credit risk in that business***.
>
> **Joe Leone** . . . ***That's right.*** And all those loans, the historical book is at the old rate or the grandfathered rate, so to speak.

100.    On August 7, 2007, defendants filed CIT's quarterly report with the SEC on Form 10-Q for 2Q 2007. The Company's Form 10-Q was signed by defendants Leone and Taylor and reported CIT's financial results for 2Q 2007, including $10.285 billion in student loan assets and $364.6 million in private student loans. CIT's Form 10-Q also reported that the Company's student loan assets had grown $1.513 billion since December 31, 2006, and over $408 million since March 31, 2007. Student loans now comprised 13.9% of CIT's total assets, just slightly less than CIT's

home lending assets, and was one of only two areas of CIT's business to show any growth for the quarter. Moreover, nearly 20% of CIT's asset growth in 2Q 2007 came from student lending.

101.    In the 2Q 2007 Form 10-Q, defendants reassured investors that, despite an increase in student loan delinquencies, "[t]he higher delinquency in the student loan portfolio is not indicative of potential loss due to the underlying U.S. government guarantee" and "***non-performing assets are insignificant***." Commenting on credit metrics, defendants again stated that "[w]e present the metrics excluding student loans, as virtually the entire student loan portfolio (other than private loans, which are not guaranteed) is covered by the U.S. government guarantees for 97%-98% of the remaining balance."

102.    Defendants Peek and Leone assured investors that they personally "evaluated [CIT's] disclosure controls and procedures and have concluded that such procedures are effective as of June 30, 2007." Peek and Leone also signed certifications filed with the Form 10-Q stating that they had personally reviewed the Company's Form 10-Q and that the public filing "does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "[t]he information contained in the [2Q 2007 Form 10-Q] fairly presents, in all material respects, that financial condition and results of operations of CIT."

103.    On September 11, 2007, after the issuance of CIT's 2Q 2007 Form 10-Q, Peek attended the Lehman Brothers 5th Annual Services Conference and made a presentation regarding CIT's financial performance to investors and analysts. With respect to CIT's student lending portfolio, Peek stated that "[o]perationally, ***the business is in the midst of its strongest operating quarter. We had record originations in July and the school channel in August. . . . So despite all***

*the turmoil and the legislative uncertainty that has plagued the sector for much of 2007, the operating team there is doing a very good job*. . . . It is a business with very good growth potential."

104.     The 1934 Act Defendants' statements in July, August and September 2007 were false and misleading when made.  Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a)     As detailed in ¶¶125-130, 150-164, rather than appropriately accounting for the known and increasing uncertainties and impairments to CIT's portfolio of Silver State private student loans, defendants violated GAAP and failed to appropriately reserve for the Company's loan loss exposure;

(b)     As a result of defendants' GAAP violations related to the Silver State private student loans, CIT's reported net income and EPS for 2Q 2007 were materially overstated.  As detailed in ¶¶125-130, 150-164, had defendants complied with GAAP and appropriately accounted for the Silver State loan loss exposure, for 2Q 2007 CIT would have had a loss of $379.5 million as opposed to the reported loss of $241.5 million.  Properly accounting for the Silver State loans would have reduced CIT's reported EPS by $0.32 per share;

(c)     There was, in fact, significant credit risk and substantial non-performing assets in the student lending business as a result of the Silver State private student loans.  By 2Q 2007, CIT had made more than $138 million in private loans to Silver State students, far exceeding the concentration of such loans at any other institution.  The Silver State loans represented nearly 38% of CIT's total private student loan portfolio and 23% of the Company's total at risk student loans;

(d)    One hundred percent of the loans made to Silver State students were private student loans, violating CIT's internal guideline that no more than 15% of the loans to the students of any institution be non-guaranteed, private loans;

(e)    Silver State suffered from an abysmal graduation rate, below 20%, as a result of inadequate staffing at the school locations and a lack of simulators and training helicopters. Even for those few students who graduated, the promised aviation and training jobs were nonexistent. By the end of 2Q 2007, less than 10% of CIT's loans to Silver State students were in repayment;

(f)    As a result of the poor training and low graduation rate, which led to drop-outs and prevented graduates from getting professional helicopter positions, the 60 days and over delinquency rate for CIT's few Silver State private student loans in repayment had risen to 34.8% at the end of 2Q 2007. In comparison, at the same time, CIT reported that the average delinquency rate for CIT's entire student loan portfolio was 5.01%;

(g)    As a result of CIT's material exposure to Silver State and the known risks with the school and its students, in early May 2007 defendants ordered CIT's employees to cease making any new loans to Silver State students and placed Silver State on the Company's Suspended Accounts list. Defendants' directive to cease all lending to Silver State students meant that the school was cut off from its only revenue stream, would be unable to continue operations for more than six months and virtually all of the students for whom CIT had provided loans would be unable to obtain flight certification or repay their outstanding loans;

(h)    By July 2007, CIT had received only a single, inadequate bid for the Silver State private student loan portfolio from Deutsche Bank, and internally acknowledged that that they would be unable to sell the Silver State loan portfolio due to "market conditions" and were stuck with the overvalued and under reserved loans; and

(i)      The certifications Peek and Leone made together with CIT's 2Q 2007 Form 10-Q (¶102) stating that the Company's financial results were reported in accordance with GAAP were, as described above and in ¶¶125-130, 150-164, false and misleading when made.

105.     Defendants' statements during July, August and September 2007 regarding CIT's financial results and the student lending business, which were false and misleading when made, had a direct effect on CIT's stock price.  While CIT's stock price declined dramatically as a result of the subprime home lending disclosures, as a result of defendants' false and misleading statements it continued to trade at artificially inflated levels above $35 per share.

106.     On October 17, 2007, defendants issued a press release entitled "CIT Reports Third Quarter Results; Quarterly Financial Highlights."  The press release reported CIT's financial results for 3Q 2007, including a net loss of $46.3 million, and, with respect to student lending, stated that "[n]ew business volume improved from last quarter."  In the press release, defendants provided that "delinquencies increased moderately," and stated that this was due to "seasoning of the student lending portfolio."  The press release quoted Peek as follows:  "'We made good strategic progress this quarter in a very challenging market environment which highlights the value of our model and the resilience of our franchise . . . .'"

107.     That same day, October 17, 2007, defendants hosted a conference call with analysts and investors to discuss CIT's business operations and the Company's 3Q 2007 financial results. While attention was again focused on disclosures regarding CIT's subprime home lending portfolio, defendants Peek and Leone also addressed inquiries regarding the student lending business: "***Our team did a great job delivering record new business volume in what is seasonally the most important quarter of the year***.  School channel originations were up 17% from a year ago, and that

is important because with the new legislation, in-school originations are, far and away, the most profitable for us."

108.    On November 6, 2007, defendants filed CIT's quarterly report with the SEC on Form 10-Q for 3Q 2007.  The Company's Form 10-Q was signed by defendants Leone and Taylor and reported CIT's financial results for 3Q 2007, including $11.552 billion in student loan assets and $486.3 million in private student loans.  CIT's Form 10-Q also reported that the Company's student loan assets had grown $2.779 billion since December 31, 2006, and over $1.266 billion since June 30, 2007.  Student loans now comprised 14.9% of CIT's total assets, and had replaced home lending as CIT's largest business line.

109.    In the 3Q 2007 Form 10-Q, defendants reassured investors that, despite another increase in student loan delinquencies, the delinquencies were "not indicative of potential loss due to the underlying U.S. government guarantee."  Commenting on credit metrics, defendants stated that "[w]e exclude student loans [from the metrics], as virtually the entire student loan portfolio (other than private loans, which are not guaranteed) is covered by U.S. government guarantees for 97%-98% of the remaining balance."

110.    Defendants Peek and Leone assured investors that they personally "evaluated [CIT's] disclosure controls and procedures and have concluded that such procedures are effective as of September 30, 2007."  Peek and Leone also signed certifications filed with the Form 10-Q stating that they had personally reviewed the Company's Form 10-Q and that the public filing "does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "[t]he information contained in

the [3Q 2007 Form 10-Q] fairly presents, in all material respects, that financial condition and results of operations of CIT."

111.    On November 15, 2007, defendant Leone attended the Merrill Lynch Banking and Financial Services Investor Conference and made presentations regarding CIT's financial performance to investors and analysts.  With respect to CIT's student lending portfolio, Leone stated "there is interest in this business because it has – ***it really does have a good growth demographic*** as many of you think about who would take a student loan and why.  And that's one of the reasons we got into it.  ***It still has that good growth demographic***."

112.    On December 11, 2007, defendant Peek attended the Goldman Sachs Financial Services CEO Conference and made presentations regarding CIT's financial performance to investors and analysts.  With respect to CIT's student lending portfolio, Peek stated:  "***We have effectively exited the consolidation loan and the private loan channels*** and we're concentrating on the government guaranteed school channel."  Responding to questions about CIT's student lending business, Peek said that "I certainly can't argue with their ability to generate loans.  And they've been very successful in the school channel. . . .  And once again, we really don't focus – I know recent headlines – ***we don't really emphasize the private loan at all***.  Our, 95% of our portfolio is government guaranteed."

113.    The 1934 Act Defendants' statements in October, November and December 2007 were false and misleading when made.  Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a)    As detailed in ¶¶125-130, 150-164, rather than appropriately accounting for the known and increasing uncertainties and impairments to CIT's portfolio of Silver State private

student loans, defendants violated GAAP and failed to appropriately reserve for the Company's loan loss exposure;

        (b)    As a result of defendants' GAAP violations related to the Silver State private student loans, CIT's reported net income and EPS for 3Q 2007 were materially overstated.  As detailed in ¶¶125-130, 150-164, had defendants complied with GAAP and appropriately accounted for the Silver State loan loss exposure for 3Q 2007 CIT would have had a loss of $291.8 million, as opposed to the reported $133.3 million loss.  Properly accounting for the Silver State loans would have reduced CIT's reported EPS by $0.19 per share;

        (c)    Despite the claim that CIT does not "really emphasize the private loan channels," by 3Q 2007 the Company had made more than $158.5 million in private loans to Silver State students, far exceeding the concentration of such loans at any other institution.  The Silver State loans represented over 32% of CIT's total private student loan portfolio and 21% of the Company's total at risk student loans;

        (d)    One hundred percent of the loans made to Silver State students were private student loans, violating CIT's internal guideline that no more than 15% of the loans to the students of any institution be non-guaranteed, private loans;

        (e)    Silver State suffered from an abysmal graduation rate, below 20%, as a result of inadequate staffing at the school locations and a lack of simulators and training helicopters.  Even for those few students who graduated, the promised aviation and training jobs were nonexistent.  By the end of 3Q 2007, less than 10% of the Company's loans to Silver State students were in repayment;

        (f)    As a result of the poor training and low graduation rate, which led to drop-outs and prevented graduates from getting professional helicopter positions, the 60 days and over

delinquency rate for CIT's few Silver State private student loans in repayment was 35.65% during 3Q 2007. In comparison, at the same time, CIT reported that the average delinquency rate for the Company's entire student loan portfolio was 5.46%;

(g)     As a result of CIT's material exposure to Silver State and the known risks with the school and its students, in early May 2007 defendants ordered CIT's employees to cease making any new loans to Silver State students and placed Silver State on the Company's Suspended Accounts list. Defendants' directive to cease all lending to Silver State students meant that the school was cut off from its only revenue stream, would be unable to continue operations for more than six months and virtually all of the students for whom CIT had provided loans would be unable to obtain flight certification or repay their outstanding loans;

(h)     By July 2007, CIT had received only a single, inadequate bid for the Silver State private student loan portfolio from Deutsche Bank, and internally acknowledged that that they would be unable to sell the Silver State loan portfolio due to "market conditions" and were stuck with the overvalued and under reserved loans; and

(i)     The certifications Peek and Leone made together with CIT's 3Q 2007 Form 10-Q (¶110) stating that the Company's financial results were reported in accordance with GAAP were, as described above and in ¶¶125-130, 150-164, false and misleading when made.

114.     Defendants' statements during October, November and December 2007 regarding CIT's financial results and the student lending business, which were false and misleading when made, had a direct effect on CIT's stock price. While CIT's stock price again declined dramatically as a result of additional disclosures regarding the Company's home lending portfolio, as a result of defendants' false statements and omissions it continued to trade at artificially inflated levels above $25 per share.

## THE CIT-Z PREFERRED STOCK OFFERING

115. On October 17, 2007, CIT filed an amended registration statement and prospectus for the offering of CIT-Z preferred stock. The registration statement was signed by defendants Peek, Leone, Taylor, Butler, Freeman, Lyne, Parrs, Ring, Ryan, Sternberg, Tobin and Van Deusen.

116. The registration statement incorporated CIT's reported financial results and SEC filings for the periods 1Q 2007 and 2Q 2007, which were materially false and misleading for the reasons set forth in ¶¶95, 104, 113, 125-130, 150-164.

117. The CIT-Z prospectus also incorporated CIT's 2Q 2007 financial statement and included CIT's consolidated financial results for 2Q 2007, which were materially false and misleading for the reasons set forth in ¶¶104, 125-130, 150-164. The prospectus also contained a recitation of generic risks related to CIT's "business and industry," but failed to disclose the material risks associated with the Company's student lending portfolio as detailed in ¶¶104, 125-130, 150-164.

118. Pursuant to the registration statement and prospectus, the 1934 Act Defendants issued and sold 24 million shares of CIT-Z preferred stock, plus an over-allotment of 3.6 million shares, raising $690 million.

## THE TRUTH ABOUT CIT'S PRIVATE STUDENT LOAN PORTFOLIO EMERGES

119. On February 29, 2008, defendants filed CIT's annual report with the SEC on Form 10-K for 4Q and FY 2007. Buried within the Company's Form 10-K was the disclosure, for the first time, that CIT's reported assets included $196 million of private, unguaranteed student loans – one-third of all the private loans in CIT's portfolio and 22% of the at risk student loan portfolio – to students of a defunct "private pilot training school":

> The Company ceased originating private (unguaranteed) student loans in late 2007 based on an evaluation of the return and risk characteristics of this student lending product, but has continued to fund pre-existing loan commitments. In

February 2008, a private pilot training school filed bankruptcy. Our student lending business had originated private (unguaranteed) loans to students of the school, which totaled approximately $196 million in total principal and accrued interest as of December 31, 2007. We ceased originating new loans to students of this school in mid-2007. Approximately $17 million of the total loans represents loans to students who have completed their education (loans in "repayment"); the remainder is to students who have not yet completed their training. Loans in repayment to students of this school that were past due loans 60 days or more were approximately $2.0 million at December 31, 2007. Collectibility of the outstanding principal and interest balance of loans that have both reached, and have not yet reached repayment status, will depend on a number of factors, including the student's current ability to repay the loan, whether a student has completed the licensing requirements, whether a student can complete any remaining education requirements at another institution (including making further tuition payments and accessing previous education records) and satisfy any remaining licensing requirements.

Management is currently evaluating the collectibility and projected cash flows related to these loans. Given that the loans are unsecured and that uncertainties exist regarding collection, management currently expects that additional reserves may be required in 2008 in connection with these loans.

120.   On March 6, 2008, soon after the filing of CIT's FY 2007 Form 10-K and the disclosure regarding CIT's exposure for the Silver State loans, securities analysts identified the negative, material impact that the previously undisclosed private student loans had on the Company's financial results.  On that day, a Keefe, Bruyette & Woods issued a report titled "CIT: Adjusting Q108 Estimate for Likely Student Loan Write-down."  The analyst reported that "we are lowering our Q108 EPS estimate to $0.08 from $0.76 to reflect our view that the company will have to write-down a significant portion of its private student loan portfolio."

121.   An Associated Press article on March 6, 2008, titled "Analyst cuts CIT earnings target on expectation of write-off," reported that CIT's share price decline was due to "concerns that the company will take a massive charge to write down its student loan portfolio."  The article quoted analyst Sameer Gokhale reporting that "'there is increased risk that the company will have to charge off $179 million of private student loans made to students of a flight school which recently filed for bankruptcy.'"

122.    Neither on March 6, 2008, nor after the disclosure of the negative impact of the Silver State loans, did defendants deny that they would have to write-down those loans or otherwise suggest that the analyst reports were incorrect.  In fact, by the end of March 2008, defendants had written off over $111 million of the Silver State private student loans and have subsequently written off virtually all of the remaining loans.  By May 2008, it was reported that CIT's consumer loan and student loan books were in "liquidation mode" and, by November 2008, the Company had shuttered SLX and exited the student loan business.

123.    As a result of the February 29 and March 6, 2008 disclosures, CIT's already battered stock price fell precipitously.  On February 29, 2008, CIT's stock price declined $2.21 per share, to $22.22, and continued to decline on the following trading day to below $21.30 per share.  On March 6, 2008, CIT's stock price plummeted further, on huge trading volume of over 24 million shares, dropping $4.50 per share, to close at $15.86.  CIT's stock price has never recovered, and the Company is currently on the verge of bankruptcy.

124.    The price for CIT-Z preferred shares also dropped sharply in response to the February 29 and March 6, 2008 disclosures about CIT's private student lending exposure.  On February 29, 2008, the share price of CIT-Z dropped $1.25 and continued to decline on the following trading day.  On March 6, 2008, the share price of CIT-Z dropped an additional $3.30 to close at $13.00, down almost 50% from the offering price less than five months before.  The share price of CIT-Z has never recovered from the disclosure of the truth about CIT's private student lending practices.

## CIT'S FINANCIAL STATEMENTS WERE MATERIALLY MISSTATED IN VIOLATION OF GAAP

**Background**

125.     As detailed herein, CIT's publicly issued financial statements and related earnings releases during the Class Period were materially misstated in violation of GAAP for the following reasons:

(a)     For 4Q 2006, FY 2006 and 1Q 2007 defendants failed to record adequate and timely loan loss reserves and misled investors as to the significant loss exposure CIT faced related to the Company's portfolio of subprime home loans; and

(b)     For 1Q 2007, 2Q 2007 and 3Q 2007 defendants failed to record adequate and timely loan loss reserves or disclose the Company's significant loss exposure related to a portfolio of private student loans in the student lending business.

126.     SEC Staff Accounting Bulletin No. 102, *Selected Loan Loss Allowance Methodology and Documentation Issues* ("SAB 102") states, "[f]or many entities engaged in lending activities, the allowance and provision for loan losses are significant elements of the financial statements." CIT was no exception, and, as a result of defendants failure to record adequate and timely loan loss reserves, CIT's financial statements during the Class Period were in violation of GAAP and materially misstated. CIT's reported pre-tax income and EPS was materially overstated at each quarter during the Class Period as shown in the chart below:

| ($ in millions – except per share data) | 4Q 2006 | FY 2006 | 1Q 2007 | 2Q 2007 | 3Q 2007 |
|---|---|---|---|---|---|
| Originally Reported Pre-Tax Income (Loss) | $378.4 | $1,015.8 | $242.3 | $(241.5) | $(133.3) |
| Originally Reported EPS | $1.28 | $5.00 | $1.01 | $(0.70) | $(0.24) |

| ($ in millions – except per share data) | 4Q 2006 | FY 2006 | 1Q 2007 | 2Q 2007 | 3Q 2007 |
|---|---|---|---|---|---|
| **Home Lending:** Minimum Additional Loan Loss Provision Required under GAAP | $(470.1) | $(470.1) | $(544.3) | | |
| **Student Lending:** Minimum Additional Loan Loss Provision Required under GAAP | | | $(113.3) | $(138.0) | $(158.5) |
| Adjusted Pre-Tax Income (Loss) | $(91.7) | $545.7 | $(415.3) | $(379.5) | $(291.8) |
| Corrected EPS | $(0.32) | $1.74 | $(1.80) | $(1.02) | $(0.43) |

**Applicable Accounting Rules**

127.    GAAP constitutes those standards recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB"). SEC Regulation S-X, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC that are not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

128.    Statement of Financial Accounting Standards No. 5, *Accounting for Contingencies* ("FAS 5"), SAB 102, Statement of Financial Accounting Standards No. 114, *Accounting by Creditors for Impairment of a Loan* ("FAS 114"), EITF Topic No. D-80, *Application of FASB Statements No. 5 and No. 114 to a Loan Portfolio* ("EITF Topic D-80"), FASB Interpretation No. 14, *Reasonable Estimation of the Amount of a Loss* ("FIN 14"), SEC Financial Reporting Release No. 28 ("FRR 28"),  and Statement of Financial Accounting Standards No. 65, *Accounting for*

*Certain Mortgage Banking Activities* ("FAS 65") set forth the standards of financial accounting and reporting for loan loss reserves.

129.    Additionally, the American Institute of Certified Public Accountants ("AICPA") issues industry-specific Audit & Accounting Guides to provide guidance in preparing financial statements in accordance with GAAP. The Audit and Accounting Guide for Finance Companies ("AICPA Audit and Accounting Guide") was applicable to CIT. The AICPA also issues Audit Risk Alerts particularized by industry, including financial institutions. The Audit Risk Alerts are used by financial institutions, such as CIT, to address areas of concern and identify the significant business risks that may result in the material misstatement of the financial statements.

130.    CIT was also required under GAAP to prepare its financial statements in accordance with the following fundamental accounting principles:

- The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users of the financial reports in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, ¶34);

- The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources and the effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, ¶40);

- The principle that financial reporting should provide information about an enterprise's financial performance during a period because investors and creditors often use information about the past to help in assessing the prospects of an enterprise (FASB Statement of Concepts No. 1, ¶42);

- The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it (FASB Statement of Concepts No. 1, ¶50);

- The principle that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

- The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79);

- The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶95);

- The principle that that revenues and gains should not be recognized until they are both earned and realizable (FASB Statement of Concepts No. 5, ¶83); and

- The principle that if collectability of assets received for products, services or other assets is doubtful, revenues may be recognized on the basis of the cash received (FASB Statement of Concepts No. 5, ¶84).

## DEFENDANTS CONCEALED IMPAIRMENTS AND LOSSES IN CIT'S SUBPRIME HOME LENDING PORTFOLIO IN VIOLATION OF GAAP

**Summary**

131. As alleged in greater detail herein, prior to and during the Class Period, defendants caused CIT to engage in the origination and purchasing of inherently risky residential subprime mortgages. In fact, subprime home lending was a key to CIT's overall receivable and revenue growth between 2003 and 2006 – making up a staggering 33% of the Company's total growth in finance receivables over that period. Following CIT's public offering in 2002, when the home lending portfolio totaled just $963 million, defendants caused the home lending portfolio to grow rapidly through the end of 2006, by which time CIT had amassed a portfolio of over $10.1 billion of residential subprime mortgages representing over 15% of the Company's total finance receivables. Particularly in 2006, this growth was driven by defendants' reduction of minimum credit standards and documentation, and the increased use of stated income loans and ARMs. Unlike the relatively low risk associated with CIT's core commercial lending business lines, subprime home loans carried a substantial risk that the loans would be defaulted on and the underlying assets would be inadequate to cover the loan amounts.

132.     While the general risks with subprime home loans was recognized by investors, defendants repeatedly assured investors that CIT's portfolio was of superior quality to that of other subprime mortgage lenders.  During 2006, however, defendants had substantially lowered credit standards at CIT and the quality of the Company's subprime home loans declined sharply. Moreover, by late 2006, cracks began to appear in the domestic housing market and delinquency and default rates began to rise sharply at CIT.  Defendants, nevertheless, continued to tout CIT's "healthy portfolio," "more conservative" subprime lending and better risk management, while failing to record adequate and timely loan loss reserves on CIT's portfolio of subprime home loans. Instead, defendants hid the mounting losses and risks associated with CIT's home lending business from investors.  As the subprime mortgage market worsened, and defendants were unable to dispose of CIT's home lending assets, defendants were forced to disclose that those assets had been overvalued and under-reserved.  Beginning in July 2007, defendants were forced to write-down the value of the Company's subprime home lending portfolio by over $1.2 billion – a write-down of more than 10% of the total portfolio.  In accordance with GAAP and reflecting the already known risks and impairments to the loan portfolio, a substantial portion of these losses, however, should have been taken, in the form of loan loss reserves, by December 2006.  Had defendants complied with GAAP and properly accounted for the true value of the subprime home lending porfolio, the reported losses would have wiped out all of CIT's earnings and given investors a true picture of the Company's dire financial health.

**CIT's High Risk Loan Portfolio Was Susceptible to Losses**

133.     CIT's entire home lending portfolio consisted of domestic residential subprime mortgages.  As described in further detail herein, defendants were required, under GAAP, to take into account various portfolio attributes in evaluating the possible impairment of CIT's subprime mortgage portfolio and in the calculation of appropriate loan loss reserves at the end of each quarter.

The risks inherent in CIT's subprime home lending portfolio by the start of the Class Period were evidenced by the following portfolio attributes:

- CIT was relying on reduced credit standards to continue to increase the size of its home lending portfolio in the second half of 2006, and into 2007, despite the fact that the domestic housing market was collapsing. For example, in the third and fourth quarter of 2006 and the first quarter of 2007, CIT's subprime home lending portfolio increased by $1.5 billion, or 15%.

- At the start of 2007, the average FICO credit score associated with CIT's subprime mortgage portfolio was 636. An alarming 27% of the borrowers in the portfolio, representing roughly $3.2 billion in loans, had FICO credit scores below 600. Moreover, in an effort to increase the volume of loan originations, defendants were lowering CIT's credit standards, even as the subprime housing market was souring.

- More than half of all of CIT's mortgage loans were originated in 2005 and 2006 at the height of the domestic residential real estate bubble.

- Nearly 20% of the mortgage loans in CIT's portfolio, equal to roughly $2 billion, had loan-to-value ratios between 90% and 100% at origination. An additional $3.4 billion, nearly 30% of mortgages had loan-to-value ratios between 80% and 90% at origination. As a result, even a small decline in housing prices would, and did, result in high default rates, as borrowers are far less likely to make mortgage payments when the unpaid principal exceeds the value of the underlying asset.

- At least 50%, over $6 billion, of CIT's home lending portfolio consisted of the higher risk 2/28 and 3/27 ARMs which defendants were pushing in 2006. As these ARMs reset with higher interest rates, many borrowers can no longer afford their monthly payment which greatly increases the likelihood of default.

- Historically, CIT was able to sell mortgage loans meeting certain risk attributes in the secondary market. However, by the start of 2007, disruption in the secondary asset backed securities market adversely affected mortgage lenders such as CIT. Declining asset prices were freezing the secondary market loan sales, forcing CIT to hold more subprime home loans, and consequently the loss exposure on those loans, that it otherwise would have sold. CIT's securitized home lending assets decreased over 30% in the 12 months ending March 31, 2007.

- By late 2006 and during the Class Period, the largest geographic concentrations in CIT's subprime home lending portfolio were California and Florida – which made up approximately $2.8 billion or 27% of the entire home lending mortgage portfolio – states that had seen increases in housing prices and historically have high risks for defaults and foreclosures.

- As of December 31, 2006, approximately 42%, or $4.4 billion, of CIT's subprime home lending portfolio consisted of the high risk stated-income loans that defendants had internally pushed in 2006.

- By the end of 2006, 60 days and over delinquencies had spiked to $470.1 million or 4.77% of the CIT's home lending portfolio, up from just $185.5 million or 2.18% of the portfolio a year earlier. In just 12 months, the delinquency rate at CIT had more than doubled. By 1Q 2007, delinquencies of 60 days or more totaled $544.3 million or more than 5% of CIT's home lending portfolio.

- In one year, from 1Q 2006 to 1Q 2007, charge-offs associated with CIT's home lending portfolio nearly doubled, from 0.69% to 1.20% of the portfolio.

**Defendants Ignored Red Flags**

134. By the start of the Class Period, defendants knew or recklessly disregarded significant red flags as to the state of, and future prospects for, CIT's subprime home lending business and the loss exposure the Company faced related to its portfolio of subprime home loans. In fact, defendants admitted, belatedly, that it was aware of certain red flags by the start of the Class Period, stating in CIT's 3Q 2007 Form 10-Q that "*credit indicators in the home lending industry, and particularly the sub-prime market, have been declining over the past year*." As described in further detail herein, defendants were required, under GAAP, to take these "indicators" into account in evaluating the possible impairment of CIT's subprime mortgage portfolio and in the calculation of appropriate loan loss reserves at the end of each quarter. The red flags, or indicators, ignored by defendants include the following, all of which should have strongly indicated to defendants that the visibility and value of CIT's subprime home lending portfolios was impaired:

• As illustrated in the chart below, by mid-2006, and accelerating into 2007, the domestic housing market collapsed. For lenders, such as CIT, with substantial exposure to subprime borrowers, high loan-to-value loans and ARMs, this collapse immediately resulted in rising delinquency rates and impaired loans.



- The BBB-subprime ABX Index[3] experienced a sharp decline from late 2006 through 2007 (see BBB-subprime index on chart below). The rapid decline in the ABX Index was clear evidence that fixed income investors were anticipating significant losses from the risky subprime mortgages that backed RMBS. Disruption in the secondary ABS market adversely affected mortgage lenders such as CIT as described herein.



- On January 3, 2007 subprime mortgage lender Ownit Mortgage Solutions Inc. the 16th largest issuer of sub-prime mortgages in the U.S. filed for Chapter 11 bankruptcy protection.

- On January 31, 2007, the American Securitization Forum held its annual meeting, which was attended by sellers and purchasers of mortgage backed securities ("MBS") in the secondary market. According to the SEC, at the meeting, MBS investors discussed the likelihood of increased subprime losses and the likelihood that certain MBS, despite their AAA ratings, could be downgraded. After the

---

[3]     The ABX index was created in January 2006 when several banks collaborated with Markit to create an index to provide some purported value transparency within the RMBS market. During the relevant period, the ABX Index tracked the performance of 15 to 20 equally-weighted RMBS tranches backed by subprime collateral and was used as a barometer for assessing how subprime mortgage-backed assets were performing in the market place. Significantly, the AICPA's Center for Audit Quality has stated that "the pricing indicated by the ABX credit derivative index for subprime mortgage bonds may be a Level 2 input when used as an input to the valuation of a security backed by subprime mortgage loans."

conference, the secondary market for certain types of subprime loans collapsed. CIT's Vice President of Securitization, Usama Ashraf, was listed as a speaker and CIT was listed as a presenter at the conference.

- On February 5, 2007, Mortgage Lenders Network USA Inc., the country's 15th largest subprime lender with $3.3 billion in loans funded in 3Q 2006, filed for Chapter 11 bankruptcy protection.

- On February 7, 2007, HSBC, the largest subprime mortgage originator in the United States, announced that its loan loss provisions would exceed analysts estimates due to deteriorating conditions in the domestic housing market and increasing subprime delinquencies. HSBC announced that it was raising its loan loss provision by 20%, from $8.8 billion to over $10.5 billion.

- On February 13, 2007, ResMae Mortgage Corp., the country's 26th largest subprime lender, filed for Chapter 11 bankruptcy protection.

- During March 2007, the subprime mortgage industry continued to collapse, with several more subprime lenders declaring bankruptcy, announcing significant losses or putting themselves up for sale including Accredited Home Lenders, New Century Financial, DR Horton, Countrywide Financial and SouthStar Funding LLC.

- On April 2, 2007, New Century Financial the nation's second largest subprime mortgage lender, filed for Chapter 11 bankruptcy protection. CIT was particularly familiar with the problems New Century faced because CIT, along with Greenwich Capital Financial Products, agreed to provide up to $150 million of debtor-in-possession financing to New Century.

- In May 2007, Countrywide disclosed in its Form 10-Q for the first quarter of 2007 that its consolidated net earnings for the quarter had declined 37% from the first quarter of 2006. Countrywide indicated that its first quarter results had been negatively impacted by higher delinquencies related to its subprime lending, which had caused the company to take a write down of $217.8 million, due to its inability to sell certain of its subprime loans into the secondary market, and increase its allowance for loan losses on loans held for investment by $96 million.

- By late 2006, interest rates began to increase and CIT's 2/28 and 3/27 ARMs began to reset. Many borrowers were unable to refinance their ARMs as falling home prices had wiped out excess equity in their homes. This combination was devastating and left many borrowers with mortgages they could not afford. As shown in the graph below, delinquencies on subprime ARMs rapidly increased from mid 2006 into early 2007.



**DEFENDANTS VIOLATED GAAP**

135.    The AICPA Audit and Accounting Guide states:

> *Finance receivables normally are the most significant portion of a finance company's total assets*. . . .   A finance company should maintain a reasonable *allowance for credit losses*. . . . *The allowance for loan losses reduces the carrying amount of loans receivable to the amount that is estimated to be collectible.*

During November 2000 speech to the AICPA National Conference on Banks and Savings Institutions, the Deputy Chief Accountant of the SEC stated the following:

> In plain English, the allowance for loan losses must reflect, on a timely basis, the changes in the credit quality of an institution's loan portfolio. *As credit quality deteriorates, the allowance should be adjusted upward in a timely fashion to reflect the additional losses that have been incurred*.

136.    For 4Q 2006, FY 2006 and 1Q 2007, CIT's loan loss reserves failed to cover the likely and estimable losses associated with the Company's $10+ billion portfolio of risky subprime home loans.

137.    Under GAAP, CIT was required to have adequate reserves for: (1) estimated credit losses for loans specifically identified as being impaired; (2) estimated credit losses for loans or groups of loans with specific characteristics that indicate probable losses; and (3) estimated credit

- 70 -

losses inherent in the remainder of the portfolio based on current economic events and circumstances. In its Class Period financial statements, CIT stated the following reserve policy:

> We determine the reserve for credit losses using three key components: (1) specific reserves for collateral and cash flow dependent ***loans that are impaired*** under SFAS 114, (2) reserves for ***estimated losses inherent in the portfolio based upon historical and projected credit risk, and*** (3) reserves for ***estimated risks inherent in the portfolio based upon economic environment risk and other factors***.

138.    Despite its stated policy, CIT's reserves were grossly understated at December 31, 2006 and March 31, 2007. As of 4Q 2006, despite increasing loan impairments, rising credit risk and sharply escalating economic environment risks, CIT had ***no specific reserves*** related to impairment of subprime home loans and CIT's non-specific home lending reserves totaled roughly $168 million. This represented a total reserve coverage of less than 1.7% on CIT's portfolio of over $10 billion of home lending receivables.

139.    Under GAAP, CIT was required to consider various factors such as the current performance of its loans, the characteristics of the portfolio, the value of the underlying collateral and the general economic environment. CIT's loss reserves were understated and in violation of GAAP for several reasons, as described herein.

**Defendants Ignored Internal and External Risk Factors**

140.    In calculating all of the above components of its required loan loss reserves at the end of 4Q 2006, FY 2006 and 1Q 2007, defendants were required, under GAAP and CIT's stated reserve policy, to consider the various portfolio attributes and red flags described above, as well as the inherent risks associated with subprime lending. SAB 102 states that:

> A registrant's loan loss allowance methodology generally should:
>
> \*        \*        \*
>
> - Consider ***all known relevant internal and external factors*** that may affect loan collectability;

> • *Consider the particular risks inherent in different kinds of lending* . . . .

The SEC further stated in SAB 102 that:

> In developing loss measurements, *registrants should consider the impact of current environmental factors* and then document which factors were used in the analysis and how those factors affected the loss measurements. Factors that should be considered in developing loss measurements include the following:

> • *Levels of and trends in delinquencies* and impaired loans;

> • *Levels of and trends in charge-offs* and recoveries;

> • Trends in volume and *terms of loans*;

> • *Effects of any changes in risk selection and underwriting standards*, and other changes in lending policies, procedures, and practices;

> • Experience, ability, and depth of lending management and other relevant staff;

> • *National and local economic trends and conditions*;

> • *Industry conditions*; and

> • Effects of changes in *credit concentrations*.

Similarly, the AICPA Audit and Accounting Guide states:

> . . . *present conditions* such as the *amount of delinquent receivables* and the number of days they are past due; *local, national, and international economic trends*; credit policies and procedures; and the mix of receivables *should be taken into account in evaluating the adequacy of the allowance*.

141.   While defendants acknowledged in CIT's FY 2006 Form 10-K that home loan delinquencies were increasing, and were expected to get worse in 2007, defendants continued to claim that the subprime home lending portfolio valuation and reserves reflected that trend and projected risks.  In fact, defendants had barely altered CIT's loan loss reserves, which were just $168 million as of December 31, 2006.  The non-specific reserves on CIT's risky subprime loans were less than 1.7% of the $10+ billion home lending portfolio.  At a minimum, if defendants had simply raised the reserves to reflect loans already delinquent by 60 days or more, setting aside the

downward trend in the loan portfolio credit metrics, the significant level of high risk loans, defendants' lowering of credit standards in 2006 and readily apparent economic environment risks and red flags, CIT's reserve should have been increased by, at a minimum, $470.1 million for 4Q 2006 and $544.3 million for 1Q 2007.

**Defendants Failed to Reserve for CIT's Impaired Subprime Home Loans**

142.    FAS 114 and EITF Topic D-80 clearly describe that an evaluation of loan impairment must be made in context of current information and events, stating in part:

> A loan is *impaired* when, *based on current information and events*, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement. All amounts due according to the contractual terms means that both the contractual interest payments and contractual principal payments will be collected as scheduled in the loan agreement. *Existing "environmental" factors (for example, existing industry, geographical, economic, and political factors) should be considered as part of current information and events when assessing a loan* that has been identified for evaluation under Statement 114.

In a hypothetical example included in EITF Topic D-80, the Emerging Issues Task Force ("EITF") described how current environmental factors, such as the "red flags" described herein, impact the evaluation of loan impairment in light of historical loss statistics. EITF Topic D-80 states in part:

> The bank would consider the effect of the current economic downturn to assess whether a loss has been incurred in that group of loans at the balance sheet date and to estimate the amount of loss. In doing so, the bank would consider its historical loss experience in collecting loans in similar situations, such as the typical recovery rate, including amount and timing. *However, the use of historical statistics alone would be inappropriate if the nature of the loans or current environmental conditions differ from those on which the statistics were based*.

143.    As the Class Period started and through 1Q 2007, defendants failed to take any specific reserves related to the impairment of loans in its subprime home lending portfolio. Defendants' failure to increase or adequately reserve for the subprime home loans, ignored substantial changes in the macroeconomic conditions impacting CIT's loans as well as CIT's reduced credit metrics and factors indicating high risk. These internally known factors included

rising delinquency rates, high loan-to-value rates, high rates of stated income loans and ARMs and heavy loan concentrations in California and Florida.

**CIT Failed to Reserve for Groups of Loans with Characteristics that Indicated Probable Losses**

144.    Even where loans were not delinquent and impaired under GAAP, defendants were required to set reserves to reflect the risks associated with loans with similar characteristics to those that were impaired. EITF Topic D-80 states:

> • ***Simply because a portion of the allowance is designated as "unallocated," it is not thereby inconsistent with GAAP***. The important consideration is whether the allowance reflects an estimate of probable losses, determined in accordance with GAAP, and is appropriately supported.
>
> *        *        *
>
> [S]ome loans that are specifically identified for evaluation may be individually impaired, while other loans, that are not impaired individually pursuant to FAS 114, may have ***specific characteristics that indicate that there would be probable loss in a group of loans with those characteristics***. Loans in the first category must be accounted for under FAS 114 and ***loans in the second category should be accounted for under FAS 5***. Under FAS 5, ***a loss is accrued if characteristics of a loan indicate that it is probable that a group of similar loans includes some losses even though the loss could not be identified with a specific loan***. [fn] Moreover, current GAAP . . . emphasize that ***the loss does not have to be virtually certain in order to be recognized***.

Similarly, FAS 5 states:

> ***[A]ccrual shall be made even though the particular receivables that are uncollectible may not be identifiable***.

In violation of the GAAP described above, defendants failed to look beyond individually impaired loans and ignored the probable loss characteristics in groups of very high risk subprime home loans that were increasingly suffering from delinquencies. Only after the 3Q 2007 disclosures did defendants segregate out a pool of approximately $870 million of non-performing loans as assets for sale. Notably, these loans substantially shared the same characteristics with those loans that defendants should have, but did not, reserve for during the Class Period: 81% of the mortgages were

ARMs and 72% were more than 60 days delinquent. The pool of loans was sold for only $500 million, a discount to the unpaid principal on the mortgages of over 42%. During the Class Period, defendants took virtually no reserves for loans with these high risk characteristics, despite external red flags and internal knowledge that similar loans were suffering high delinquency and default rates.

**Defendants Failed to Account for Declining Collateral Values**

145.    In calculating CIT's loan loss reserves, defendants were also required to consider the declining value of the collateral backing its home loans. In assessing loans for impairment, CIT management should have identified loans in which it was probable that that the Company would be unable to collect all amounts due according to the contractual terms of the loan agreements. As such, management must then evaluate the fair value of the underlying collateral to arrive at estimated impairment losses.   As domestic property values collapsed, delinquencies and subsequent foreclosures in CIT's subprime home lending portfolio were more likely to, and did, result in significant losses. SAB 102 states:

A registrant's loan loss allowance methodology generally should:

\*       \*       \*

- Consider current collateral values (less costs to sell) . . . .

EITF Topic D-80 states:

- In assessing whether loans are fully collateralized and thus whether there is a need for an allowance on those loans, institutions should consider the reliability and timing of appraisals or other valuations to ensure that the values used for any allowance calculations are realistically and reliably measured. An institution should ***ensure that an appraisal of collateral reflects a realistic estimate of fair value***, which takes into consideration the time it will take the institution to realize the value of the collateral and ***current market conditions for selling the collateral***.

- 75 -

146.    Given both that the value of the underlying assets of CIT's home loans was dropping rapidly, and the substantial percentage of 90%+ loan-to-value loans in CIT's portfolio, market conditions required that defendants adjust CIT's loan loss allowance to reflect the default risks. Defendants, however, failed to timely adjust CIT's allowance or reassess the value of the Company's collateral assets.

**CIT's Financial Statements Were Materially Misstated**

147.    As a result of defendants' violations of GAAP and failure to record adequate and timely loan loss reserves, CIT's financial statements were materially misstated. Specifically, defendants overstated CIT's pre-tax income and EPS for 4Q 2006, FY 2006 and Q1 2007 as shown in the chart below:

| ($ in millions – except per share data) | **4Q 2006** | **FY 2006** | **1Q 2007** |
|---|---|---|---|
| Originally Reported Pre-Tax Income (Loss) | $378.4 | $1,015.8 | $242.3 |
| Originally Reported EPS | 1.28 | $5.00 | $1.01 |
| **Home Lending:**  Minimum Additional Loan Loss Provision Required under GAAP | $(470.1) | $(470.1) | $(544.3) |
| Adjusted Pre-Tax Income (Loss) | $(91.7) | $545.7 | $(415.3)[4] |
| Corrected EPS | $(0.32) | $1.74 | $(1.80)[4] |

148.    These amounts reflect an extremely conservative additional loss provision equal to CIT's loans that were already delinquent by 60 days or more as of December 31, 2006 and March 31, 2007.  Based on the impairment to these loans, the internally known credit risks associated with

---

[4]    Includes effect of Minimum Additional Loan Loss Provision Required under GAAP for CIT's student lending portfolio.  *See* ¶159.

these subprime loans and the risks to CIT's entire loan portfolio as a result of the collapsing home and securitization markets, at a minimum defendants should have reserved for these delinquent loans. Even with these additional loan loss reserves, which defendants failed to timely take, CIT's loan loss provision would have represented less than 5% of the Company's subprime mortgage portfolio.

149.    Beginning in July 2007, defendants' disclosures revealed the truth about CIT's subprime home lending portfolio and subsequent events substantiate the magnitude of the impairments to CIT's home loan assets:

- For the quarter ended June 30, 2007, defendants were forced to take a pre-tax charge of *$765 million* to write-down the value of CIT's subprime home lending portfolio by approximately 6.3%.

- For the quarter ended September 30, 2007, defendants were forced to take another charge of *$465 million*, bringing the total write-down of CIT's subprime home lending portfolio to 10%.

- Included in the total home lending portfolio write-down as of September 30, 2007 was a $1.4 billion pool of non-performing and delinquent loans that were written-down approximately 35%, almost *$500 million*.

- In addition to the total mortgage portfolio write-down as of September 30, 2007, CIT had a $342 million portfolio of home lending repossessed assets that were written down by *$137 million* or over 40% as of September 30, 2007.

- In the second half of 2007, CIT recorded a total of over *$1.5 billion* of charges, excess loss provisions and write-downs on a roughly $11.5 billion portfolio of home lending assets representing *losses of approximately 15%* as compared to the $168 million or 1.7% of recorded loss reserves on essentially the same portfolio at December 31, 2006.

- As of March 31, 2008, CIT was forced to take another charge of *$218 million* to further write-down the value of its subprime mortgage portfolio and to record additional reserves for credit losses.

- Finally, in July 2008, CIT sold all of its remaining home lending portfolio for $5.9 billion – *$3.2 billion*, or 40%, less than CIT's carrying value of the mortgage portfolio. In fact, the losses would have been more severe had the sale not included all of CIT's mortgage servicing operations which had some assigned value.

### DEFENDANTS CONCEALED MATERIAL RISKS AND IMPAIRMENTS TO PRIVATE STUDENT LOANS IN CIT'S STUDENT LENDING PORTFOLIO  IN VIOLATION OF GAAP

**Summary**

150.     As alleged and discussed in greater detail herein, beginning in 2005, after CIT's acquisition of SLX, the Company entered into a preferred lender agreement with Silver State. Pursuant to the agreement, CIT would be the exclusive lender to Silver State students and defendants agreed to fund up to $85 million a year in private loans.  Historically, SLX had avoided making private loans, as opposed to federally-guaranteed loans, because of the high risk involved and the lack of any government backing in the case of default.  The inherent risks with private student loans were amplified by the extreme concentration of such loans with students of one school, Silver State. Internally, CIT had typically mandated that no more than 15% of the total loans to students of any one institution could be private, non-guaranteed loans.  Silver State, however, could not qualify for federally guaranteed loans and 100% of CIT's loans to Silver State were private loans.  Moreover, by the end of 2006, CIT had made more than $90 million in loans to Silver State students.  By way of comparison, as of the end of 2005, CIT had only made $17.6 million in total private student loans. By May 2007, CIT had made more than $138.9 million in loans to students of Silver State, 32% of the entire private student loan portfolio.

151.     Because the government-backed loans were 97% to 98% guaranteed, they carried very little risk.  The private student loans, however, had no such guarantee and where wholly at risk. As a result, while CIT had a far larger volume of federally guaranteed loans, as of May 2007, more than 60% of the "at risk" portion of the student lending portfolio was comprised of private loans. The Silver State private student loans alone constituted a staggering 19% of CIT's total at risk loans. The Silver State loans, as described herein, were even riskier – far riskier – than CIT's remaining private student lending portfolio.

152.    Even as it became clear to defendants by May 2007 that CIT was unlikely to collect on the Silver State loans, and that their attempts to sell the loans had been unsuccessful, defendants failed to record adequate and timely loan loss reserves and, instead, hid the risks from investors. Only after the truth about the Silver State private student loans emerged in February and March 2008, after Silver State declared bankruptcy, did CIT finally write-down virtually all of the loans it had made to Silver State students. Had defendants complied with GAAP and timely recorded loan loss reserves as of 1Q 2007, 2Q 2007 and 3Q 2007, the losses would have significantly decreased CIT's reported earnings, but given investors a true picture of CIT's financial health.

**B.    Known Impairments to the Silver State Private Student Loan Portfolio**

153.    Promptly following the suspension of SLX's senior officers in April 2007, and Peek's assertion that CIT's management was conducting an "independent review of [SLX's] student lending practices," CIT placed Silver State on the Company's Suspended Accounts list, ceased making any loans to Silver State students and was desperately attempting to sell the private loans made to students of the school. Internally, defendants recognized that:

- As of the end of 1Q 2007, CIT had made over $113 million in loans to Silver State students.

- At least 31% of the entire private student lending portfolio was comprised of Silver State loans, and 19% of the Company's total at risk student loans were to Silver State students.

- One hundred percent of the loans to Silver State students were private, non-guaranteed loans, violating CIT's internal guideline that no more than 15% of the total loans to the students of any institution be private loans.

- The graduation rate for Silver State students was below 20% and, by May 2007, less than 10% of the Silver State private loans made by CIT were in repayment.

- Silver State targeted low income, second career individuals, almost all of whom borrowed 100% of their tuition payments and did not have any resources, other than the potential for future employment, with which to repay their loans.

- 79 -

- Of those Silver State student loans in repayment to CIT, the 60 days and over delinquency rate was already over 34% by April 2007, nearly seven times the delinquency rate on CIT's full private student loan portfolio.

- Defendants' efforts to sell the Silver State loan portfolio to Deutsche Bank, Greystone & Co. or MyRichUncle.com, among others, were unsuccessful and, by July 2007, defendants had ceased their efforts to sell the loan portfolio as a result of "market conditions."

- Absent student loan funding from CIT, the school's exclusive lender, Silver State would be unable to continue enrolling students and had no means of generating the revenue necessary to continue recruiting new students or maintain even the substandard facilities and training the school provided. As a result, students at Silver State as of May 2007, including approximately 2,000 students who had borrowed their full tuition from CIT, were highly unlikely to graduate or receive flight certification.

154. Defendants also knew, or recklessly disregarded the facts about Silver State that made loans to the school's students inherently risky and far riskier than the Company's other student loans. These facts included:

- Due to substandard training and equipment, Silver State could not qualify for FAA Part 141 approval. The lack of FAA Part 141 approval rendered the few students who did graduate from Silver State unemployable outside the school itself.

- Due to the lack of FAA Part 141 approval and the school's tuition and refund policies, Silver State could not qualify for federal loans or qualify as a Veterans Administration school.

- In its "Academy Promise" to prospective students, Silver State claimed that it would "hire almost every graduate of our program as an instructor in our schools." While this might have been enticing to unsuspecting students, it should have been clear to defendants that, even assuming a student could get the necessary training to graduate, their employment as Silver State instructors would be dependent on the exponential growth of Silver State and its student body population. In other words, CIT would simply be committing an ever larger volume of student loans in an effort to service payments on earlier loans.

- While Silver State expanded at a rate of over 2,500% through 2005 and, by May 2007, CIT had made loans to approximately 2,000 Silver State students, there was no apparent demand for helicopter pilots. Silver State asserted that graduates would be used as trainers and to fly for Silver State's "aviation services," which were to include tourism, search and rescue and border patrol flights. As described above, however, the school's student body would have to continue to grow exponentially to

support new trainers and, as of May 2007, Silver State had no contracts and had generated no revenue from any of the purported aviation services.

- Silver State's tuition and refund policies were highly unusual, even for a private, vocational school. Silver State required students to pay 100% of the $69,900 tuition in three equal installments within 90 days of a student enrolling in the school. The payment schedule was not based on the amount or availability of training or the status of the student. Worse, once the tuition was paid, it was essentially non-refundable. The only refund available to students was in the form of vouchers to purchase services from Silver State. Students could not use these vouchers to repay any portion of their loan and, given the lack of services provided by Silver State, the vouchers were essentially worthless.

- As a result of Silver State's lack of any adequate training staff or facilities, by 2007 the school had already been the subject of a large number of lawsuits from current and former students. For example, in June 2006, 21 Silver State students filed a federal suit in the Southern District of California for breach of contract and misrepresentation, identifying, *inter alia*, that Silver State did not have the resources that would allow students to achieve flight certifications within 18 months. Similar lawsuits were filed in other state and federal courts by students, who also alleged that Silver State had failed to provide either the helicopters or instructors necessary for students to obtain Certified Flight Instructor certificates. Silver State's Williams, Arizona school had only one helicopter in 2006 – despite Silver State's claims that students would be trained in two different types of helicopters – and one instructor for over 115 students, none of whom was able to achieve flight certification. Another Silver State school in Mesa, Arizona also had only one helicopter for 119 students.

- Even a cursory review of the FAA's publicly-available database of individuals who had qualified for helicopter flight certifications would have revealed that only a small fraction of Silver State students had ever received the certifications necessary to become commercial pilots.

- Silver State's previous preferred lender, KeyBank, had identified significant concerns with Silver State's operations and the ability of Silver State students to repay loans. A March 2004 KeyBank memo addressed those concerns and, with regard to private vocational schools, identified that Silver State "could be the next 'big one' to go under." By March 2005, KeyBank had identified Silver State as one of the "highest risk schools," and, soon thereafter, ceased making any loans to Silver State students.

### Defendants Failed to Properly Account for the Risks and Impairments to the Silver State Private Student Loans

155.    SAB 102 states:

A registrant's loan loss allowance methodology generally should:

*    *    *

- ***Consider the particular risks inherent in different kinds of lending*** . . . .

Unlike, many of CIT's business lines, in which loans were backed by collateral or a guarantee by the federal government, CIT's private student loans were backed by nothing more than a student's promise to re-pay. Given the above-identified risks to the Silver State loans, including the extremely low graduation rate, high delinquency rate on the few loans in repayment and the fact that, as of May 2007, Silver State was highly unlikely to be able to continue as a going concern, there was a high likelihood that CIT would not collect a majority of the contractual principal and interest due on the Silver State student loans. This resulted in the impairment of the Silver State loan portfolio as of May 2007. FAS 114 states:

> ***A loan is impaired when, based on current information and events, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement***.  As used in this Statement and in Statement 5, as amended, all amounts due according to the contractual terms means that both the contractual interest payments and the contractual principal payments of a loan will be collected as scheduled in the loan agreement.

FAS 114 also states:

> The conditions for accrual . . . are not inconsistent with the accounting concept of conservatism. ***Those conditions are not intended to be so rigid that they require virtual certainty before a loss is accrued***. They require only that it be ***probable*** that an asset has been impaired or a liability has been incurred and that the amount of loss be ***reasonably*** estimable.

156.    As of May 2007, it was probable that the Silver State loan portfolio was impaired and as a result, defendants were required, under GAAP, to estimate the loss exposure and set up appropriate  reserves (in the form of a valuation allowance) at that time.  FAS 114 states:

> [If] the present value of expected future cash flows . . . is less than the recorded investment in the loan (including accrued interest, net deferred loan fees or costs, and unamortized premium or discount), ***a creditor shall recognize an impairment by creating a valuation allowance with a corresponding charge to bad-debt expense*** . . . .

To calculate the Company's loss exposure, CIT was required under GAAP, to evaluate the likelihood of future cash flows (in the form of repayments of principle and interest). FAS 114 states:

> When a loan is impaired . . . *a creditor shall measure impairment based on the present value of expected future cash flows* discounted at the loan's effective interest rate . . . .

FAS 5 states that "*information about the ability of individual debtors to pay*" should be considered in estimating impairment losses. As of May 2007, the expected future cash flows on the Silver State loan portfolio, after taking into account the extremely low graduation rate, high delinquency rate on the few loans in repayment and the fact that Silver State was highly unlikely to be able to continue as a going concern, were next to nothing. As a result, CIT was required, under GAAP to recognize impairment losses totaling roughly the entire amount of the contractual principal and interest due on the Silver State student loans.

**CIT's Financial Statements Were Materially Misstated**

157.    As a result of defendants' failure to record adequate and timely loan loss reserves as required by GAAP as described above, CIT's financial statements were materially misstated. Specifically, defendants overstated CIT's pre-tax income and EPS for 1Q 2007 through 3Q 2007 as shown in the chart below:

| ($ in millions – except per share data) | **1Q 2007** | **2Q 2007** | **3Q 2007** |
|---|---|---|---|
| Originally Reported Pre-Tax Income (Loss) | $242.3 | $(241.5) | $(133.3) |
| Originally Reported EPS | $1.01 | $(0.70) | $(0.24) |
| **Student Lending:** Minimum Additional Loan Loss Provision Required under GAAP | $(113.3) | $(138.0) | $(158.5) |
| Adjusted Pre-Tax Income (Loss) | $(415.3)[5] | $(379.5) | $(291.8) |
| Adjusted EPS | $(1.80)[5] | $(1.02) | $(0.43) |

The Minimum Additional Loan Loss Provision was calculated based on CIT's outstanding loans made in 2006 and through the appropriate period in 2007 to Silver State students, excluding interest and loans in repayment.

**Defendants Also Violated GAAP and SEC Disclosure Requirements**

158.     CIT's financial statements were also materially misstated, in violation of GAAP and SEC rules, as a result of defendants' failure to properly disclose the material loss contingencies and significant concentrations of risk related to the Silver State private student loans.

FAS 5, states as follows:

If no accrual is made for a loss contingency . . ., or if an exposure to loss exists in excess of the amount accrued . . . ***disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred***. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made.

159.     Statement of Financial Accounting Standards No. 107, *Disclosures about Fair Value of Financial Instruments* ("FAS 107"), required CIT to disclose "all significant concentrations of"

---

[5]     Includes effect of Minimum Additional Loan Loss Provision Required under GAAP for CIT's subprime home lending portfolio. *See* ¶¶149-150.

credit risk from all financial instruments, whether from an individual counterparty or groups of counterparties." Group concentrations of credit risk exist if a number of counterparties have similar economic characteristics that would cause their ability to meet contractual obligations to be similarly affected by changes in economic or other conditions. As alleged herein, CIT's Silver State private student loans clearly represented a significant concentration of credit risk. Indeed, as of May 2007, 31% of all of CIT's private student loans were to Silver State students, and 19% of CIT's entire at risk student loans were to Silver State students.

160.    If a significant concentration of risk represents a material contingency, the risk must be disclosed in the Company's interim financial statements in accordance with Accounting Principles Board Opinion No. 28, *Interim Financial Reporting* ("APB 28"). The purpose behind these GAAP provisions is to warn investors about concentrations of risk that ***may*** result in losses under changed conditions – not to wait until those losses become substantial (which they already were by 1Q 2007) and then disclose the concentration of risk ***after*** the losses have already harmed investors.

161.    Similarly, AICPA Statement of Position No. 94-6, *Disclosure of Certain Risks and Uncertaintie*s ("SOP 94-6"), requires disclosures to be made in financial statements regarding any vulnerabilities arising due to the fact that the business is exposed to certain risks and uncertainties that might have a "severe impact" on future operations. SOP 94-6 defines a "severe impact" as a "significant financially disruptive effect on the normal functioning of the entity." For CIT, the Silver State loans presented a group concentration of credit risk that threatened to, and ultimately did, severely impact the Company's financial position.

162.    Defendants were also required to follow additional disclosure rules, promulgated by the SEC, for the Management Discussion and Analysts ("MD&A") section of the Company's

financial statements. The SEC stated the following in Securities Act Release Nos. 33-8182, 34-47264:

> *The disclosure in MD&A is of paramount importance in increasing the transparency of a company's financial performance and providing investors with the disclosure necessary to evaluate a company and to make informed investment decisions*. MD&A also provides a unique opportunity for management to provide investors with an understanding of its view of the financial performance and condition of the company, an appreciation of what the financial statements show and do not show, as well as *important trends and risks that have shaped the past or are reasonably likely to shape the future*.
>
> . . . [MD&A] designed to cover a wide range of corporate events, including events, *variables and uncertainties* not otherwise required to be disclosed under [GAAP].

Securities Act Release No. 33-6711 states:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient *for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance.* MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company.

In discussing results of operations, Item 303 of Regulation S-K requires:

> The discussion and analysis shall focus specifically on material events and *uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results* . . . .

163.    In its May 18, 1989 Interpretive Release No. 34-26831, the SEC indicated that registrants should employ the following two-step analysis in determining when a known trend or uncertainty is required to be included in the MD&A disclosure pursuant to Item 303 of Regulation S-K:

> A disclosure duty exists where a trend, demand, commitment, event or *uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition* or results of operation.

The SEC stated the following in SEC Release Nos. 33-8056, 34-45321:

- 86 -

Registrants are reminded that identification of circumstances that could materially affect liquidity is necessary if they are "*reasonably likely*" *to occur. This disclosure threshold is lower than* "*more likely than not*." Market price changes, *economic downturns, defaults on guarantees, or contractions of operations that have material consequences for the registrant's financial position* or operating results can be reasonably likely to occur under some conditions.

164.     Defendants failed to comply with these requirements and CIT's SEC filings for 1Q 2007 through 3Q 2007 failed to include any warning, or even mention, of the concentration and risks associated with the Company's private loans to Silver State students.

### DEFENDANTS' KNOWLEDGE OR RECKLESS DISREGARD OF THE TRUTH ABOUT CIT'S SUBPRIME HOME LOAN AND STUDENT LOAN PORTFOLIOS

165.     Throughout the Class Period, defendants knew, or recklessly disregarded, the true facts about CIT's subprime home lending and student lending portfolios, including the unaccounted for risks and impairments to those portfolios. These were CIT's two largest businesses. Indeed, home lending was one of the Company's few businesses that was reporting any growth as the Class Period started and, until defendants revelations in July and October 2007, home lending was CIT's largest business and represented more than 14% of the Company's assets. Student lending was the Company's second largest business until 3Q 2007, when it replaced home lending as the Company's largest asset class. Like subprime home lending, student lending was one of CIT's few business reporting any growth and, as of May 2007, represented more than 14% of the Company's assets.

166.     Given the size and importance of the subprime home and student lending businesses, investor attention was focused on those loan portfolios and their impact on CIT's financial results. In turn, defendants Peek, Leone, Hallman and Taylor held themselves out to investors and the market as the persons most knowledgeable at CIT about the subprime home and student lending portfolios, as well as the loss reserves and accounting for those loans. As detailed in ¶¶46-52, 55-59, 61-65, 92-94, 98-103, 106-112, each of these defendants communicated with investors and analysts during the Class Period and represented that they were informed of and knowledgeable about, *inter*

*alia*, the subprime home lending and student lending credit metrics, the risks associated with the loan portfolios, the valuation of the loan portfolios and the assessment of the loss reserves taken for those portfolios. At no time during their communications with investors on these matters did any of these defendants assert that they were uninformed about any material aspect of CIT's subprime home lending or student lending portfolios.

167. Defendants Peek, Leone, Hallman and Taylor did not merely hold themselves out as knowledgeable about the subprime home and student lending portfolios, but specifically described how they personally monitored and kept apprised of the portfolios, including the accounting for the loans and related loss reserves and their impact on CIT's financial results. For example, according to CIT's SEC filings, Peek, together with the Company's senior officers, would "regularly evaluate the consumer loan portfolio," which included the subprime home loans and private student loans, and the reserve for credit losses was "reviewed formally on a quarterly basis with senior management," including Peek, Leone and Taylor. The SEC filings also identified Peek as the senior member of CIT's Executive Credit Committee, which oversaw and managed credit rsk throughout CIT, and the Company's Capital Committee, which was responsible for the "establishment and monitoring of risk metrics." Leone was identified as the senior member of CIT's Internal Controls Committee and the Company's Asset Quality Review Committee, which monitored "portfolio performance," and was responsible for reviewing and monitoring CIT's credit exposure in order to "identify, as early as possible, customers that may be experiencing declining creditworthiness or financial difficulty, and periodically evaluate the performance of our finance receivables across the entire organization . . . [including] concentrations by borrower." Hallman, until his retirement in December 2007, was identified as the Head of CIT's Specialty Finance Unit, which ran the subprime home lending and student lending businesses. And, Taylor was identified as the Principal

Accounting Officer at CIT, the chair of the Company's Internal Controls Committee and was second in seniority to Leone on the Asset Quality Review Committee, responsible for reviewing "portfolio performance" and "reserves for credit losses."

168.    During public conference calls, Peek further assured investors that he met with CIT's senior executives on a monthly basis to "look at the [subprime home lending portfolio] reserve" and that "every quarter we talk about what the provision should be.  We meet monthly on that."  In separate presentations to investors and analysts, Peek and Leone asserted that "[c]redit remains at the heart of what we do every day" and "we go through a detailed review of reserves every quarter." With regard to the student lending business, in April 2007, following the NYAG investigation of CIT's payment of kickbacks to loan officers and the suspension of SLX's senior officers, Peek again assured investors that he and his senior executives were closely monitoring the student loan portfolio and that the "management changes announced today should facilitate CIT's independent review of Student Loan Xpress' student lending practices."

169.    Concurrent with their claims of personal knowledge and active involvement in setting the reserves for the subprime home and student lending portfolios, defendants Peek and Leone publicly certified with each of the Company's SEC filings that they had personally "evaluated [CIT's] disclosure controls and procedures" and "concluded that such procedures are effective." Peek and Leone further certified that CIT's internal controls were designed to and did, keep them apprised of all material facts about the financial condition and results of operations of CIT, including material facts about the Company's subprime home and student lending businesses.

170.    Consistent with their claims of active involvement in and knowledge of the subprime home and student lending portfolios, including the associated reserves for loan losses, former officers and employees of CIT have confirmed that defendants were directly involved in the

operations of these businesses and that they knew or had access to internal information identifying

the known, but not timely disclosed, risks and impairments to the lending portfolios.  For example,

former officers and employees involved in subprime home lending, including numerous Account

Executives and Branch Managers who were involved in generating and reporting subprime home

loans at CIT offices throughout the country during 2006, have confirmed that the reduction in CIT's

credit standards and documentation in 2006, and the related push to increase loan volume through

reduced credit metrics, were at the direction of CIT's senior executives.  According to a former CIT

Area Manager, these Company-wide decisions could only have been made at the level of Peek,

Leone and Hallman.  Indeed, a former Consumer Finance Senior Vice President at CIT who had

responsibility for home lending during 2006 and at the start of the Class Period described Hallman's

dictatorial control over the business and asserted that Hallman was responsible for decisions on the

composition of the subprime home loan portfolios and what loans were to be bought and sold by

CIT.

171.    The former Area Manager, who was with CIT for five years and through the start of

the Class Period, and reported to the Division Manager of Home Lending, Larry Edelmann

("Edelmann"), explained that underwriting guidelines, which would include the reduced

underwriting standards in 2006, were passed down from defendant Peek and Chesler, who reported

directly to Peek and Hallman, to Mike Cary ("Cary"), the former President of Home Lending, and

Edelmann.  These guidelines were then passed on to the Area Managers for implementation.  Based

on his years with the Company and participation in home lending meetings, the former Area

Manager also provided that the home lending managers had weekly meetings and would provide

daily, weekly and monthly lending pipeline reports to Edelmann, including the volume and quality

of the subprime loans being made.  Edelmann and his staff in Cincinnati, Ohio, in turn, consolidated

the lending pipeline reports and reported up to Chesler and Cary.  Based on memoranda that were provided to him, the former Area Manager ascertained that summaries of the lending pipeline reports, which would have identified CIT's reduced lending standards in 2006, were provided to Peek and available to CIT's senior executives.  A former Account Executive who was with CIT during 2006 and through late 2007, and both prepared and reviewed periodic pipeline reports, corroborated that the loosening of credit standards was reflected in daily, weekly and monthly pipeline reports automatically generated from CIT's internal IT systems, which would identify, *inter alia*, the increasing numbers of stated income loan, high loan-to-value loans, 2/28 and 3/37 ARMs and reduced credit scores.

172.    Going into 2006, defendants had also structured CIT's bonus and incentive programs for the subprime home lending originators to reward quantity over quality.  Numerous former employees in CIT's subprime home origination business have reported that the Company's bonus and incentive programs, which would have been set and approved by Peek and CIT's senior executives, were based on generating an ever-increasing volume of loans, without regard to quality. Both individual and office-wide bonuses were only awarded if a pre-set amount of loans were made. There was no incentive for making higher quality loans and, in fact, there were additional bonuses provided for generating the riskier 2/28 and 3/27 ARMs.  Together with the top down emphasis on asset growth, during 2006 originators were knowingly encouraged by defendants' policies to sell and approve riskier loans without consideration of the loan quality.

173.    To monitor the student lending business, defendant Hallman had a monthly financial meeting with SLX's senior officers and received Management Process Meeting reports, which were available to each of the defendants.  The Management Process Meeting reports specifically identified, on a monthly basis throughout the Class Period, the total volume of loans that CIT had

made to Silver State, the incredibly high delinquency rate associated with those Silver State loans in repayment, the fact that the Silver State account was suspended in May 2005 and the status of defendants' failed effort to sell the Silver State loan portfolio. In addition, through CIT's internal Salesforce.com customer relationship management system, each of the defendants had access to the status of the Company's interactions with Silver State, including meetings to address Silver State's poor graduation rate.

174.    According to a former Executive Vice President at SLX, who was employed by SLX prior to its acquisition by CIT, stayed with CIT throughout the Class Period and participated in the monthly Management Process Meetings, SLX's new business development was highly scrutinized by senior executives at CIT, including Hallman and Chesler. According to this Executive Vice President, he and the other senior officers at SLX "couldn't and wouldn't" do anything without the approval of CIT's executives. Moreover, the private lending aspect of SLX's business, substantially composed of Silver State loans, was closely monitored and scrutinized because of the high risk involved. Following the suspension of SLX's senior officers in April 2007, this former SLX executive recalls growing concern at CIT that the portfolio of private loans, including the Silver State loans, had become disproportionately large and risky.

175.    According to two other former Vice Presidents at SLX, both of whom were with CIT throughout 2007, in September 2007 CIT held a fall Sales Meeting for SLX employees in Denver, Colorado. During the Sales Meeting, Chesler, who had assumed oversight of SLX in April 2007, spoke to the attendees. In particular, these former Vice Presidents recalled  Chesler's remarks that CIT's expansion into private student loans had been a mistake and that there was a substantial problem with Silver State that was going to cost CIT a lot of money on the loans to students of the school.

176.    Finally, defendants were privy to information that should have warned them about the risks and impairments to CIT's subprime home and student lending portfolios.  With regard to the subprime home lending portfolio and related loss reserves, by the end of 2006 the domestic housing market was collapsing, immediately impacting lenders, like CIT, with high volumes of stated income loans and ARMs and resulting in rising delinquency rates and impaired loans.  Indeed, by December 2006, CIT's subprime home lending delinquency rate had jumped 103%, year over year.  At the same time, the secondary market for securitized subprime loans began to freeze up as potential buyers recognized the risks and impairments with the loans.  As a result, by early 2007, major lenders had not only taken massive write-downs in their loan portfolios, but were declaring for bankruptcy with increasing frequency.  *See* ¶134.

177.    With regard to the private loans to Silver State students, by May 2007 defendants knew or recklessly disregarded that Silver State was little more than a ponzi scheme and that the school's students were not graduating or getting flight certifications.  For example:

(a)    Silver State could not qualify for federal loans or as a Veterans Administration-approved flight school due to its lack of the requisite FAA Part 141 approval and the school's tuition and refund policy.  This should have triggered an immediate red flag as schools that could not receive federal loans were considered high risk in the student lending industry. CIT's own internal policy, which was violated with regard to Silver State, was to limit private student lending at any institution to no more than 15% of the total amount of loans in order to minimize risk;

(b)    Silver State's too-good-to-be-true pledge to hire all of its graduates should have raised serious concerns. In its "Academy Promise" to prospective students, the school claimed that it would "hire almost every graduate of our program as an instructor in our schools." While this might have been enticing to unsuspecting students, it should have been clear to defendants that, even

assuming a student could get the necessary training to graduate, their employment as Silver State instructors would be dependent on the exponential growth of Silver State and its student body population. In other words, CIT would simply be committing an ever larger volume of student loans in an effort to service payments on earlier loans, a classic ponzi scheme;

(c)     Silver State's recruiting seminars targeted low income, second career individuals who were enticed by the prospect of $80,000 a year jobs.  The majority of the Silver State students only worked part-time and were largely dependent on the student loans to fund their education.  Indeed, virtually all of the Silver State loans made by CIT were for 100% of the tuition costs;

(d)     While Silver State expanded rapidly through 2006 and, by May 2007, CIT had made loans to approximately 2,000 Silver State students, there was no apparent demand for helicopter pilots.  Silver State asserted that graduates would be used as trainers and to fly for Silver State's "aviation services," which were to include tourism, search and rescue and border patrol flights.  As described above, however, the school's student body would have to grow exponentially to support new trainers and, as of May 2007, Silver State had no contracts and had generated no revenue from any of the purported aviation services;

(e)     Silver State's tuition and refund policies were highly unusual, even for a private, vocational school.  Silver State required students to pay 100% of the $69,900 tuition in three equal installments within 90 days of a student enrolling in the school.  The payment schedule was not based on the amount or availability of training or the status of the student.  Worse, once the tuition was paid, it was essentially non-refundable.  The only refund available to students was in the form of vouchers to purchase services from Silver State.  Students could not use these vouchers to

repay any portion of their loan and, given the lack of services provided by Silver State, the vouchers were essentially worthless;

(f)    As a result of Silver State's lack of adequate training staff or facilities, by 2007 the school had already been the subject of a large number of lawsuits from current and former students. In June 2006, 21 students filed a federal suit against Silver State in the Southern District of California for breach of contract and misrepresentation against Silver State, identifying, *inter alia*, that the school did not have the resources that would allow students to achieve flight certifications within 12-18 months. Additional lawsuits were filed in various state courts before May 2007, all making similar allegations that Silver State was not providing and did not have the resources necessary for students to graduate or obtain their flight certifications. For example, Silver State's Williams, Arizona school had only one helicopter in 2006 – despite Silver State's claims that students would be trained in two different types of helicopters – and one instructor for over 115 students, none of whom was able to achieve flight certification. Another Silver State school in Mesa, Arizona also had only one helicopter for 119 students;

(g)    Even a cursory review of the FAA's publicly-available database of individuals who had qualified for flight certification would have revealed that only a small fraction of Silver State students had ever received the certifications necessary to become helicopter pilots. The operators of other helicopter schools also identified serious problems with Silver State's instruction and facilities. A former SLX officer who worked on the Silver State account during the Class Period recounted that Neil Jones of Quantum Helicopters in Arizona told him that Silver State had a very poor reputation and warned that CIT's involvement with Silver State was "a really bad idea";

(h)    Even prior to CIT negotiating its preferred lender agreement with Silver State, the school's previous preferred lender, KeyBank, had identified significant concerns with Silver

State's operations and the ability of Silver State students to repay loans. A March 2004 KeyBank memo addressed those concerns and, with regard to private vocational schools, identified that Silver State "could be the next 'big one' to go under." By March 2005, KeyBank had identified Silver State as one of the "highest risk schools," and, soon thereafter, ceased making any loans to Silver State students;

        (i)      By the end of 2006, little more than one year after becoming Silver State's preferred lender, CIT had made more than $90 million in loans to Silver State students.  This far exceeded the amount of private loans CIT had made to any other institution and represented approximately 30% of the total private student loan portfolio.  By the end of April 2007, loans to Silver State students had grown to more than $127.6 million, still far exceeding the volume of such loans at any other institution;

        (j)      By April 2007, less than 10% of the Silver State students CIT had lent to had graduated from the school and CIT personnel had already been in meetings with the school's executives about the low graduation rate.  Even for the small volume of loans in repayment, the 60 days and over delinquency rate for Silver State students was over 34%.  In comparison, the 60 days and over delinquency rate for the entire private student loan portfolio was only 5%; and

        (k)      As Silver State's preferred and, essentially, exclusive lender, once CIT ceased making any new student loans, Silver State would be unable to continue operations.  The school's operational funds were dependent on a constant influx of new students, who were, in turn, dependent on full student loans.  Without the influx of students and upfront loan payments, Silver State would not be able to fund operations for more than six months and, certainly, would not be able to provide employment for any student that was able to graduate.  According to one former SLX Vice

President, who was with CIT through the early fall of 2007, the decision to cease lending "pulled the rug out" from under the Silver State ponzi scheme.

### DEFENDANTS' MOTIVE AND OPPORTUNITY TO COMMIT FRAUD

178.    In addition to their knowledge and reckless disregard of the true facts about CIT's subprime home lending and private student lending portfolios, as detailed above, the 1934 Act Defendants also had both the motive and opportunity to defraud CIT shareholders.  Defendants Peek, Leone, Hallman and Taylor were CIT's senior officers, directed the operations of the Company, including the home lending and student lending businesses, had access to internal information about CIT's financial results and the lending portfolios and had the opportunity to commit the fraudulent acts alleged herein.  The 1934 Act Defendants were motivated to, and did, take advantage of the fraud, raising  more than $690 million in critically needed capital through the CIT-Z preferred stock offerings, preserving CIT's  credit and commercial paper ratings,  staving off dividend restrictions, buying time to try and sell the Silver State loan portfolios  and personally collecting more than $35 million in performance bonuses and insider trading proceeds.

179.    **Defendants' Fraudulent Conduct Allowed the Individual Defendants to Collect More than $20.98 Million in Performance-Based Bonuses**:  Defendants Peek, Leone, Hallman and Taylor's employment contracts and CIT's "Executive Incentive Plan" tied the majority of their compensation to the Company's reported earnings and the performance of the CIT's stock. Beginning in 2006, CIT's Executive Incentive Plan tied the majority of the defendants' compensation to the annual income performance, establishing award pools based upon a percentage of net income.  Based on CIT's reported net income for FY 2006 of $1.015 billion, which was inflated by $470.1 million as a result of defendants' failure to properly account for impairments to the subprime home lending portfolio, the 1934 Act Defendants collectively reaped $20.98 million in performance-based compensation.  Had these defendants properly accounted for the subprime home

lending portfolio, and reported a loss for 4Q 2006 and income of only $545 million for FY 2006, their performance-based compensation would have been substantially reduced.

180.    The incentive compensation at CIT played an unusually large part of the 1934 Act Defendants' total compensation. Collectively, performance-based compensation comprised more than 85% of the value of defendants Peek, Leone and Hallman's total compensation for 2006. For example, for FY 2006, Peek's salary was $800,000, but he received performance-based stock and cash awards totaling $11,945,667 according to CIT's April 4, 2007 proxy statement. Defendant Leone's salary was $500,000, but he received performance-based stock and cash awards totaling $4,423,284. And, Hallman's salary was $500,000, but he received performance based stock and cash awards totaling $4,610,034. Collectively, for FY 2006 alone, defendants Peek, Leone and Hallman collected $20,978,985 in performance-based compensation based on their manipulated reporting of CIT's financial results.

181.    **Defendants' Fraudulent Scheme Allowed Them to Preserve CIT's Positive Credit and Debt Ratings**: The 1934 Act Defendants were further motivated to obfuscate the problems with CIT's subprime home and student lending portfolios, inflate the Company's reported financial results and keep CIT's stock trading at artificially inflated levels in order to maintain positive credit and debt ratings. The vast majority of CIT's operations are financed through the capital markets and, prior to and throughout the Class Period, CIT was heavily dependent on access to affordable commercial paper. As a result, far more than most companies, CIT's credit and debt ratings were critical to the ongoing success of the business as a whole. As defendant Peek said in a September 2006 interview with the Financial Times, "[f]or us," access to credit and commercial paper "is the air we breath."

182.    Not long before the Class Period, CIT was almost destroyed by an inability to competitively access credit and debt financing.  In 2001, when the Tyco securities fraud scandal burst into public view, equity and bond markets lost faith in CIT.  The Company was forced to draw down its emergency bank facilities, effectively starving CIT of long-term funding.  It was only after CIT was spun off from Tyco that the Company was able to slowly rebuild its credibility and credit and debt ratings.  By May 2006, based on CIT's "satisfactory and improving profitability" and purportedly "conservative underwriting standards," Standard & Poor's revised its outlook on CIT from stable to positive and assigned a A/A-1 credit rating to the Company.  According to the Standard & Poor's release, the long-term credit rating "could be raised to 'A+' within the next two years if there is further improvement in profitability."  At the same time, Dominion Bond Rating Service ("DBRS") revised its rating trend on CIT's long-term debt to "positive," citing "expectations that CIT will continue to generate strong earnings while enhancing its portfolio diversity, as evidenced by its expanding range of consumer lending."  In November 2006, Fitch ratings revised its outlook for CIT from stable to positive and gave the Company an Issuer Default Rating of A. According to Fitch, the ratings upgrade was the result of CIT's "improved financial performance" and "recent success in growing managed assets."

183.    The improvement in CIT's credit and debt ratings substantially lowered the cost of capital, improved the Company's margins and allowed CIT to more effectively compete with peers, such as GE Capital, that had better credit and debt ratings.  As defendant Leone told investors during the November 7, 2006 Investor Conference, "*[r]atings are critically important to our strategy*. . . . We really would like plus [A-1] ratings [and] [w]e've got to prove to the agencies that the other dimensions of our business deserve it."  Leone reiterated during defendants' January 17, 2007 conference call with investors that "[o]n the rating agency front, in November, [Fitch] upgraded a

long-term ratings outlook to positive.  So that is three out of four agencies with a positive outlook on our term debt.  ***We manage our business and capital strategy to maintain the highest ratings possible***, and as we said our goal remains an A-plus A-1 term debt rating."  Later, Leone again confirmed that positive credit and debt ratings were "very much on our mind" and "***essential to the execution of [CIT's] long-term model***."

184.    CIT's Class Period SEC filings, including the FY 2006 Form 10-K also reported that "[o]ur credit ratings are an important factor in meeting our earnings and net finance revenue targets as better ratings generally correlate to lower costs of funds and broader market access."  As of the start of the Class Period, three of the four major ratings agencies had upgraded CIT's ratings outlook to "positive."

185.    Through their fraudulent scheme, during the Class Period defendants were able to maintain the "critically important" credit ratings that allowed CIT to effectively operate its business and generate profits.  For example, during CIT's April 18, 2007 conference call with investors, defendant Leone stated:  "On the rating agency front, both [Fitch] and S&P reaffirm their positive long term ratings outlook . . . it was a step in the right direction, certainly supportive of our strategy and an endorsement of our strong operating performance in a business environment that had some challenges, particularly in housing. My comment on ratings, strong debt ratings, continue to be a very important element of CIT's strategy and an A-plus debt rating continues to be our objective."

186.    Once defendants' fraud was revealed, however, and the truth belatedly came out about CIT's subprime home and student lending portfolios, the Company's credit ratings were slashed. Following the July 18, 2007 disclosures regarding CIT's subprime home lending portfolio, both DBRS and Standard & Poor's reduced their ratings outlook to stable, from positive.  By December 2007, DBRS, Standard & Poor's and Moody's had all lowered their ratings and Moody's

had revised its ratings outlook to negative.  Finally, following the end of the Class Period and the disclosures regarding CIT's subprime home and private student lending portfolios, all four of the major ratings agencies had reduced CIT's ratings outlook to "negative" or "on review-negative."

187.    **Defendants' Fraudulent Conduct Allowed CIT to Avoid Triggering Dividend Restrictions**:  During the Class Period, the terms of CIT's preferred securities restricted defendants and the Company from declaring or paying dividends on its preferred stock if the Company's rolling four-quarter fixed-charge coverage ratio, a ratio that indicates a firm's ability to satisfy fixed financing expenses, dropped below 1.10.  Moreover, if CIT did not pay dividends on the preferred securities, defendants were prohibited from paying dividends on CIT's common stock.  Had defendants timely disclosed and accounted for the true value of CIT's home lending and private student lending assets, the Company's fixed charge coverage ratio would have dropped below 1.10.

188.    The failure to pay dividends on preferred or common securities would not only have had a dramatic and negative impact on CIT's stock price, raising questions about the Company's ability to operate as a going concern[6], but would have impacted CIT's ability to raise capital.  In the prospectus in support of the CIT-Z offering, defendants emphasized that the Company had paid $0.25 per share dividends in each of the first three fiscal quarters in 2007 and had paid dividends in each fiscal quarter in both 2005 and 2006.  Moreover, if CIT had been forced to stop paying dividends, it would have impacted the individual defendants' own wallets.  For example, defendant Peek reported owning 1,002,016 shares of CIT securities during the Class Period.  By failing to disclose the truth about the home lending and private student lending portfolios, defendants were able to pay dividends of $0.25 a share in February, May and August 2007.  Based on his reported

---

[6]    For example, the consumer lending corporation American Home Mortgage Investment Corp.'s shares plunged 45% on July 30, 2008 after the lender delayed its quarterly dividend.

ownership of CIT shares, Peek pocketed approximately $751,000 from these dividend payments. Defendants Leone and Hallman also pocketed more than $1 million, collectively, by continuing CIT's dividend payments.

189.    In CIT's 3Q 2007 Form 10-Q, defendants acknowledged that, as a result of finally correcting for the overvalued home loan portfolio, the Company's fixed charge ratio fell below 1.10. In response, CIT's Board of Directors had to authorize the sale of common stock in order to cover the dividend payments.  In October 2007, defendants entered into an Underwriting Agreement with Morgan Stanley and Citigroup to sell 235,800 shares of CIT common stock, allowing the Company to pay the preferred and common stock dividends on December 17, 2007.  Morgan Stanley and Citigroup committed to purchase the CIT shares at the lesser of (1) the volume weighted average price of the common stock during the final hour of trading on the NYSE on the third trading day preceding the purchase date or (2) the closing price of the common stock on the NYSE on the third trading day preceding the purchase date.

190.    Following the Class Period, CIT was forced to slash its dividend payment by 60% and sell approximately 91 million shares of common stock in order to, among other purposes, make the dividend payment on the Company's preferred stock.  No longer able to use their fraudulent accounting scheme to boost CIT's reported earnings, defendants were forced to dilute the Company's EPS in order to make any dividend payment at all.  As was later described in the  New York Times in October 2008, "[s]uspending the common stock dividend would [have been] smarter, though it might panic some investors. . . .  Shareholders would be better off in the long run if [CIT's] chief executive, Jeffrey M. Peek, spent more time sorting out CIT's core problems or finding a buyer than playing games with its dividends."

191.    **Defendants' Fraudulent Conduct Allowed Defendants to Raise $690 Million in the CIT-Z Offering**: The 1934 Act Defendants were also motivated to inflate CIT's stock price and withhold the truth about the Company's student lending portfolio in order to complete the $690 million CIT-Z offering. As detailed herein, pursuant to the October 17, 2007 registration statement and prospectus, CIT sold 27,600,000 shares of CIT-Z preferred stock. The preferred stock was to convert to common stock by November 2010 and, accordingly, was valued based on the inflated trading price of CIT's common stock as of October 17, 2007.

192.    The capital raised by the CIT-Z offering, as well as that raised through the Class Period Sales Agency Agreement between CIT and Morgan Stanley and Citigroup for the sale of common stock, were desperately needed by defendants. As detailed above, the belated disclosures about the true value of CIT's subprime home lending portfolio had caused the Company's fixed charge ratio to drop below 1.10 and triggered restrictions on CIT's ability to declare dividends. Through the Class Period securities sales, the 1934 Act Defendants were able to remove the restriction on declaring dividends, albeit, as it turned out, only briefly.

193.    **Defendants' Fraudulent Conduct Facilitated Attempts to Dump the Silver State Loan Portfolio Before the Truth Emerged**: In the spring of 2007, the decision was made at CIT to try and dump the entire Silver State loan portfolio. Accordingly, bids for the portfolio were solicited from Deutsche Bank, Greystone & Co., Inc. and MyRichUncle.com, among others. For several months, through July 2007, and unbeknownst to investors, defendants actively tried to sell the Sliver State loan portfolio with no success. While desperately trying to get the Silver State loan portfolio off CIT's books, defendants maintained the public appearance that the loans were sound and that there was no reason to reserve for their impairment. Had they done otherwise, the ability to sell the loans would have been greatly impacted, as would have been CIT's financial results. By the July

2007, however, defendants knew, but failed to disclose, that they would be unable to sell the Silver State Helicopters loan portfolio due to "market conditions" and that they were stuck with the overvalued and under reserved loans.

194.    **Defendants' Fraudulent Conduct Allowed Defendants Leone, Hallman and Taylor to Collect More than $14.74 Million in Insider Trading Proceeds Through Trading Plans**: In December 2006, as the Class Period was beginning and defendants were in possession of material nonpublic information about CIT's subprime home lending portfolio, defendants Leone, Hallman and Taylor instituted SEC Rule 10b5-1 trading plans (the "Plans") designed to routinely sell portions of their personal holdings of the Company's common stock.  In accordance with the Plans, Leone could exercise and sell options representing 207,390 shares of CIT common stock, Hallman could exercise and sell options representing 166,728 shares of CIT common stock and Taylor could exercise and sell options representing 34,710 shares of CIT common stock.  The Plans provided for at least three trading windows – the first day of February, May and August 2007 – and were set to expire on January 31, 2008.  The Plans also could be modified or cancelled at any time by the defendants.

195.    These defendants were highly motivated to keep CIT's stock price inflated through as many of the Plans' trading windows as possible.  In the February 2007 trading window, while in possession of material nonpublic information, Hallman sold 55,576 shares of CIT stock at artificially inflated prices up to $58.85 per share for total proceeds of $3,252,561.  At the same time, Leone collected $1,662,890 and Taylor pocketed $677,302 in insider trading proceeds.  Again, in May 2007, Leone, Hallman and Taylor sold their CIT shares through the Plans for total proceeds of $4,099,342, $3,292,532, and $547,752, respectively, at prices as high as $60.30 per share.  Collectively, these defendants sold 228,765 shares of their CIT common stock for proceeds of

$13,492,379 in February and May 2007 while failing to disclose the truth about CIT's subprime home lending business.

196.     As the truth about CIT's subprime home lending portfolio emerged in July 2007, Hallman suddenly cancelled his trading plan and Taylor stopped all trades under his plan.  Prior to the October 17, 2007 disclosure about CIT's subprime home lending portfolio, Leone sold an additional 31,200 shares of his CIT stock for proceeds of $1,249,788.  As the truth about CIT's financial results and lending portfolios continued to emerge, and the artificial inflation came out of CIT's stock price, all of these defendants ceased any trading activity.  Indeed, from August 1, 2007 through the end of 2008, none of the 1934 Act Defendants reported selling any of their CIT securities or entering into any new trading plan.  Through their manipulation of SEC Rule 10b5-1 trading plans and the artificial inflation in CIT's stock price caused by their fraud, defendants Leone, Hallman and Taylor managed to sell their stock at an average price of $57.77 per share, 464% higher than CIT's post-Class Period share price, for $14,742,167 in collective insider trading proceeds.

## LOSS CAUSATION/ECONOMIC LOSS

197.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive investors and the market and a course of conduct that artificially inflated and maintained CIT's stock price and operated as a fraud or deceit on Class Period purchasers of CIT's publicly traded securities by misrepresenting and omitting material information about the Company's subprime home lending and student lending portfolios.  When defendants' prior misrepresentations and omissions about the loan portfolios and the Company's financial results were revealed,  CIT's stock price fell precipitously as the prior artificial inflation came out of the price.  As a result of their purchases of CIT stock, including CIT-Z preferred stock, during the Class Period, plaintiffs and other members of the Class, as defined in ¶31, suffered economic loss, *i.e.*, damages, under the federal securities laws.

- 105 -

198.    As illustrated in the chart below, defendants' false statements and omissions, identified herein at ¶¶46-52, 55-59, 61-65, 92-94, 98-103, 106-112, had the intended effect and caused CIT's stock to trade at artificially inflated levels up to and above $60 per share during the



199.    As a direct result of disclosures on July 18, 2007, October 17, 2007, February 29, 2008 and March 6, 2008, CIT's stock price suffered statistically significant declines. On July 18, 2007, when defendants disclosed that CIT would have to take a $765 million charge to write-down the value of the subprime home lending portfolio, the Company's stock price dropped $6.26 per share on unusually high trading volume. *See* ¶¶68-71. Similarly, on October 17, 2007, when

- 106 -

defendants revealed that additional write-downs to CIT's subprime home lending portfolio were necessary, the Company's stock price dropped an additional $2.14 per share on volume of over 11.6 million shares. *See* ¶¶72-74. On February 29, 2008, defendants filed CIT's FY 2007 Form 10-K and disclosed for the first time the Company's exposure to $196 million in private, non-guaranteed loans to students of the defunct Silver State, CIT's stock price dropped $2.21 per share, again on high volume. *See* ¶¶119, 123-124. Finally, four trading days later, on March 6, 2008, securities analysts exposed that CIT would likely have to take "a massive charge to write down its student loan portfolio" as a result of the Silver State loans. On that news, CIT's stock price plunged another $4.50 per share on volume of over 24 million shares. *See* ¶¶120-124. Individually and collectively, these drops removed the inflation from CIT's stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

200.    The decline in CIT's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' prior false statements and omissions being revealed to investors and the market. The timing and magnitude of CIT's stock price declines negate any inference that the loss suffered by plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct. Indeed, on each of the days on which CIT's stock price suffered material price declines, the Standard & Poor 500 and Dow Jones securities indices were essentially flat. The economic loss, *i.e.*, damages, suffered by PH&C and other members of the Class, was a direct result of defendants' fraudulent scheme to artificially inflate CIT's stock price and maintain the price at artificially inflated levels and the subsequent significant decline in the value of CIT's stock when defendants' prior misrepresentations and omissions were revealed.

## NO SAFE HARBOR

201.    CIT's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

202.    The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of CIT who knew that the FLS was false.  None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET

203.    Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's stock traded in an open efficient and well-developed market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)      Plaintiffs and other members of the Class purchased CIT securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

## COUNT I

### For Violation of §10(b) of the 1934 Act
### and Rule 10b-5 Against Defendants CIT, Peek, Leone, Hallman and Taylor

204.      Lead Plaintiff PH&C repeats and realleges each and every allegation contained above as if fully set forth herein.  Count I is brought pursuant to §10(b) of the 1934 Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. 240.10b-5, on behalf of all class members against the 1934 Act Defendants.

205.      During the Class Period, the 1934 Act Defendants carried out a plan, scheme and course of conduct which was intended to and did: (a) deceive the investing public, including PH&C and other members of the Class, regarding CIT's business, operations, financial results and the intrinsic value of CIT's publicly traded securities; (b) artificially inflate and maintain the market price of CIT's securities; and (c) cause PH&C and other members of the Class to purchase CIT's securities at artificially inflated prices and, as a result, suffer economic losses when the truth and impact about the 1934 Act Defendants' fraud was revealed.  In furtherance of this unlawful scheme, plan and course of conduct, the 1934 Act Defendants, and each of them, took the actions set forth herein.

206.      The 1934 Act Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's publicly traded securities in an effort to maintain artificially high market prices for CIT's publicly traded securities

- 109 -

in violation of §10(b) of the 1934 Act and Rule 10b-5. The 1934 Act Defendants are sued as primary participants in the wrongful and illegal conduct charged herein and/or as controlling persons as alleged below.

207.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about CIT's subprime home lending and student lending businesses and finances as specified herein.

208.    The 1934 Act Defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, non-public information and engaged in acts, practices and a course of conduct as alleged herein in an effort to assure investors of CIT's value and financial performance, which included the making of, or the participation in the making of, untrue statements of material fact and omitting to state material facts necessary in order to make the statements made about CIT's subprime home lending and student lending businesses, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of CIT's publicly traded securities during the Class Period.

209.    Each of defendants Peek, Leone, Hallman and Taylor's primary liability, and controlling person liability, arises from the following facts: (a) these individual defendants were high-level executives and in certain circumstances, directors at CIT during the Class Period and members of the Company's senior executive team; (b) each of these defendants, by virtue of his responsibilities and activities as a senior executive and director of the Company was privy to and participated in the filings and reporting on CIT's subprime home lending and student lending businesses; (c) each of these defendants enjoyed significant personal contact and familiarity with the

other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the true status of CIT's subprime home lending and student lending portfolios, at all relevant times; and (d) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading and omitted material information.

210.    In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, the 1934 Act Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X, 17 C.F.R. §210.01, *et seq.*, and Regulation S-K, 17 C.F.R. §229.10, *et seq.*, and other SEC regulations, including accurate and truthful information with respect to CIT's subprime home lending and student lending portfolios so that the market price of the Company's securities would be based on truthful, complete and accurate information.

211.    The 1934 Act Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were made knowingly or with a reckless disregard for the truth and for the purpose and effect of inflating CIT's financial results, concealing the risks and impairments associated with the subprime home lending and student lending portfolios and supporting the artificially inflated prices of the Company's publicly traded securities.

212.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of CIT's publicly traded securities were artificially inflated during the Class Period.  In ignorance of the fact that the market price of CIT's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the 1934 Act Defendants, or upon the integrity of the markets in which the securities trade and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, PH&C and the other members of the Class acquired CIT publicly traded securities during the Class Period at artificially inflated prices and were damaged when the artificial inflation came out of the securities.

213.     At the time of said misrepresentations and omissions, PH&C and other members of the Class were ignorant of their falsity, and believed them to be true.  Had PH&C, the other members of the Class and the marketplace known the truth regarding CIT's subprime home lending and private student lending businesses, which were not disclosed by defendants, PH&C and other members of the Class would not have purchased or otherwise acquired their CIT publicly traded securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

214.     By virtue of the foregoing, the 1934 Act Defendants have violated §10(b) of the 1934 Act, and Rule 10b-5 promulgated thereunder.

215.     As a direct and proximate result of the 1934 Act Defendants' wrongful conduct, PH&C and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's publicly traded securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act Against Defendants CIT, Peek, Leone, Hallman and Taylor

216.    Lead Plaintiff PH&C repeats and realleges each and every allegation contained above as if fully set forth herein.  Count II is brought pursuant to §20(a) of the 1934 Act, 15 U.S.C. §78t(a), on behalf of all Class members against the 1934 Act Defendants.

217.    Defendants Peek, Leone, Hallman and Taylor acted as controlling persons of CIT within the meaning of §20(a) of the 1934 Act as alleged herein.  CIT controlled all of its employees and each of the individual defendants.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and awareness of the Company's finances and operations and intimate knowledge of the false statements and omissions made by the Company and disseminated to the investing public, the 1934 Act Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which PH&C contends are false and misleading. These defendants participated in conference calls with investors and were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements, alleged by PH&C to be misleading, prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

218.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  CIT controlled defendants Peek, Leone, Hallman and Taylor and the Company's other officers and employees.

219.    As set forth above, the 1934 Act Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this complaint.  By virtue of their positions as controlling persons, these defendants are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of the 1934 Act Defendants' wrongful conduct, PH&C and other members of the Class suffered damages in connection with their purchases of the Company's publicly traded securities during the Class Period.

## COUNT III

### For Violation of §11 of the 1933 Act in Connection with the CIT-Z Offering Against Defendants CIT, Peek, Leone, Butler, Freeman, Lyne, Parrs, Ring, Ryan, Sternberg, Tobin and Van Deusen

220.    Count III is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k.  Plaintiff Pizzuti repeats and realleges the allegations in ¶¶1-2, 5-9, 16-45, 76-130, 150-164, 197-202, as if fully set forth herein.  These 1933 Act counts are not based on any allegations of knowing or reckless misconduct and Pizzuti, for purposes of this claim, disclaims any allegations of fraud.  This Count is brought on behalf of  a Class of all those who acquired CIT-Z preferred stock issued pursuant to CIT's October 17, 2007 registration statement and prospectus and who were damaged as a result of the 1933 Act Defendants' false statements and omissions in the CIT-Z offering documents.

221.    This count is asserted against CIT and the individual defendants who signed the CIT-Z offering registration statement.

222.    CIT was the issuer, within the meaning of §11 of the 1933 Act, pursuant to the CIT-Z registration statement, of the CIT-Z preferred stock.  The CIT-Z registration statement was materially false and misleading and contained untrue statements of material fact and omitted to state material facts necessary to make the statements made therein, under the circumstances they were

made, not misleading, as set forth herein.  As the issuer of the CIT-Z preferred stock, CIT is strictly liable for the untrue statements of material fact and material omissions described herein.

223.    None of the defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the CIT-Z registration statement were accurate and complete in all material respects.  Had they exercised reasonable care, the 1933 Act Defendants could have known of the material misstatements and omissions alleged herein.

224.    At the time Pizzuti purchased shares in the CIT-Z offering, neither he nor any member of the Class knew, or by the reasonable exercise of care could have known, of the material misstatements and omissions alleged herein.

225.    In connection with the CIT-Z offering and sale of securities, the 1933 Act Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails and a national securities exchange.

226.    This claim was brought within one year after discovery of the false statements and omissions in the CIT-Z registration statement and within three years after the CIT-Z securities were sold to Class members in connection with the offering.

227.    By reason of the misconduct alleged herein, the 1933 Act Defendants violated §11 of the 1933 Act and are liable to Pizzuti and the Class members who purchased or acquired CIT-Z securities pursuant to the CIT-Z registration statement, each of whom has been damaged as a result of such violations.

**COUNT IV**

**For Violation of §12(a)(2) of the 1933 Act in Connection with the CIT-Z
Offering Against Defendant CIT**

228.    Count IV is brought pursuant to §12(a)(2) of the 1933 Act, 15 U.S.C. §77(a)(2).

Plaintiff Pizzuti repeats and realleges the allegations in ¶¶1-2, 5-9, 16-45, 76-130, 150-164, 197-202,

as if fully set forth herein.  These 1933 Act counts are not based on any allegations of knowing or

reckless misconduct and Pizzuti, for purposes of this claim, disclaims any allegations of fraud.  This

Count is brought on behalf of  a Class of all those who acquired CIT-Z preferred stock issued

pursuant to CIT's October 17, 2007 registration statement and prospectus and who were damaged as

a result of defendant CIT's violations of §12(a)(2) of the 1933 Act.

229.    By means of the CIT-Z prospectus and offering documents, and by using the means

and instrumentalities of interstate commerce, the United States mails and a national securities

exchange, defendant CIT, through the CIT-Z offering, solicited and sold CIT-Z securities to

members of the Class.

230.    As set forth herein, the CIT-Z offering documents contained untrue statements of

material fact and omitted to state material facts necessary in order to make the statements, in light of

the circumstances in which they were made, not misleading.

231.    In connection with the CIT-Z offering, CIT sold 27,600,000 shares of CIT-Z

preferred stock for proceeds, before expenses, of $669,300,000 and is, therefore, liable under

§12(a)(2).

232.    CIT was obligated to make a reasonable and diligent investigation of the statements

contained in the CIT-Z prospectus and offering documents to ensure that such statements were true

and that there was no omission of material fact required to be stated in order to make the statements

contained therein not misleading.  CIT failed to make a reasonable investigation or possess

- 116 -

reasonable grounds for the belief that the statements contained in the CIT-Z offering documents were accurate and complete in all material respects.  Had CIT done so, it could have known of the material misstatements and omissions alleged herein.

233.     Members of the Class purchased CIT-Z preferred stock by means of the materially misstated prospectus and offering documents.  At the time they purchased their CIT-Z shares, no member of the Class knew, or by the reasonable exercise of care could have known, of the material misstatements in and omissions from the CIT-Z prospectus and offering documents.

234.     This claim was brought within one year after discovery of the untrue statements and omissions and within three years after CIT-Z preferred stock was sold to the Class in connection with the CIT-Z offering.

235.     By reason of the misconduct alleged herein, CIT violated §12(a)(2) of the 1933 Act and is liable to Pizzuti and Class members who purchased or acquired CIT-Z preferred stock pursuant to the CIT-Z offering documents, each of whom has been damaged as a result of such violation.

## COUNT V

**For Violation of §15 of the 1933 Act in Connection with the CIT-Z Offering Against Defendants Peek, Leone, Butler, Freeman, Lyne, Parrs, Ring, Ryan, Sternberg, Tobin and Van Deusen**

236.     Count V is brought pursuant to §15 of the 1933 Act, 15 U.S.C. §77o.  Plaintiff Pizzuti repeats and realleges the allegations in ¶¶1-2, 5-9, 16-45, 76-130, 150-164, 197-202, as if fully set forth herein.  These 1933 Act counts are not based on any allegations of knowing or reckless misconduct and Pizzuti, for purposes of this claim, disclaims any allegations of fraud.

237.     At all relevant times, each of defendants Peek, Leone, Butler, Freeman, Lyne, Parrs, Ring, Ryan, Sternberg, Tobin and Van Deusen was a control person of CIT within the meaning of

§15 of the 1933 Act by virtue of, among other things, their positions as senior officers and/or directors of CIT.

238.    For all of the reasons set forth above in Count III, CIT is liable to Pizzuti and the Class who purchased or acquired CIT-Z preferred securities pursuant to the CIT-Z offering based on the materially false and misleading statements and omissions contained in the CIT-Z offering documents and were damaged thereby.

239.    None of the defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the CIT-Z offering documents were accurate and complete in all material respects.  Had they exercised reasonable care, these defendants could have known of the material misstatements and omissions alleged herein.

240.    This claim was brought within one year after discovery of the untrue statements and omissions and within three years after CIT-Z preferred stock was sold to the Class in connection with the CIT-Z offering.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and the Class, respectfully pray for judgment as follows:

A.    Determining that this action is a proper class action, and certifying plaintiffs as class representatives under Federal Rule of Civil Procedure 23;

B.    Awarding compensatory damages in favor of plaintiffs and the other members of the Class against all defendants, jointly and severally, for all damages sustained as a result of defendants' violations of the federal securities laws, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    With respect to Count IV, ordering that the CIT-Z offering be rescinded; and

E.    Such equitable, injunctive or other and further relief as the Court may deem just and

proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: July 16, 2009                   COUGHLIN STOIA GELLER
                                         RUDMAN & ROBBINS LLP
                                       SAMUEL H. RUDMAN
                                       DAVID A. ROSENFELD
                                       MARIO ALBA, JR.


                                       _____
                                       DAVID A. ROSENFELD

                                       58 South Service Road, Suite 200
                                       Melville, NY  11747
                                       Telephone:  631/367-7100
                                       631/367-1173 (fax)

                                       COUGHLIN STOIA GELLER
                                         RUDMAN & ROBBINS LLP
                                       PATRICK W. DANIELS
                                       TOR GRONBORG
                                       JENNIFER Y. LAI
                                       655 West Broadway, Suite 1900
                                       San Diego, CA  92101
                                       Telephone:  619/231-1058
                                       619/231-7423 (fax)

                                       COUGHLIN STOIA GELLER
                                         RUDMAN & ROBBINS LLP
                                       RANDI D. BANDMAN
                                       52 Duane Street, 7th Floor
                                       New York, NY  10007
                                       Telephone:  212/693-1058
                                       212/693-7423 (fax)

                                       Lead Counsel for Plaintiffs


- 119 -

IZARD NOBEL LLP
JEFFREY S. NOBEL
NANCY A. KULESA
29 South Main Street, Suite 215
West Hartford, CT  06107
Telephone:  860/493-6292
860/493-6290 (fax)

Additional Counsel for Plaintiff Don Pizzuti

# EXHIBIT A

## SCHEDULE A

### SECURITIES TRANSACTIONS

**Acquisitions**

| Date<br>Acquired | Type/Amount of<br>Securities Acquired | Price |
|---|---|---|
| 03/15/2007 | 600 | $53.55 |
| 03/15/2007 | 6,100 | $53.51 |
| 04/04/2007 | 600 | $53.35 |
| 04/13/2007 | 2,600 | $52.95 |
| 08/31/2007 | 9,600 | $37.57 |
| 10/25/2007 | 6,800 | $32.96 |
| 11/30/2007 | 1,400 | $26.60 |
| 11/30/2007 | 1,500 | $26.60 |
| 12/03/2007 | 1,600 | $26.43 |
| 12/27/2007 | 3,700 | $23.86 |
| 01/22/2008 | 115,000 | $21.25 |
| 01/23/2008 | 115,000 | $25.64 |
| 01/30/2008 | 105,000 | $26.03 |
| 01/31/2008 | 52,000 | $27.96 |
| 02/06/2008 | 3,000 | $25.79 |
| 02/14/2008 | 120,000 | $23.92 |
| 02/15/2008 | 4,500 | $24.20 |
| 02/15/2008 | 16,400 | $24.20 |

**Sales**

| Date<br>Sold | Type/Amount of<br>Securities Sold | Price |
|---|---|---|
| 05/22/2007 | 2,900 | $60.43 |
| 05/23/2007 | 3,500 | $59.94 |
| 05/24/2007 | 3,500 | $59.94 |
| 11/28/2007 | 16,400 | $26.24 |
| 12/11/2007 | 4,500 | $26.03 |
| 02/06/2008 | 97,000 | $25.79 |

# EXHIBIT B

## CERTIFICATION OF NAMED PLAINTIFF

I, Don Pizzutti, hereby certify that the following is true and correct to the best of my knowledge, information and belief:

1.      I have reviewed the complaint (the "Complaint") and would be willing to serve as a lead plaintiff on behalf of the class (the "Class") as defined in the Complaint, including providing testimony at deposition and trial, if necessary.

2.      I did not purchase the stock that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action.

3.      My transactions in the securities of CIT Group, Inc. shares during the Class Period defined in the Complaint are set forth on Schedule A attached hereto.

4.      During the three years prior to the date of this Certification, I have not sought to serve, nor have I served, as a representative party on behalf of a class in any private action arising under the federal securities laws.

5.      I will not accept any payment for serving as a representative party on behalf of the Class beyond my pro rata share of any possible recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _13_ day of August, 2008.

_____
Don Pizzutti

## SCHEDULE A - TRANSACTIONS IN CIT GROUP, INC.

### Purchases of CIT-Z Preferred

| Date | Transaction | Price per share |
|------|-------------|-----------------|
| 1/3/2008 | 5,000 | $18.77 |
| 1/3/2008 | 5,000 | $18.50 |
| 1/4/2008 | 5,000 | $18.35 |
| 1/7/2008 | 5,000 | $18.01 |
| 1/10/2008 | 2,000 | $16.50 |
| 1/15/2008 | 3,000 | $17.70 |
| 2/4/2008 | 1,000 | $21.31 |
| 2/8/2008 | 3,000 | $19.26 |
| 2/15/2008 | 1,000 | $18.71 |
| 2/19/2008 | 2,000 | $19.15 |
| 2/29/2008 | 2,500 | $17.70 |
| 3/3/2008 | 2,000 | $17.15 |
| 3/3/2008 | 5,000 | $17.00 |
| 3/4/2008 | 2,500 | $16.38 |

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of Suffolk, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 58 South Service Road, Suite 200, Melville, NY 11747.

2.      That on July 16, 2009, declarant served the CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS by depositing a true copy thereof in a United States mailbox at Melville, New York in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.      That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 16th day of July, 2009, at Melville, New York.

_____
CHRISTINE STELLA

CIT GROUP
Service List - 7/16/2009    (08-0145)
Page 1 of  2

**Counsel For Defendant(s)**

Douglas H. Flaum
Israel  David
Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY  10004-1980
   212/859-8000
   212/859-4000 (Fax)

**Counsel For Plaintiff(s)**

D. Seamus Kaskela
David M. Promisloff
Barroway Topaz Kessler Meltzer & Check, LLP
280 King of Prussia Road
Radnor, PA  19087
   610/667-7706
   610/667-7056 (Fax)

Evan J. Smith
Brodsky & Smith, LLC
240 Mineola Blvd., 1st Floor
Mineola, NY  11501
   516/741-4977
   516/741-0626 (Fax)

Randi D. Bandman
Coughlin Stoia Geller Rudman & Robbins LLP
52 Duane Street, 7th Floor
New York, NY  10007
   212/693-1058
   212/693-7423 (Fax)

Samuel H. Rudman
David A. Rosenfeld
Mario  Alba, Jr.
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY  11747
   631/367-7100
   631/367-1173 (Fax)

Patrick W. Daniels
Tor  Gronborg
Jennifer Y. Lai
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
   619/231-1058
   619/231-7423 (Fax)

Michael E. Criden
Criden & Love, P.A.
7301 S.W. 57th Court, Suite 515
South Miami, FL  33143
   305/357-9000
   305/357-9050 (Fax)

CIT GROUP

Service List - 7/16/2009    (08-0145)

Page 2 of 2

Robert N. Kaplan
Jeffrey P. Campisi
Kaplan, Fox & Kilsheimer LLP
850 Third Avenue, 14th Floor
New York, NY 10022
    212/687-1980
    212/687-7714 (Fax)